# EXHIBIT B

# EXHIBIT 1

**THIS NOTE AND THE COMMON STOCK ISSUABLE UPON CONVERSION OF THIS NOTE HAVE NOT BEEN AND WILL NOT BE REGISTERED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE PURSUANT TO AN EXEMPTION FROM REGISTRATION PROVIDED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE RULES AND REGULATIONS PROMULGATED THEREUNDER (THE "1933 ACT")**

**FACE VALUE:**        **US $135,000.00**
**PURCHASE PRICE:**    **US $115,000.00**

GENTECH HOLDINGS, INC.
ORIGINAL ISSUE DISCOUNT
10% CONVERTIBLE REDEEMABLE NOTE
DUE MAY 8, 2020

FOR a purchase price of **One Hundred FifteenThousand** Dollars (**$115,000.00**), Gentech Holdings, Inc. (the "Company") **promises to pay to the order of** ESSEX CAPITAL, LLC and its authorized successors and Permitted Assigns, defined below, ("Holder"), the aggregate principal face amount One Hundred Thirty Five **Thousand Dollars ($135,000.00)** on May 8, 2020 ("Maturity Date") and to pay interest on the **principal amount outstanding** hereunder at the rate of 10% per annum commencing on May 8, 2019. **The interest will be paid** to the Holder in whose name this Note is registered on the records of the **Company regarding** registration and transfers of this Note. The principal of, and interest on, this **Note are payable at such** address or means as designated by the Holder hereof, as may be changed **from time to time.** The Company will pay each interest payment and the outstanding principal **due upon this Note** before or on the Maturity Date, less any amounts required by law to be **deducted or withheld, to the** Holder of this Note by check or wire transfer addressed to such Holder **at the last address appearing** on the records of the Company. The forwarding of such check or wire **transfer shall constitute** a payment of outstanding principal hereunder and shall satisfy and **discharge the liability for principal** on this Note to the extent of the sum represented by such check or **wire transfer. Interest shall** be payable in Common Stock (as defined below) pursuant to paragraph **4(b) herein.** Permitted Assigns means any Holder assignment, transfer or sale of all or **a portion of this Note** accompanied by an Opinion of Counsel as provided for in Section 2(f) of the **Securities Purchase Agreement.**

This Note is subject to **the following additional** provisions:

1.      This Note is **exchangeable for an equal** aggregate principal amount of Notes of different authorized denominations, **as requested by the** Holder surrendering the same. No service charge will be made for **such registration or transfer or** exchange, except that Holder shall pay any tax or other governmental **charges payable in connection** therewith. To the extent that Holder subsequently transfers, assigns, sells or exchanges any of the multiple lesser denomination

notes, Holder acknowledges that it will provide the Company with Opinions of Counsel as provided for in Section 2(f) of the Securities Purchase Agreement.

2.      The Company shall be entitled to withhold from all payments any amounts required to be withheld under applicable laws.

3.      This Note may be transferred or exchanged only in compliance with the Securities Act of 1933, as amended ("Act"), applicable state securities laws and Sections 2(f) and 5(f) of the Securities Purchase Agreement. Any attempted transfer to a non-qualifying party shall be treated by the Company as void. Prior to due presentment for transfer of this Note, the Company and any agent of the Company may treat the person in whose name this Note is duly registered on the Company's records as the owner hereof for all other purposes, whether or not this Note be overdue, and neither the Company nor any such agent shall be affected or bound by notice to the contrary. Any Holder of this Note electing to exercise the right of conversion set forth in Section 4(a) hereof, in addition to the requirements set forth in Section 4(a), and any prequalified prospective transferee of this Note, also is required to give the Company written confirmation that this Note is being converted ("Notice of Conversion") in the form annexed hereto as Exhibit A. The date of receipt (including receipt by telecopy) of such Notice of Conversion shall be the Conversion Date. All notices of conversion will be accompanied by an Opinion of Counsel.

4.      (a)      The Holder of this Note is entitled, at its option, at any time after 150 days, to convert all or any amount of the principal face amount of this Note then outstanding into shares of the Company's common stock (the "Common Stock") at a price ("Conversion Price") for each share of Common Stock equal to **50%** of the **lowest traded price** of the Common Stock as reported on OTC Markets exchange which the Company's shares are traded or any exchange upon which the Common Stock may be traded in the future ("Exchange"), for the *Twenty* prior trading days including the day upon which a Notice of Conversion is received by the Company (provided such Notice of Conversion is delivered together with an Opinion of Counsel, by fax or other electronic method of communication to the Company after 4 P.M. Eastern Standard or Daylight Savings Time if the Holder wishes to include the same day closing price). If the shares have not been delivered within 3 business days, the Notice of Conversion may be rescinded. Such conversion shall be effectuated by the Company delivering the shares of Common Stock to the Holder within 3 business days of receipt by the Company of the Notice of Conversion. Accrued, but unpaid interest shall be subject to conversion. No fractional shares or scrip representing fractions of shares will be issued on conversion, but the number of shares issuable shall be rounded to the nearest whole share. To the extent the Conversion Price of the Company's Common Stock closes below the par value per share, the Company will take all steps necessary to solicit the consent of the stockholders to reduce the par value to the lowest value possible under law. The Company agrees to honor all conversions submitted pending this increase.

(b)      Interest on any unpaid principal balance of this Note shall be paid at the rate of 10% per annum. Interest shall be paid by the Company in Common Stock ("Interest Shares"). Holder may, at any time, send in a Notice of Conversion to the Company for Interest Shares based on the formula provided in Section 4(a) above. The dollar amount converted into Interest Shares shall be all or a portion of the accrued interest calculated on the unpaid principal balance of this Note to the date of such notice.

(c)     Reserved.

(d)     Upon financing through any Qualified Offering, this Note shall automatically convert into shares of Common Stock at a rate equal to a 50% discount to the offering price as published in the Qualified Offering, and to the extent allowed by federal securities laws, said shares shall be included as securities included in the Qualified Offering. However, at no time shall the automatic conversion pursuant to this Section 4(d) result in the issuance of more than 9.99% of the outstanding shares of the Company.

(e)     Upon (i) a transfer of all or substantially all of the assets of the Company to any person in a single transaction or series of related transactions, (ii) a reclassification, capital reorganization (excluding an increase in authorized capital) or other change or exchange of outstanding shares of the Common Stock, other than a forward or reverse stock split or stock dividend, or (iii) any consolidation or merger of the Company with or into another person or entity in which the Company is not the surviving entity (other than a merger which is effected solely to change the jurisdiction of incorporation of the Company and results in a reclassification, conversion or exchange of outstanding shares of Common Stock solely into shares of Common Stock) (each of items (i), (ii) and (iii) being referred to as a "Sale Event"), then, in each case, the Company shall, upon request of the Holder, redeem this Note in cash for 150% of the principal amount, plus accrued but unpaid interest through the date of redemption, or at the election of the Holder, such Holder may convert the unpaid principal amount of this Note (together with the amount of accrued but unpaid interest) into shares of Common Stock immediately prior to such Sale Event at the Conversion Price.

(f)     In case of any Sale Event (not to include a sale of all or substantially all of the Company's assets) in connection with which this Note is not redeemed or converted, the Company shall cause effective provision to be made so that the Holder of this Note shall have the right thereafter, by converting this Note, to purchase or convert this Note into the kind and number of shares of stock or other securities or property (including cash) receivable upon such reclassification, capital reorganization or other change, consolidation or merger by a holder of the number of shares of Common Stock that could have been purchased upon exercise of the Note and at the same Conversion Price, as defined in this Note, immediately prior to such Sale Event. The foregoing provisions shall similarly apply to successive Sale Events. If the consideration received by the holders of Common Stock is other than cash, the value shall be as determined by the Board of Directors of the Company or successor person or entity acting in good faith.

5.     No provision of this Note shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of, and interest on, this Note at the time, place, and rate, and in the form, herein prescribed.

6.     The Company hereby expressly waives demand and presentment for payment, notice of non-payment, protest, notice of protest, notice of dishonor, notice of acceleration or intent to accelerate, and diligence in taking any action to collect amounts called for hereunder and shall be directly and primarily liable for the payment of all sums owing and to be owing hereto.

7.    The Company agrees to pay all costs and expenses, including reasonable attorneys' fees and expenses, which may be incurred by the Holder in collecting any amount due under this Note.

8.    If one or more of the following described "Events of Default" shall occur:

(a)    The Company shall default in the payment of principal or interest on this Note or any other note issued to the Holder by the Company; or

(b)    Any of the representations or warranties made by the Company herein or in any certificate or financial or other written statements heretofore or hereafter furnished by or on behalf of the Company in connection with the execution and delivery of this Note, or the Securities Purchase Agreement under which this note was issued shall be false or misleading in any respect; or

(c)    The Company shall fail to perform or observe, in any respect, any covenant, term, provision, condition, agreement or obligation of the Company under this Note or any other note issued to the Holder; or

(d)    The Company shall (1) become insolvent (which does not include a "going concern opinion); (2) admit in writing its inability to pay its debts generally as they mature; (3) make an assignment for the benefit of creditors or commence proceedings for its dissolution; (4) apply for or consent to the appointment of a trustee, liquidator or receiver for its or for a substantial part of its property or business; (5) file a petition for bankruptcy relief, consent to the filing of such petition or have filed against it an involuntary petition for bankruptcy relief, all under federal or state laws as applicable; or

(e)    A trustee, liquidator or receiver shall be appointed for the Company or for a substantial part of its property or business without its consent and shall not be discharged within sixty (60) days after such appointment; or

(f)    Any governmental agency or any court of competent jurisdiction at the instance of any governmental agency shall assume custody or control of the whole or any substantial portion of the properties or assets of the Company; or

(g)    One or more money judgments, writs or warrants of attachment, or similar process, in excess of fifty thousand dollars ($50,000) in the aggregate, shall be entered or filed against the Company or any of its properties or other assets and shall remain unpaid, unvacated, unbonded or unstayed for a period of fifteen (15) days or in any event later than five (5) days prior to the date of any proposed sale thereunder; or

(h)    Defaulted on or breached any term of any other note of similar debt instrument into which the Company has entered and failed to cure such default within the appropriate grace period; or

(i)     The Company shall have its Common Stock delisted from an exchange (including the OTC Markets exchange) or, if the Common Stock trades on an exchange, then trading in the Common Stock shall be suspended for more than 10 consecutive days or ceases to file its 1934 act reports with the SEC;

(j)     If a majority of the members of the Board of Directors of the Company on the date hereof are no longer serving as members of the Board;

(k)     The Company shall not deliver to the Holder the Common Stock pursuant to paragraph 4 herein without restrictive legend within 3 business days of its receipt of a Notice of Conversion which includes an Opinion of Counsel expressing an opinion which supports the removal of a restrictive legend; or

(l)     The Company shall not replenish the reserve set forth in Section 12, within 3 business days of the request of the Holder.

(m)     The Company shall be delinquent in its periodic report filings with the Securities and Exchange Commission; or

(n)     The Company shall cause to lose the "bid" price for its stock in a market (including the OTC marketplace or other exchange).

Then, or at any time thereafter, unless cured within 5 days, and in each and every such case, unless such Event of Default shall have been waived in writing by the Holder (which waiver shall not be deemed to be a waiver of any subsequent default) at the option of the Holder and in the Holder's sole discretion, the Holder may consider this Note immediately due and payable, without presentment, demand, protest or (further) notice of any kind (other than notice of acceleration), all of which are hereby expressly waived, anything herein or in any note or other instruments contained to the contrary notwithstanding, and the Holder may immediately, and without expiration of any period of grace, enforce any and all of the Holder's rights and remedies provided herein or any other rights or remedies afforded by law. Upon an Event of Default, interest shall accrue at a default interest rate of 24% per annum or, if such rate is usurious or not permitted by current law, then at the highest rate of interest permitted by law. In the event of a breach of Section 8(k) the parties agree that damages shall be difficult to determine and agree on liquidated damages in the amount of $250 per day the shares are not issued beginning on the 4th day after the conversion notice was delivered to the Company. The agreed liquidated damages shall increase to $500 per day beginning on the 10th day. In the event of a breach of Section 8(n), the parties agree that damages shall be difficult to determine and hereby agree to an increase of the outstanding principal amounts by 20% as a liquidated damages payment. In case of a breach of Section 8(i), the parties agree that damages will be difficult to determine and agree that the outstanding principal due under this Note shall increase by 50% as a liquidated damages payment. If this Note is not paid at maturity, the outstanding principal due under this Note shall increase by 10%. Further, if a breach of Section 8(m) occurs or is continuing after the 6 month anniversary of the Note, then the Holder shall be entitled to use the lowest closing bid price during the delinquency period as a base price for the conversion. For example, if the lowest closing bid price during the delinquency period is $0.01 per share and the conversion discount is 50% the Holder may elect to convert future

conversions at $0.005 per share.

If the Holder shall commence an action or proceeding to enforce any provisions of this Note, including, without limitation, engaging an attorney, then if the Holder prevails in such action, the Holder shall be reimbursed by the Company for its attorneys' fees and other costs and expenses incurred in the investigation, preparation and prosecution of such action or proceeding.

Make-Whole for Failure to Deliver Loss. At the Holder's election, if the Company fails for any reason to deliver to the Holder the conversion shares by the by the 3rd business day following the delivery of a Notice of Conversion to the Company and if the Holder incurs a Failure to Deliver Loss, then at any time the Holder may provide the Company written notice indicating the amounts payable to the Holder in respect of the Failure to Deliver Loss and the Company must make the Holder whole as follows:

Failure to Deliver Loss = [(Highest VWAP for the 30 trading days on or after the day of exercise) x (Number of conversion shares)]

The Company must pay the Failure to Deliver Loss by cash payment, and any such cash payment must be made by the third business day from the time of the Holder's written notice to the Company.

9.     In case any provision of this Note is held by a court of competent jurisdiction to be excessive in scope or otherwise invalid or unenforceable, such provision shall be adjusted rather than voided, if possible, so that it is enforceable to the maximum extent possible, and the validity and enforceability of the remaining provisions of this Note will not in any way be affected or impaired thereby.

10.     Neither this Note nor any term hereof may be amended, waived, discharged or terminated other than by a written instrument signed by the Company and the Holder.

11.     The Company represents that it is not a "shell" issuer and that if it previously has been a "shell" issuer that at least 12 months have passed since the Company has reported Form 10 type information indicating it is no longer a "shell issuer.

12.     The Company shall issue irrevocable transfer agent instructions reserving sufficient shares of its Common Stock for conversions under this Note (the "Share Reserve"). Upon full conversion of this Note, any shares remaining in the Share Reserve shall be cancelled. The Company shall pay all transfer agent costs associated with issuing and delivering the share certificates to Holder. If such amounts are to be paid by the Holder, it may deduct such amounts from the Conversion Price. The company should at all times reserve a minimum of four times the amount of shares required if the note would be fully converted. The Holder may reasonably request increases from time to time to reserve such amounts. The Company will instruct its transfer agent to provide the outstanding share information to the Holder in connection with its conversions.

13.     If it shall be found that any interest or other amount deemed interest due

Case 1:21-cv-10300-LLS   Document 1-2   Filed 12/03/21   Page 9 of 173

hereunder violates the applicable law governing usury, the applicable provision shall automatically be revised to equal the maximum rate of interest or other amount deemed interest permitted under applicable law. The Company covenants (to the extent that it may lawfully do so) that it will not seek to claim or take advantage of any law that would prohibit or forgive the Company from paying all or a portion of the principal or interest on this Note.

14.     This Note shall be governed by and construed in accordance with the laws of Nevada applicable to contracts made and wholly to be performed within the State of Nevada and shall be binding upon the successors and assigns of each party hereto.  The Holder and the Company hereby mutually waive trial by jury and consent to exclusive jurisdiction and venue in the courts of the State of New York or in the Federal courts sitting in the county or city of New York.  This Agreement may be executed in counterparts, and the facsimile transmission of an executed counterpart to this Agreement shall be effective as an original.

15.     Upon Closing, Company shall pay to Holder an administrative and legal costs fee of $10,000.00.

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed by an officer thereunto duly authorized.

Dated: 05/08/2019

Gentech Holdings, Inc.

By: _____
Name: David W. Lovatt
Title: CEO & President

## EXHIBIT A

### NOTICE OF CONVERSION

(To be Executed by the Registered Holder in order to Convert the Note)

        The undersigned hereby irrevocably elects to convert $_____ of the above Note into _____ Shares of Common Stock of Gentech Holdings, Inc. ("Shares") according to the conditions set forth in such Note, as of the date written below.

        If Shares are to be issued in the name of a person other than the undersigned, the undersigned will pay all transfer and other taxes and charges payable with respect thereto.

Date of Conversion: _____

Applicable Conversion Price: _____

Signature: _____

              [Print Name of Holder and Title of Signer]

Address: _____

         _____

SSN or EIN: _____

Shares are to be registered in the following name: _____

Name: _____

Address: _____

Tel: _____

Fax: _____

SSN or EIN: _____

Shares are to be sent or delivered to the following account:

Account Name: _____

Address: _____

# EXHIBIT 2

Principal Amount: $72,500

## 10% CONVERTIBLE NOTE
### DATED May 23, 2019

THIS NOTE (the "Note") is a duly authorized Convertible Note of GenTech Holdings, Inc., a Florida corporation (the "Company").

FOR VALUE RECEIVED, the Company therefore promises to pay the Holder, the principal sum of $72,500 (the "Principal Amount") or such lesser principal amount following the conversion or conversions of this Note in accordance with Paragraph 2 (the "Outstanding Principal Amount") six (6) months from the date of issuance hereof (the "Maturity Date"), and to pay interest on the Outstanding Principal Amount ("Interest") in a lump sum on the Maturity Date, at the rate of twelve percent (10%) per Annum(the "Rate") from the date of issuance.

Accrual of Interest shall commence on the date of this Note and continue until the Company repays or provides for repayment in full the Outstanding Principal Amount and all accrued but unpaid Interest. Accrued and unpaid Interest shall bear Interest at the Rate until paid, compounded monthly. The Outstanding Principal Amount of this Note is payable on the Maturity Date in such coin or currency of the United States as at the time of payment is legal tender for payment of public and private debts, at the address last appearing on the Note Register of the Company as designated in writing by the Holder from time to time. The Company may prepay principal and interest on this Note at any time before the Maturity Date.

The Company will pay the Outstanding Principal Amount of this Note on the Maturity Date, free of any withholding or deduction of any kind (subject to the provision of paragraph 2 below), to the Holder as of the Maturity Date and addressed to the Holder at the address appearing on the Note Register.

This Note is subject to the following additional provisions:

1.   All payments on account of the Outstanding Principal Amount of this Note and all other amounts payable under this Note (whether made by the Company or any other person) to or for the account of the Holder hereunder shall be made free and clear of and without reduction by reason of any present and future income, stamp, registration and other taxes, levies, duties, cost, and charges whatsoever imposed, assessed, levied or collected by the United States or any political subdivision or taxing authority thereof or therein, together with interest thereon and penalties with respect thereto, if any, on or in respect of this Note (such taxes, levies, duties, costs and charges being herein collectively called "Taxes").

2.   The Holder of this Note is entitled, at its option, six (6) months after the Company's receipt of the proceeds of the Note, to convert all or any lesser portion of the Outstanding Principal Amount and accrued but unpaid Interest into Common Stock at a conversion price equal to a price which is a 50% discount from the lowest trading price in the twenty-five (25) days prior to the day that the Holder requests conversion, unless otherwise modified by mutual agreement between the Parties (the "Conversion Price") (The Common stock into which the Note is converted shall be referred to in this agreement as "Conversion Shares").The Issuer will not be obligated to issue fractional Conversion Shares. The Holder may convert this Note into Common Stock by surrendering the Note to the Company, with the form of conversion notice attached to the Note as Exhibit A, executed by the Holder of the Note evidencing such Holder's intention to convert the Note. If the Borrower is unable to issue any shares under this provision due to the fact that there is an insufficient number of authorized and unissued shares available, the Holder promises not to force the Borrower to issue these shares or trigger an Event of Default, provided that Borrower takes immediate steps required to get the appropriate level of approval from shareholders or the board of directors, where applicable to raise the number of authorized shares to satisfy the Notice of Conversion.

The Company will not issue fractional shares or scrip representing fractions of shares of Common Stock on conversion, but the Company will round the number of shares of Common Stock issuable up to the nearest whole share. The date on which a Notice of Conversion is given shall be deemed to be the date on which the Holder notifies the

1

Company of its intention to so convert by delivery, by facsimile transmission or otherwise, of a copy of the Notice of Conversion. Notice of Conversion may be sent by email to the Company, attn: CEO, COO. The Holder will deliver this Note, together with original executed copy of the Notice of Conversion, to the Company within three (3) business days following the Conversion Date. At the Maturity Date, the Company will pay any unconverted Outstanding Principal Amount and accrued Interest thereon, at the option of the Company, in either (a) cash or (b) Common Stock valued at a price equal to the Conversion Price determined as if the Note was converted in accordance with its terms into Common Stock on the Maturity Date.

Notwithstanding the foregoing conversion privilege, in no event shall Issuer have the right to convert into, nor shall the Issuer issue to such Holder, shares of Common Stock to the extent that such conversion would result in the Holder and its affiliates together beneficially owning more than 9.99% of the then issued and outstanding shares of Common Stock. If the number of shares issued to Holder is greater than 4.99% of the total issued common stock of the company, the Issuer must notify the Holder immediately. For purposes hereof, beneficial ownership shall be determined in accordance with Section 13(d) of the Securities Exchange Act of 1934, as amended, and Regulation 13D-G thereunder.

3.    No provision of this Note shall alter or impair the obligation of the Company, which is absolute and unconditional, to the payment of the Outstanding Principal Amount of this Note at the Maturity Date, and in the coin or currency herein prescribed.

4.    If at any time or from time to time after the date of this Note, the Common Stock issuable upon the conversion of the Note is changed into the same or different numbers of shares of any class or classes of stock, whether by recapitalization or otherwise, then in each such event the Holder shall have the right thereafter to convert the Note into the kind of security receivable in such recapitalization, reclassification or other change by holders of Common Stock, all subject to further adjustment as provided herein. In such event, the formulae set forth herein for conversion and redemption shall be equitably adjusted to reflect such change in number of shares or, if shares of a new class of stock are issued, to reflect the market price of the class or classes of stock issued in connection with the above described transaction.

5.    Events of Default

5.1.    A default shall be deemed to have occurred upon any one of the following events:

5.1.1.    Withdrawal from registration of the Issuer under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), either voluntary or involuntary.

5.1.2.    Issuer filing for bankruptcy protection under the federal bankruptcy laws, the calling of a meeting of creditors, or any act of insolvency under any state law regarding insolvency, without written notification to the Investor within five business days of such filing, meeting or action.

5.1.3.    The Borrower fails to issue shares of Common Stock to the Holder (or announces or threatens in writing that it will not honor its obligation to do so) upon exercise by the Holder of the conversion rights of the Holder in accordance with the terms of this Note, fails to transfer or cause its transfer agent to transfer (issue) (electronically or in certificated form) any certificate for shares of Common Stock issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, the Borrower directs its transfer agent not to transfer or delays, impairs, and/or hinders its transfer agent in transferring or issuing (electronically or in certificated form) any certificate for shares of Common Stock to be issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, or fails to remove (or directs its transfer agent not to remove or impairs, delays, and/or hinders its transfer agent from removing) any restrictive legend (or to withdraw any stop transfer instructions in respect thereof) on any certificate for any shares of Common Stock issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note (or makes any written announcement, statement or threat that it does not intend to honor the obligations described in this paragraph) and any such failure shall continue uncured (or any written announcement, statement or threat not to honor its obligations shall not be rescinded in writing) for three (3) business days after the Holder shall have delivered a Notice

2

of Conversion.

5.1.4.    Failure to pay the principal and unpaid but accrued interest on the Note when due.

5.1.5.    Any dissolution, liquidation, or winding up of Borrower or any substantial portion of its business.

5.1.6.    Any cessation of operations by Borrower or Borrower admits it is otherwise generally unable to pay its debts as such debts become due, provided, however, that any disclosure of the Borrower's ability to continue as a "going concern" shall not be an admission that the Borrower cannot pay its debts as they become due.

5.1.7.    The failure by Borrower to maintain any material intellectual property rights, personal, real property or other assets which are necessary to conduct its business (whether now or in the future).

5.1.8.    The Borrower effectuates a reverse split of its Common Stock without twenty (20) days prior written notice to the Holder.

5.1.9.    In the event that the Borrower proposes to replace its transfer agent, the Borrower fails to provide, prior to the effective date of such replacement, fully executed Irrevocable Transfer Agent Instructions in a form as initially delivered pursuant to the Purchase Agreement (including but not limited to the provision to irrevocable reserve shares of Common Stock in the Reserved Amount) signed by the success or transfer agent to Holder and the Borrower.

5.1.10.    The failure by Borrower to pay any and all Post-Closing Expenses as defined herein.

5.1.11.    From and after the initial trading, listing or quotation of the Common Stock on a Principal Market, an event resulting in the Common Stock no longer being traded, listed or quoted on a Principal Market; failure to comply with the requirements for continued quotation on a Principal Market; or notification from a Principal Market that the Borrower is not in compliance with the conditions for such continued quotation and such non-compliance continues for seven (7) trading days following such notification.

5.2.    Default remedies. Upon the occurrence and during the continuation of any Event of Default specified in Section 5.1. (solely with respect to failure to pay the principal hereof or interest thereon when due at the Maturity Date), the Note shall become immediately due and payable and the Borrower shall pay to the Holder, in full satisfaction of its obligations hereunder, an amount equal to the Default Sum (as defined herein). UPON THE OCCURRENCE AND DURING THE CONTINUATION OF ANY EVENT OF DEFAULT SPECIFIED IN SECTION 5.1., THE NOTE SHALL BECOME IMMEDIATELY DUE AND PAYABLE AND THE BORROWER SHALL PAY TO THE HOLDER, IN FULL SATISFACTION OF ITS OBLIGTAIONS HEREUNDER, AN AMOUNT EQUAL TO: (Y) THE DEFAULT SUM (AS DEFINED HEREIN)). Upon the occurrence and during the continuation of any Event of Default specified in Sections 5.1. (solely with respect to failure to pay the principal hereof or interest thereon when due on this Note, 5.1.1, 5.1.2, 5.1.5, 5.1.6, 5.1.7, 5.1.8, 5.1.9, 5.1.10, 5.1.11 exercisable through the delivery of written notice to the Borrower by such Holders (the "Default Notice"), and upon the occurrence of an Event of Default specified in the remaining sections of Section 5.1. (other than failure to pay the principal hereof or interest thereon at the Maturity Date specified in Section 5.1. hereof), the Note shall become immediately due and payable and the Borrower shall pay to the Holder, in full satisfaction of its obligations hereunder, an amount equal to the greater of (i) 150% times the sum of (w) the then outstanding principal amount of this Note plus (x) accrued and unpaid interest on the unpaid principal amount of this Note to the date of payment (the "Mandatory Prepayment Date") plus (y) Default Interest, if any, on the amounts referred to in clauses (w) and/or (x) (the then outstanding principal amount of this Note to the date of payment plus the amounts referred to in clauses (x) and (y) shall collectively be known as the "Default Sum") or (ii) the "parity value" of the Default Sum to be prepaid, where parity value means (a) the highest number of shares of

3

Common Stock issuable upon conversion of or otherwise pursuant to such Default Sum, treating the Trading Day immediately preceding the Mandatory Prepayment Date as the "Conversion Date" for purposes of determining the lowest applicable Conversion Price, unless the Default Event arises as a result of such breach in respect of a specific Conversion Date in which case such Conversion Date shall be the Conversion Date, **multiplied by** (b) the highest Closing Price for the Common Stock during the period beginning on the date of first occurrence of the Event of Default and ending one day prior to the Mandatory Prepayment Date (the "Default Amount") and all other amounts payable hereunder shall immediately become due and payable, all without demand, presentment or notice, all of which hereby are expressly waived, together with all costs, including, without limitation, legal fees and expenses, of collection, and the Holder shall be entitled to exercise all other rights and remedies available at low or in equity.

If the Borrower fails to pay the Default Amount within five (5) business days of written notice that such amount is due and payable, then the Holder shall have the right at any time, so long as the Borrower remains in default (and so long and to the extent that there are sufficient authorized shares), to require the Borrower, upon written notice, to immediately issue, in lieu of the Default Amount, the number of shares of Common Stock of the Borrower equal to the Default Amount divided by the Conversion Price then in effect.

6.   Prepayment. Notwithstanding anything to the contrary contained in this Note, at any time during  the periods set forth on the table immediately following this paragraph (the "Prepayment Periods"), the Borrower shall have the right, exercisable on not more than three (3) Trading Days prior written notice to the Holder of the Note to prepay the outstanding Note (principal and accrued interest), in full, in accordance with this Section 6. Any notice of prepayment hereunder (an "Optional Prepayment Notice") shall be delivered to the Holder of the Note at its registered addresses and shall state: (1) that the Borrower is exercising its right to prepay the Note, and (2) the date of prepayment which shall be not more than three (3) Trading Days from the date of the Optional Prepayment Notice. On the date fixed for prepayment (the "Optional Prepayment Date"), the Borrower shall make payment of the Optional Prepayment Amount (as defined below) to Holder, or upon the direction of the Holder as specified by the Holder in a writing to the Borrower (which direction shall to be sent to Borrower by the Holder at least one (1) business day prior to the Optional Prepayment Date). If the Borrower exercises its right to prepay the Note, the Borrower shall make payment to the Holder of an amount in cash equal to the percentage ("Prepayment Percentage") as set forth in the table immediately following this paragraph opposite the applicable Prepayment Period, multiplied by the sum of: (i)the then outstanding principal amount of this Note plus (ii) accrued and unpaid interest on the unpaid principal amount of this Note to the Optional Prepayment Date plus (iii) Default Interest, if any accrued thereon. If the Borrower delivers an Optional Prepayment Notice and fails to pay the Optional Prepayment Amount due to the Holder of the Note within two (2) business days following the Optional Prepayment Date, the Borrower shall forever forfeit its right to prepay the Note pursuant to this Section 6.

| Prepayment Period | Prepayment Percentage |
|---|---|
| 1. The period beginning on the Issue Date and ending on the date which is one hundred eighty (180) days following the Issue Date. | 120% |

After the expiration of one hundred eighty (180) days following the Issue Date, the Borrower shall have no right of prepayment.

7.      The Company covenants that until all amounts due under this Note are paid in full, by conversion or otherwise, unless waived by the Holder or subsequent Holder in writing, the Company shall:

give prompt written notice to the Holder of any Event of Default or of any other matter which has resulted in, or could reasonably be expected to result in a materially adverse change in its financial condition or operations;

give prompt notice to the Holder of any claim, action or proceeding which, in the event of any unfavorable outcome, would or could reasonably be expected to have a Material Adverse Effect (as defined below) on the financial condition of the Company;

at all times reserve and keep available out of its authorized but unissued Common Stock, for the purpose of effecting the conversion of this Note into Common Stock, such number of its duly authorized shares of Common Stock as shall from time to time be sufficient to effect the conversion of the Outstanding Principal Amount of this Note into Common Stock.

*"Material Adverse Effect"* means (i) any condition, occurrence, state of facts or event having, or insofar as reasonably can be foreseen would likely have, any material adverse effect on the legality, validity or enforceability of the Transaction Documents or the transactions contemplated thereby, (ii) any condition, occurrence, state of facts or event having, or insofar as reasonably can be foreseen would likely have, any effect on the business, operations, properties or financial condition of the Company that is material and adverse to the Company and its Subsidiaries, taken as a whole, and/or (iii) any condition, occurrence, state of facts or event that would, or insofar as reasonably can be foreseen would likely, prohibit or otherwise materially interfere with or delay the ability of the Company to perform any of its obligations under any of the Transaction Documents to which it is a party.

8.    Upon receipt by the Company of evidence from the Holder reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Note,

(i)    in the case of loss, theft or destruction, upon provision of indemnity reasonably satisfactory to it and/or its transfer agent, or

(ii)    in the case of mutilation, upon surrender and cancellation of this Note, then the Company at its expense will execute and deliver to the Holder a new Note, dated the date of the lost, stolen, destroyed or mutilated Note, and evidencing the outstanding and unpaid principal amount of the lost, stolen, destroyed or mutilated Note.

9.    If any term in this Note is found by a court of competent jurisdiction to be unenforceable, then the entire Note shall be rescinded, the consideration proffered by the Holder for the remaining Debt acquired by the Holder not converted by the Holder in accordance with this Note shall be returned in its entirety and any Conversion Shares in the possession or control of the Investor shall be returned to the Issuer.

10.    The Note and the Agreement between the Company and the Holder (including all Exhibits thereto) constitute the full and entire understanding and agreement between the Company and the Holder with respect to the subject hereof. Neither this Note nor any term hereof may be amended, waived, discharged or terminated other than by a written instrument signed by the Company and the Holder.

11.    This Note shall be governed by and construed in accordance with the laws of the State of Florida without regard to principles of conflicts of laws. Any action brought by either party against the other concerning the transactions contemplated by this Agreement shall be brought only in the state courts of Florida.

12.    Conditions. The Issuer acknowledges the Investor's participation in respect to this Agreement is on a conditions permitting basis. In the event that the transaction risk profile substantially changes, market pricing or implied volatility substantially change, due diligence raises concerns or any other conditions material to the successful closing of the transaction change, the Investor reserves the right to terminate the Agreement at any time before delivering to the Non-Affiliate Debtholder the cash consideration as described hereof.

13.    Miscellaneous.

13.1.    Counterparts. This Agreement may be executed in any number of counterparts by original, facsimile or email signature. All executed counterparts shall constitute one Agreement not withstanding that all signatories are not signatories to the original or the same counterpart. Facsimile and scanned signatures are considered original signatures.

13.2.    Severability. This Agreement is not severable. If any term in this Agreement is found by a court of competent jurisdiction to be unenforceable, then the entire Agreement shall be rescinded, the outstanding principal and accrued and unpaid interest including Default Interest, at such time, not converted by the Investor in

5

accordance with this Agreement shall be returned in its entirety and all remaining Conversion Shares in the possession or control of the Investor or reserved by the Company's Transfer Agent shall be released and returned to the Issuer.

13.3.   Legal Fees. Except as provided in this agreement, each Party will bear its own legal expenses in the execution of this Agreement. If the Issuer defaults and the Investor is required to expend funds for legal fees and expenses, such costs will be reimbursed to the Investor, solely by the Issuer.

13.4.   Trading Activities. Neither the Buyer nor their affiliates has an open short position in the common stock of the Company and the Buyer agree that they shall not, and that they will cause their affiliates not to, engage in any short sales of or hedging transactions with respect to the common stock of the Company.

13.5.   Modification. This Agreement and the Note may only be modified in a writing signed by all Parties.

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed by an officer thereunto duly authorized, as of the date first written above.

GENTECH HOLDINGS, INC.

By: _____

David Lovatt, Chief Executive Officer

Exhibit A.

## NOTICE OF CONVERSION

The undersigned hereby elects to convert $_____ of the principal amount of the Note (defined below) into Shares of Common Stock of GenTech Holdings, Inc., a Florida Corporation (the **"Borrower"**) according to the conditions of the Convertible Note of the Borrower dated as of May 23, 2019 (the **"Note"**). No fee will be charged to the Holder or Holder's Custodian for any conversion, except for transfer taxes, if any.

Box Checked as to applicable instructions:

[ ]   The Borrower shall electronically transmit the Common Stock issuable pursuant to this Notice of Conversion to the account of the undersigned or its nominee with DTC through its Deposit Withdrawal Agent Commission system (**"DWAC Transfer"**).

Name of DTC Prime Broker: _____

Account Number: _____

[ ]   The undersigned _____ hereby requests that the Borrower issue a certificate or certificates for the number of shares of Common Stock set forth below (which numbers are based on the Holder's calculation attached hereto) in the name(s) specified immediately below:

**Essex Global Investment Corp**
EIN #: _____

Date of Conversion: _____

Conversion Price: _____

Shares to Be Delivered: _____

Remaining Principal Balance Due After This Conversion: _____

Signature

_____

Print Name: _____

8

# EXHIBIT 3

Case 1:21-cv-10300-LLS   Document 1-2   Filed 12/03/21   Page 22 of 173

Principal Amount: $100,000

## 10% CONVERTIBLE NOTE
### DATED June 6, 2019

THIS NOTE (the "Note") is a duly authorized Convertible Note of GenTech Holdings, Inc., a Florida corporation (the "Company").

FOR VALUE RECEIVED, the Company therefore promises to pay the Holder, the principal sum of $100,000 (the "Principal Amount") or such lesser principal amount following the conversion or conversions of this Note in accordance with Paragraph 2 (the "Outstanding Principal Amount") twelve (12) months from the date of issuance hereof (the "Maturity Date"), and to pay interest on the Outstanding Principal Amount ("Interest") in a lump sum on the Maturity Date, at the rate of twelve percent (10%) per Annum(the "Rate") from the date of issuance.

Accrual of Interest shall commence on the date of this Note and continue until the Company repays or provides for repayment in full the Outstanding Principal Amount and all accrued but unpaid Interest. Accrued and unpaid Interest shall bear Interest at the Rate until paid, compounded monthly. The Outstanding Principal Amount of this Note is payable on the Maturity Date in such coin or currency of the United States as at the time of payment is legal tender for payment of public and private debts, at the address last appearing on the Note Register of the Company as designated in writing by the Holder from time to time. The Company may prepay principal and interest on this Note at any time before the Maturity Date.

The Company will pay the Outstanding Principal Amount of this Note on the Maturity Date, free of any withholding or deduction of any kind (subject to the provision of paragraph 2 below), to the Holder as of the Maturity Date and addressed to the Holder at the address appearing on the Note Register.

This Note is subject to the following additional provisions:

1.    All payments on account of the Outstanding Principal Amount of this Note and all other amounts payable under this Note (whether made by the Company or any other person) to or for the account of the Holder hereunder shall be made free and clear of and without reduction by reason of any present and future income, stamp, registration and other taxes, levies, duties, cost, and charges whatsoever imposed, assessed, levied or collected by the United States or any political subdivision or taxing authority thereof or therein, together with interest thereon and penalties with respect thereto, if any, on or in respect of this Note (such taxes, levies, duties, costs and charges being herein collectively called "Taxes").

2.    The Holder of this Note is entitled, at its option, six (6) months after the Company's receipt of the proceeds of the Note, to convert all or any lesser portion of the Outstanding Principal Amount and accrued but unpaid Interest into Common Stock at a conversion price equal to a price which is a 50% discount to the lowest trading price in the twenty-five (25) days prior to the day that the Holder requests conversion, unless otherwise modified by mutual agreement between the Parties (the "Conversion Price") (The Common stock into which the Note is converted shall be referred to in this agreement as "Conversion Shares").The Issuer will not be obligated to issue fractional Conversion Shares. The Holder may convert this Note into Common Stock by surrendering the Note to the Company, with the form of conversion notice attached to the Note as Exhibit A, executed by the Holder of the Note evidencing such Holder's intention to convert the Note. If the Borrower is unable to issue any shares under this provision due to the fact that there is an insufficient number of authorized and unissued shares available, the Holder promises not to force the Borrower to issue these shares or trigger an Event of Default, provided that Borrower takes immediate steps required to get the appropriate level of approval from shareholders or the board of directors, where applicable to raise the number of authorized shares to satisfy the Notice of Conversion.

The Company will not issue fractional shares or scrip representing fractions of shares of Common Stock on conversion, but the Company will round the number of shares of Common Stock issuable up to the nearest whole share. The date on which a Notice of Conversion is given shall be deemed to be the date on which the Holder notifies the

Company of its intention to so convert by delivery, by facsimile transmission or otherwise, of a copy of the Notice of Conversion. Notice of Conversion may be sent by email to the Company, attn: CEO, COO. The Holder will deliver this Note, together with original executed copy of the Notice of Conversion, to the Company within three (3) business days following the Conversion Date. At the Maturity Date, the Company will pay any unconverted Outstanding Principal Amount and accrued Interest thereon, at the option of the Company, in either (a) cash or (b) Common Stock valued at a price equal to the Conversion Price determined as if the Note was converted in accordance with its terms into Common Stock on the Maturity Date.

Notwithstanding the foregoing conversion privilege, in no event shall Issuer have the right to convert into, nor shall the Issuer issue to such Holder, shares of Common Stock to the extent that such conversion would result in the Holder and its affiliates together beneficially owning more than 9.99% of the then issued and outstanding shares of Common Stock. If the number of shares issued to Holder is greater than 4.99% of the total issued common stock of the company, the Issuer must notify the Holder immediately. For purposes hereof, beneficial ownership shall be determined in accordance with Section 13(d) of the Securities Exchange Act of 1934, as amended, and Regulation 13D-G thereunder.

3.     No provision of this Note shall alter or impair the obligation of the Company, which is absolute and unconditional, to the payment of the Outstanding Principal Amount of this Note at the Maturity Date, and in the coin or currency herein prescribed.

4.     If at any time or from time to time after the date of this Note, the Common Stock issuable upon the conversion of the Note is changed into the same or different numbers of shares of any class or classes of stock, whether by recapitalization or otherwise, then in each such event the Holder shall have the right thereafter to convert the Note into the kind of security receivable in such recapitalization, reclassification or other change by holders of Common Stock, all subject to further adjustment as provided herein. In such event, the formulae set forth herein for conversion and redemption shall be equitably adjusted to reflect such change in number of shares or, if shares of a new class of stock are issued, to reflect the market price of the class or classes of stock issued in connection with the above described transaction.

5.     Events of Default

5.1.     A default shall be deemed to have occurred upon any one of the following events:

5.1.1.     Withdrawal from registration of the Issuer under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), either voluntary or involuntary.

5.1.2.     Issuer filing for bankruptcy protection under the federal bankruptcy laws, the calling of a meeting of creditors, or any act of insolvency under any state law regarding insolvency, without written notification to the Investor within five business days of such filing, meeting or action.

5.1.3.     The Borrower fails to issue shares of Common Stock to the Holder (or announces or threatens in writing that it will not honor its obligation to do so) upon exercise by the Holder of the conversion rights of the Holder in accordance with the terms of this Note, fails to transfer or cause its transfer agent to transfer (issue) (electronically or in certificated form) any certificate for shares of Common Stock issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, the Borrower directs its transfer agent not to transfer or delays, impairs, and/or hinders its transfer agent in transferring or issuing (electronically or in certificated form) any certificate for shares of Common Stock to be issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, or fails to remove (or directs its transfer agent not to remove or impairs, delays, and/or hinders its transfer agent from removing) any restrictive legend (or to withdraw any stop transfer instructions in respect thereof) on any certificate for any shares of Common Stock issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note (or makes any written announcement, statement or threat that it does not intend to honor the obligations described in this paragraph) and any such failure shall continue uncured (or any written announcement, statement or threat not to honor its obligations shall not be rescinded in writing) for three (3) business days after the Holder shall have delivered a Notice

2

of Conversion.

5.1.4.     Failure to pay the principal and unpaid but accrued interest on the Note when due.

5.1.5.     Any dissolution, liquidation, or winding up of Borrower or any substantial portion of its business.

5.1.6.     Any cessation of operations by Borrower or Borrower admits it is otherwise generally unable to pay its debts as such debts become due, provided, however, that any disclosure of the Borrower's ability to continue as a "going concern" shall not be an admission that the Borrower cannot pay its debts as they become due.

5.1.7.     The failure by Borrower to maintain any material intellectual property rights, personal, real property or other assets which are necessary to conduct its business (whether now or in the future).

5.1.8.     The Borrower effectuates a reverse split of its Common Stock without twenty (20) days prior written notice to the Holder.

5.1.9.     In the event that the Borrower proposes to replace its transfer agent, the Borrower fails to provide, prior to the effective date of such replacement, fully executed Irrevocable Transfer Agent Instructions in a form as initially delivered pursuant to the Purchase Agreement (including but not limited to the provision to irrevocable reserve shares of Common Stock in the Reserved Amount) signed by the success or transfer agent to Holder and the Borrower.

5.1.10.    The failure by Borrower to pay any and all Post-Closing Expenses as defined herein.

5.1.11.    From and after the initial trading, listing or quotation of the Common Stock on a Principal Market, an event resulting in the Common Stock no longer being traded, listed or quoted on a Principal Market; failure to comply with the requirements for continued quotation on a Principal Market; or notification from a Principal Market that the Borrower is not in compliance with the conditions for such continued quotation and such non-compliance continues for seven (7) trading days following such notification.

5.2.    Default remedies. Upon the occurrence and during the continuation of any Event of Default specified in Section 5.1. (solely with respect to failure to pay the principal hereof or interest thereon when due at the Maturity Date), the Note shall become immediately due and payable and the Borrower shall pay to the Holder, in full satisfaction of its obligations hereunder, an amount equal to the Default Sum (as defined herein). UPON THE OCCURRENCE AND DURING THE CONTINUATION OF ANY EVENT OF DEFAULT SPECIFIED IN SECTION 5.1., THE NOTE SHALL BECOME IMMEDIATELY DUE AND PAYABLE AND THE BORROWER SHALL PAY TO THE HOLDER, IN FULL SATISFACTION OF ITS OBLIGTAIONS HEREUNDER, AN AMOUNT EQUAL TO: (Y) THE DEFAULT SUM (AS DEFINED HEREIN)). Upon the occurrence and during the continuation of any Event of Default specified in Sections 5.1. (solely with respect to failure to pay the principal hereof or interest thereon when due on this Note, 5.1.1, 5.1.2, 5.1.5, 5.1.6, 5.1.7, 5.1.8, 5.1.9, 5.1.10, 5.1.11 exercisable through the delivery of written notice to the Borrower by such Holders (the "Default Notice"), and upon the occurrence of an Event of Default specified in the remaining sections of Section 5.1. (other than failure to pay the principal hereof or interest thereon at the Maturity Date specified in Section 5.1. hereof), the Note shall become immediately due and payable and the Borrower shall pay to the Holder, in full satisfaction of its obligations hereunder, an amount equal to the greater of (i) 150% times the sum of (w) the then outstanding principal amount of this Note plus (x) accrued and unpaid interest on the unpaid principal amount of this Note to the date of payment (the "Mandatory Prepayment Date") plus (y) Default Interest, if any, on the amounts referred to in clauses (w) and/or (x) (the then outstanding principal amount of this Note to the date of payment plus the amounts referred to in clauses (x) and (y) shall collectively be known as the "Default Sum") or (ii) the "parity value" of the Default Sum to be prepaid, where parity value means (a) the highest number of shares of

Common Stock issuable upon conversion of or otherwise pursuant to such Default Sum, treating the Trading Day immediately preceding the Mandatory Prepayment Date as the "Conversion Date" for purposes of determining the lowest applicable Conversion Price, unless the Default Event arises as a result of such breach in respect of a specific Conversion Date in which case such Conversion Date shall be the Conversion Date, **multiplied by** (b) the highest Closing Price for the Common Stock during the period beginning on the date of first occurrence of the Event of Default and ending one day prior to the Mandatory Prepayment Date (the "Default Amount") and all other amounts payable hereunder shall immediately become due and payable, all without demand, presentment or notice, all of which hereby are expressly waived, together with all costs, including, without limitation, legal fees and expenses, of collection, and the Holder shall be entitled to exercise all other rights and remedies available at low or in equity.

If the Borrower fails to pay the Default Amount within five (5) business days of written notice that such amount is due and payable, then the Holder shall have the right at any time, so long as the Borrower remains in default (and so long and to the extent that there are sufficient authorized shares), to require the Borrower, upon written notice, to immediately issue, in lieu of the Default Amount, the number of shares of Common Stock of the Borrower equal to the Default Amount divided by the Conversion Price then in effect.

6.  Prepayment. Notwithstanding anything to the contrary contained in this Note, at any time during the periods set forth on the table immediately following this paragraph (the "Prepayment Periods"), the Borrower shall have the right, exercisable on not more than three (3) Trading Days prior written notice to the Holder of the Note to prepay the outstanding Note (principal and accrued interest), in full, in accordance with this Section 6. Any notice of prepayment hereunder (an "Optional Prepayment Notice") shall be delivered to the Holder of the Note at its registered addresses and shall state: (1) that the Borrower is exercising its right to prepay the Note, and (2) the date of prepayment which shall be not more than three (3) Trading Days from the date of the Optional Prepayment Notice. On the date fixed for prepayment (the "Optional Prepayment Date"), the Borrower shall make payment of the Optional Prepayment Amount (as defined below) to Holder, or upon the direction of the Holder as specified by the Holder in a writing to the Borrower (which direction shall to be sent to Borrower by the Holder at least one (1) business day prior to the Optional Prepayment Date). If the Borrower exercises its right to prepay the Note, the Borrower shall make payment to the Holder of an amount in cash equal to the percentage ("Prepayment Percentage") as set forth in the table immediately following this paragraph opposite the applicable Prepayment Period, multiplied by the sum of: (i)the then outstanding principal amount of this Note plus (ii) accrued and unpaid interest on the unpaid principal amount of this Note to the Optional Prepayment Date plus (iii) Default Interest, if any accrued thereon. If the Borrower delivers an Optional Prepayment Notice and fails to pay the Optional Prepayment Amount due to the Holder of the Note within two (2) business days following the Optional Prepayment, the Borrower shall forever forfeit its right to prepay the Note pursuant to this Section 6.

| Prepayment Period | Prepayment Percentage |
|---|---|
| 1. The period beginning on the Issue Date and ending on the date which is one hundred eighty (180) days following the Issue Date. | 120% |

After the expiration of one hundred eighty (180) days following the Issue Date, the Borrower shall have no right of prepayment.

7.  The Company covenants that until all amounts due under this Note are paid in full, by conversion or otherwise, unless waived by the Holder or subsequent Holder in writing, the Company shall:

give prompt written notice to the Holder of any Event of Default or of any other matter which has resulted in, or could reasonably be expected to result in a materially adverse change in its financial condition or operations;

give prompt notice to the Holder of any claim, action or proceeding which, in the event of any unfavorable outcome, would or could reasonably be expected to have a Material Adverse Effect (as defined below) on the financial condition of the Company;

FILED: NEW YORK COUNTY CLERK 10/27/2021 06:17 PM
NYSCEF DOC. NO. 9
Case 1:21-cv-10300-LLS   Document 1-2   Filed 12/03/21   Page 26 of 173

INDEX NO. 656202/2021
RECEIVED NYSCEF: 10/27/2021

at all times reserve and keep available out of its authorized but unissued Common Stock, for the purpose of effecting the conversion of this Note into Common Stock, such number of its duly authorized shares of Common Stock as shall from time to time be sufficient to effect the conversion of the Outstanding Principal Amount of this Note into Common Stock.

*"Material Adverse Effect"* means (i) any condition, occurrence, state of facts or event having, or insofar as reasonably can be foreseen would likely have, any material adverse effect on the legality, validity or enforceability of the Transaction Documents or the transactions contemplated thereby, (ii) any condition, occurrence, state of facts or event having, or insofar as reasonably can be foreseen would likely have, any effect on the business, operations, properties or financial condition of the Company that is material and adverse to the Company and its Subsidiaries, taken as a whole, and/or (iii) any condition, occurrence, state of facts or event that would, or insofar as reasonably can be foreseen would likely, prohibit or otherwise materially interfere with or delay the ability of the Company to perform any of its obligations under any of the Transaction Documents to which it is a party.

8.    Upon receipt by the Company of evidence from the Holder reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Note,

(i)    in the case of loss, theft or destruction, upon provision of indemnity reasonably satisfactory to it and/or its transfer agent, or

(ii)    in the case of mutilation, upon surrender and cancellation of this Note, then the Company at its expense will execute and deliver to the Holder a new Note, dated the date of the lost, stolen, destroyed or mutilated Note, and evidencing the outstanding and unpaid principal amount of the lost, stolen, destroyed or mutilated Note.

9.    If any term in this Note is found by a court of competent jurisdiction to be unenforceable, then the entire Note shall be rescinded, the consideration proffered by the Holder for the remaining Debt acquired by the Holder not converted by the Holder in accordance with this Note shall be returned in its entirety and any Conversion Shares in the possession or control of the Investor shall be returned to the Issuer.

10.    The Note and the Agreement between the Company and the Holder (including all Exhibits thereto) constitute the full and entire understanding and agreement between the Company and the Holder with respect to the subject hereof. Neither this Note nor any term hereof may be amended, waived, discharged or terminated other than by a written instrument signed by the Company and the Holder.

11.    This Note shall be governed by and construed in accordance with the laws of the State of Florida without regard to principles of conflicts of laws. Any action brought by either party against the other concerning the transactions contemplated by this Agreement shall be brought only in the state courts of Florida.

12.    Conditions. The Issuer acknowledges the Investor's participation in respect to this Agreement is on a conditions permitting basis. In the event that the transaction risk profile substantially changes, market pricing or implied volatility substantially change, due diligence raises concerns or any other conditions material to the successful closing of the transaction change, the Investor reserves the right to terminate the Agreement at any time before delivering to the Non-Affiliate Debtholder the cash consideration as described hereof.

13.    Miscellaneous.

13.1.    Counterparts. This Agreement may be executed in any number of counterparts by original, facsimile or email signature. All executed counterparts shall constitute one Agreement not withstanding that all signatories are not signatories to the original or the same counterpart. Facsimile and scanned signatures are considered original signatures.

13.2.    Severability. This Agreement is not severable. If any term in this Agreement is found by a court of competent jurisdiction to be unenforceable, then the entire Agreement shall be rescinded, the outstanding principal and accrued and unpaid interest including Default Interest, at such time, not converted by the Investor in

accordance with this Agreement shall be returned in its entirety and all remaining Conversion Shares in the possession or control of the Investor or reserved by the Company's Transfer Agent shall be released and returned to the Issuer.

13.3.   Legal Fees. Except as provided in this agreement, each Party will bear its own legal expenses in the execution of this Agreement. If the Issuer defaults and the Investor is required to expend funds for legal fees and expenses, such costs will be reimbursed to the Investor, solely by the Issuer.

13.4.   Trading Activities. Neither the Buyer nor their affiliates has an open short position in the common stock of the Company and the Buyer agree that they shall not, and that they will cause their affiliates not to, engage in any short sales of or hedging transactions with respect to the common stock of the Company.

13.5.   Modification. This Agreement and the Note may only be modified in a writing signed by all Parties.

Case 1:21-cv-10300-LLS   Document 1-2   Filed 12/03/21   Page 28 of 173

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed by an officer thereunto duly authorized, as of the date first written above.

GENTECH HOLDINGS, INC.

By: _____

David Lovatt, Chief Executive Officer

Exhibit A.

## NOTICE OF CONVERSION

The undersigned hereby elects to convert $ _____ of the principal amount of the Note (defined below) into Shares of Common Stock of GenTech Holdings, Inc., a Florida Corporation (the **"Borrower"**) according to the conditions of the Convertible Note of the Borrower dated as of June 6, 2019 (the **"Note"**). No fee will be charged to the Holder or Holder's Custodian for any conversion, except for transfer taxes, if any.

Box Checked as to applicable instructions:

[ ]   The Borrower shall electronically transmit the Common Stock issuable pursuant to this Notice of Conversion to the account of the undersigned or its nominee with DTC through its Deposit Withdrawal Agent Commission system **("DWAC Transfer").**

Name of DTC Prime Broker: _____

Account Number: _____

[ ]   The undersigned _____ hereby requests that the Borrower issue a certificate or certificates for the number of shares of Common Stock set forth below (which numbers are based on the Holder's calculation attached hereto) in the name(s) specified immediately below:

Essex Global Investment Corp
EIN #: _____

Date of Conversion: 

Conversion Price: _____

Shares to Be Delivered: _____

Remaining Principal Balance Due After This Conversion: _____

Signature

_____

Print Name: _____

8

# EXHIBIT 4

Principal Amount: $32,000

## 10% CONVERTIBLE NOTE
### DATED June 19, 2019

THIS NOTE (the "Note") is a duly authorized Convertible Note of GenTech Holdings, Inc., a Florida corporation (the "Company").

FOR VALUE RECEIVED, the Company therefore promises to pay the Holder, the principal sum of $32,000 (the "Principal Amount") or such lesser principal amount following the conversion or conversions of this Note in accordance with Paragraph 2 (the "Outstanding Principal Amount") twelve (12) months from the date of issuance hereof (the "Maturity Date"), and to pay interest on the Outstanding Principal Amount ("Interest") in a lump sum on the Maturity Date, at the rate of ten percent (10%) per Annum (the "Rate") from the date of issuance.

Accrual of Interest shall commence on the date of this Note and continue until the Company repays or provides for repayment in full the Outstanding Principal Amount and all accrued but unpaid Interest. Accrued and unpaid Interest shall bear Interest at the Rate until paid, compounded monthly. The Outstanding Principal Amount of this Note is payable on the Maturity Date in such coin or currency of the United States as at the time of payment is legal tender for payment of public and private debts, at the address last appearing on the Note Register of the Company as designated in writing by the Holder from time to time. The Company may prepay principal and interest on this Note at any time before the Maturity Date.

The Company will pay the Outstanding Principal Amount of this Note on the Maturity Date, free of any withholding or deduction of any kind (subject to the provision of paragraph 2 below), to the Holder as of the Maturity Date and addressed to the Holder at the address appearing on the Note Register.

This Note is subject to the following additional provisions:

1.      All payments on account of the Outstanding Principal Amount of this Note and all other amounts payable under this Note (whether made by the Company or any other person) to or for the account of the Holder hereunder shall be made free and clear of and without reduction by reason of any present and future income, stamp, registration and other taxes, levies, duties, cost, and charges whatsoever imposed, assessed, levied or collected by the United States or any political subdivision or taxing authority thereof or therein, together with interest thereon and penalties with respect thereto, if any, on or in respect of this Note (such taxes, levies, duties, costs and charges being herein collectively called "Taxes").

2.      The Holder of this Note is entitled, at its option, six (6) months after the Company's receipt of the proceeds of the Note, to convert all or any lesser portion of the Outstanding Principal Amount and accrued but unpaid Interest into Common Stock at a conversion price equal to a price which is a 50% discount to the lowest trading price in the twenty-five (25) days prior to the day that the Holder requests conversion, unless otherwise modified by mutual agreement between the Parties (the "Conversion Price") (The Common stock into which the Note is converted shall be referred to in this agreement as "Conversion Shares").The Issuer will not be obligated to issue fractional Conversion Shares. The Holder may convert this Note into Common Stock by surrendering the Note to the Company, with the form of conversion notice attached to the Note as Exhibit A, executed by the Holder of the Note evidencing such Holder's intention to convert the Note. If the Borrower is unable to issue any shares under this provision due to the fact that there is an insufficient number of authorized and unissued shares available, the Holder promises not to force the Borrower to issue these shares or trigger an Event of Default, provided that Borrower takes immediate steps required to get the appropriate level of approval from shareholders or the board of directors, where applicable to raise the number of authorized shares to satisfy the Notice of Conversion.

The Company will not issue fractional shares or scrip representing fractions of shares of Common Stock on conversion, but the Company will round the number of shares of Common Stock issuable up to the nearest whole share. The date on which a Notice of Conversion is given shall be deemed to be the date on which the Holder notifies the

1

Company of its intention to so convert by delivery, by facsimile transmission or otherwise, of a copy of the Notice of Conversion. Notice of Conversion may be sent by email to the Company, attn: CEO, COO. The Holder will deliver this Note, together with original executed copy of the Notice of Conversion, to the Company within three (3) business days following the Conversion Date. At the Maturity Date, the Company will pay any unconverted Outstanding Principal Amount and accrued Interest thereon, at the option of the Company, in either (a) cash or (b) Common Stock valued at a price equal to the Conversion Price determined as if the Note was converted in accordance with its terms into Common Stock on the Maturity Date.

Notwithstanding the foregoing conversion privilege, in no event shall Issuer have the right to convert into, nor shall the Issuer issue to such Holder, shares of Common Stock to the extent that such conversion would result in the Holder and its affiliates together beneficially owning more than 9.99% of the then issued and outstanding shares of Common Stock. If the number of shares issued to Holder is greater than 4.99% of the total issued common stock of the company, the Issuer must notify the Holder immediately. For purposes hereof, beneficial ownership shall be determined in accordance with Section 13(d) of the Securities Exchange Act of 1934, as amended, and Regulation 13D-G thereunder.

3.    No provision of this Note shall alter or impair the obligation of the Company, which is absolute and unconditional, to the payment of the Outstanding Principal Amount of this Note at the Maturity Date, and in the coin or currency herein prescribed.

4.    If at any time or from time to time after the date of this Note, the Common Stock issuable upon the conversion of the Note is changed into the same or different numbers of shares of any class or classes of stock, whether by recapitalization or otherwise, then in each such event the Holder shall have the right thereafter to convert the Note into the kind of security receivable in such recapitalization, reclassification or other change by holders of Common Stock, all subject to further adjustment as provided herein. In such event, the formulae set forth herein for conversion and redemption shall be equitably adjusted to reflect such change in number of shares or, if shares of a new class of stock are issued, to reflect the market price of the class or classes of stock issued in connection with the above described transaction.

5.    Events of Default

5.1.    A default shall be deemed to have occurred upon any one of the following events:

5.1.1.    Withdrawal from registration of the Issuer under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), either voluntary or involuntary.

5.1.2.    Issuer filing for bankruptcy protection under the federal bankruptcy laws, the calling of a meeting of creditors, or any act of insolvency under any state law regarding insolvency, without written notification to the Investor within five business days of such filing, meeting or action.

5.1.3.    The Borrower fails to issue shares of Common Stock to the Holder (or announces or threatens in writing that it will not honor its obligation to do so) upon exercise by the Holder of the conversion rights of the Holder in accordance with the terms of this Note, fails to transfer or cause its transfer agent to transfer (issue) (electronically or in certificated form) any certificate for shares of Common Stock issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, the Borrower directs its transfer agent not to transfer or delays, impairs, and/or hinders its transfer agent in transferring or issuing (electronically or in certificated form) any certificate for shares of Common Stock to be issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, or fails to remove (or directs its transfer agent not to remove or impairs, delays, and/or hinders its transfer agent from removing) any restrictive legend (or to withdraw any stop transfer instructions in respect thereof) on any certificate for any shares of Common Stock issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note (or makes any written announcement, statement or threat that it does not intend to honor the obligations described in this paragraph) and any such failure shall continue uncured (or any written announcement, statement or threat not to honor its obligations shall not be rescinded in writing) for three (3) business days after the Holder shall have delivered a Notice

2

of Conversion.

5.1.4.     Failure to pay the principal and unpaid but accrued interest on the Note when due.

5.1.5.     Any dissolution, liquidation, or winding up of Borrower or any substantial portion of its business.

5.1.6.     Any cessation of operations by Borrower or Borrower admits it is otherwise generally unable to pay its debts as such debts become due, provided, however, that any disclosure of the Borrower's ability to continue as a "going concern" shall not be an admission that the Borrower cannot pay its debts as they become due.

5.1.7.     The failure by Borrower to maintain any material intellectual property rights, personal, real property or other assets which are necessary to conduct its business (whether now or in the future).

5.1.8.     The Borrower effectuates a reverse split of its Common Stock without twenty (20) days prior written notice to the Holder.

5.1.9.     In the event that the Borrower proposes to replace its transfer agent, the Borrower fails to provide, prior to the effective date of such replacement, fully executed Irrevocable Transfer Agent Instructions in a form as initially delivered pursuant to the Purchase Agreement (including but not limited to the provision to irrevocable reserve shares of Common Stock in the Reserved Amount) signed by the success or transfer agent to Holder and the Borrower.

5.1.10.    The failure by Borrower to pay any and all Post-Closing Expenses as defined herein.

5.1.11.    From and after the initial trading, listing or quotation of the Common Stock on a Principal Market, an event resulting in the Common Stock no longer being traded, listed or quoted on a Principal Market; failure to comply with the requirements for continued quotation on a Principal Market; or notification from a Principal Market that the Borrower is not in compliance with the conditions for such continued quotation and such non-compliance continues for seven (7) trading days following such notification.

5.2. Default remedies. Upon the occurrence and during the continuation of any Event of Default specified in Section 5.1. (solely with respect to failure to pay the principal hereof or interest thereon when due at the Maturity Date), the Note shall become immediately due and payable and the Borrower shall pay to the Holder, in full satisfaction of its obligations hereunder, an amount equal to the Default Sum (as defined herein). UPON THE OCCURRENCE AND DURING THE CONTINUATION OF ANY EVENT OF DEFAULT SPECIFIED IN SECTION 5.1., THE NOTE SHALL BECOME IMMEDIATELY DUE AND PAYABLE AND THE BORROWER SHALL PAY TO THE HOLDER, IN FULL SATISFACTION OF ITS OBLIGTAIONS HEREUNDER, AN AMOUNT EQUAL TO: (Y) THE DEFAULT SUM (AS DEFINED HEREIN)). Upon the occurrence and during the continuation of any Event of Default specified in Sections 5.1. (solely with respect to failure to pay the principal hereof or interest thereon when due on this Note, 5.1.1, 5.1.2, 5.1.5, 5.1.6, 5.1.7, 5.1.8, 5.1.9, 5.1.10, 5.1.11 exercisable through the delivery of written notice to the Borrower by such Holders (the "Default Notice"), and upon the occurrence of an Event of Default specified in the remaining sections of Section 5.1. (other than failure to pay the principal hereof or interest thereon at the Maturity Date specified in Section 5.1. hereof), the Note shall become immediately due and payable and the Borrower shall pay to the Holder, in full satisfaction of its obligations hereunder, an amount equal to the greater of (i) 150% times the sum of (w) the then outstanding principal amount of this Note plus (x) accrued and unpaid interest on the unpaid principal amount of this Note to the date of payment (the "Mandatory Prepayment Date") plus (y) Default Interest, if any, on the amounts referred to in clauses (w) and/or (x) (the then outstanding principal amount of this Note to the date of payment plus the amounts referred to in clauses (x) and (y) shall collectively be known as the "Default Sum") or (ii) the "parity value" of the Default Sum to be prepaid, where parity value means (a) the highest number of shares of

3

Common Stock issuable upon conversion of or otherwise pursuant to such Default Sum, treating the Trading Day immediately preceding the Mandatory Prepayment Date as the "Conversion Date" for purposes of determining the lowest applicable Conversion Price, unless the Default Event arises as a result of such breach in respect of a specific Conversion Date in which case such Conversion Date shall be the Conversion Date, **multiplied by** (b) the highest Closing Price for the Common Stock during the period beginning on the date of first occurrence of the Event of Default and ending one day prior to the Mandatory Prepayment Date (the "Default Amount") and all other amounts payable hereunder shall immediately become due and payable, all without demand, presentment or notice, all of which hereby are expressly waived, together with all costs, including, without limitation, legal fees and expenses, of collection, and the Holder shall be entitled to exercise all other rights and remedies available at low or in equity.

If the Borrower fails to pay the Default Amount within five (5) business days of written notice that such amount is due and payable, then the Holder shall have the right at any time, so long as the Borrower remains in default (and so long and to the extent that there are sufficient authorized shares), to require the Borrower, upon written notice, to immediately issue, in lieu of the Default Amount, the number of shares of Common Stock of the Borrower equal to the Default Amount divided by the Conversion Price then in effect.

6. Prepayment. Notwithstanding anything to the contrary contained in this Note, at any time during the periods set forth on the table immediately following this paragraph (the "Prepayment Periods"), the Borrower shall have the right, exercisable on not more than three (3) Trading Days prior written notice to the Holder of the Note to prepay the outstanding Note (principal and accrued interest), in full, in accordance with this Section 6. Any notice of prepayment hereunder (an "Optional Prepayment Notice") shall be delivered to the Holder of the Note at its registered addresses and shall state: (1) that the Borrower is exercising its right to prepay the Note, and (2) the date of prepayment which shall be not more than three (3) Trading Days from the date of the Optional Prepayment Notice. On the date fixed for prepayment (the "Optional Prepayment Date"), the Borrower shall make payment of the Optional Prepayment Amount (as defined below) to Holder, or upon the direction of the Holder as specified by the Holder in a writing to the Borrower (which direction shall to be sent to Borrower by the Holder at least one (1) business day prior to the Optional Prepayment Date). If the Borrower exercises its right to prepay the Note, the Borrower shall make payment to the Holder of an amount in cash equal to the percentage ("Prepayment Percentage") as set forth in the table immediately following this paragraph opposite the applicable Prepayment Period, multiplied by the sum of: (i)the then outstanding principal amount of this Note plus (ii) accrued and unpaid interest on the unpaid principal amount of this Note to the Optional Prepayment Date plus (iii) Default Interest, if any accrued thereon. If the Borrower delivers an Optional Prepayment Notice and fails to pay the Optional Prepayment Amount due to the Holder of the Note within two (2) business days following the Optional Prepayment Date, the Borrower shall forever forfeit its right to prepay the Note pursuant to this Section 6.

| Prepayment Period | Prepayment Percentage |
| --- | --- |
| 1. The period beginning on the Issue Date and ending on the date which is one hundred eighty (180) days following the Issue Date. | 120% |

After the expiration of one hundred eighty (180) days following the Issue Date, the Borrower shall have no right of prepayment.

7. The Company covenants that until all amounts due under this Note are paid in full, by conversion or otherwise, unless waived by the Holder or subsequent Holder in writing, the Company shall:

give prompt written notice to the Holder of any Event of Default or of any other matter which has resulted in, or could reasonably be expected to result in a materially adverse change in its financial condition or operations;

give prompt notice to the Holder of any claim, action or proceeding which, in the event of any unfavorable outcome, would or could reasonably be expected to have a Material Adverse Effect (as defined below) on the financial condition of the Company;

at all times reserve and keep available out of its authorized but unissued Common Stock, for the purpose of effecting the conversion of this Note into Common Stock, such number of its duly authorized shares of Common Stock as shall from time to time be sufficient to effect the conversion of the Outstanding Principal Amount of this Note into Common Stock.

*"Material Adverse Effect"* means (i) any condition, occurrence, state of facts or event having, or insofar as reasonably can be foreseen would likely have, any material adverse effect on the legality, validity or enforceability of the Transaction Documents or the transactions contemplated thereby, (ii) any condition, occurrence, state of facts or event having, or insofar as reasonably can be foreseen would likely have, any effect on the business, operations, properties or financial condition of the Company that is material and adverse to the Company and its Subsidiaries, taken as a whole, and/or (iii) any condition, occurrence, state of facts or event that would, or insofar as reasonably can be foreseen would likely, prohibit or otherwise materially interfere with or delay the ability of the Company to perform any of its obligations under any of the Transaction Documents to which it is a party.

8.    Upon receipt by the Company of evidence from the Holder reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Note,

(i)    in the case of loss, theft or destruction, upon provision of indemnity reasonably satisfactory to it and/or its transfer agent, or

(ii)    in the case of mutilation, upon surrender and cancellation of this Note, then the Company at its expense will execute and deliver to the Holder a new Note, dated the date of the lost, stolen, destroyed or mutilated Note, and evidencing the outstanding and unpaid principal amount of the lost, stolen, destroyed or mutilated Note.

9.    If any term in this Note is found by a court of competent jurisdiction to be unenforceable, then the entire Note shall be rescinded, the consideration proffered by the Holder for the remaining Debt acquired by the Holder not converted by the Holder in accordance with this Note shall be returned in its entirety and any Conversion Shares in the possession or control of the Investor shall be returned to the Issuer.

10.    The Note and the Agreement between the Company and the Holder (including all Exhibits thereto) constitute the full and entire understanding and agreement between the Company and the Holder with respect to the subject hereof. Neither this Note nor any term hereof may be amended, waived, discharged or terminated other than by a written instrument signed by the Company and the Holder.

11.    This Note shall be governed by and construed in accordance with the laws of the State of Florida without regard to principles of conflicts of laws. Any action brought by either party against the other concerning the transactions contemplated by this Agreement shall be brought only in the state courts of Florida.

12.    Conditions. The Issuer acknowledges the Investor's participation in respect to this Agreement is on a conditions permitting basis. In the event that the transaction risk profile substantially changes, market pricing or implied volatility substantially change, due diligence raises concerns or any other conditions material to the successful closing of the transaction change, the Investor reserves the right to terminate the Agreement at any time before delivering to the Non-Affiliate Debtholder the cash consideration as described hereof.

13.    Miscellaneous.

13.1.    Counterparts. This Agreement may be executed in any number of counterparts by original, facsimile or email signature. All executed counterparts shall constitute one Agreement not withstanding that all signatories are not signatories to the original or the same counterpart. Facsimile and scanned signatures are considered original signatures.

13.2.    Severability. This Agreement is not severable. If any term in this Agreement is found by a court of competent jurisdiction to be unenforceable, then the entire Agreement shall be rescinded, the outstanding principal and accrued and unpaid interest including Default Interest, at such time, not converted by the Investor in

accordance with this Agreement shall be returned in its entirety and all remaining Conversion Shares in the possession or control of the Investor or reserved by the Company's Transfer Agent shall be released and returned to the Issuer.

13.3.    Legal Fees. Except as provided in this agreement, each Party will bear its own legal expenses in the execution of this Agreement. If the Issuer defaults and the Investor is required to expend funds for legal fees and expenses, such costs will be reimbursed to the Investor, solely by the Issuer.

13.4.    Trading Activities. Neither the Buyer nor their affiliates has an open short position in the common stock of the Company and the Buyer agree that they shall not, and that they will cause their affiliates not to, engage in any short sales of or hedging transactions with respect to the common stock of the Company.

13.5.    Modification. This Agreement and the Note may only be modified in a writing signed by all Parties.

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed by an officer thereunto duly authorized, as of the date first written above.

GENTECH HOLDINGS, INC.

By: _____

David Lovatt, ~~Chief Executive~~ Officer

Exhibit A.

## NOTICE OF CONVERSION

The undersigned hereby elects to convert $_____ of the principal amount of the Note (defined below) into Shares of Common Stock of GenTech Holdings, Inc., a Florida Corporation (the **"Borrower"**) according to the conditions of the Convertible Note of the Borrower dated as of June 19, 2019 (the **"Note"**). No fee will be charged to the Holder or Holder's Custodian for any conversion, except for transfer taxes, if any.

Box Checked as to applicable instructions:

[ ]     The Borrower shall electronically transmit the Common Stock issuable pursuant to this Notice of Conversion to the account of the undersigned or its nominee with DTC through its Deposit Withdrawal Agent Commission system (**"DWAC Transfer"**).

Name of DTC Prime Broker: _____

Account Number: _____

[ ]     The undersigned _____ hereby requests that the Borrower issue a certificate or certificates for the number of shares of Common Stock set forth below (which numbers are based on the Holder's calculation attached hereto) in the name(s) specified immediately below:

Essex Global Investment Corp
EIN #: _____

Date of Conversion:          _____

Conversion Price:          _____

Shares to Be Delivered:          _____

Remaining Principal Balance Due
After This Conversion:          _____

Signature

_____

Print Name:          _____

Case 1:21-cv-10300-LLS   Document 1-2   Filed 12/03/21   Page 39 of 173

# EXHIBIT 5

Principal Amount: $71,000

**10% CONVERTIBLE NOTE**
**DATED June 24, 2019**

THIS NOTE (the "Note") is a duly authorized Convertible Note of GenTech Holdings, Inc., a Florida corporation (the "Company").

FOR VALUE RECEIVED, the Company therefore promises to pay the Holder, the principal sum of $71,000 (the "Principal Amount") or such lesser principal amount following the conversion or conversions of this Note in accordance with Paragraph 2 (the "Outstanding Principal Amount") twelve (12) months from the date of issuance hereof (the "Maturity Date"), and to pay interest on the Outstanding Principal Amount ("Interest") in a lump sum on the Maturity Date, at the rate of ten percent (10%) per Annum (the "Rate") from the date of issuance.

Accrual of Interest shall commence on the date of this Note and continue until the Company repays or provides for repayment in full the Outstanding Principal Amount and all accrued but unpaid Interest. Accrued and unpaid Interest shall bear Interest at the Rate until paid, compounded monthly. The Outstanding Principal Amount of this Note is payable on the Maturity Date in such coin or currency of the United States as at the time of payment is legal tender for payment of public and private debts, at the address last appearing on the Note Register of the Company as designated in writing by the Holder from time to time. The Company may prepay principal and interest on this Note at any time before the Maturity Date.

The Company will pay the Outstanding Principal Amount of this Note on the Maturity Date, free of any withholding or deduction of any kind (subject to the provision of paragraph 2 below), to the Holder as of the Maturity Date and addressed to the Holder at the address appearing on the Note Register.

This Note is subject to the following additional provisions:

1.      All payments on account of the Outstanding Principal Amount of this Note and all other amounts payable under this Note (whether made by the Company or any other person) to or for the account of the Holder hereunder shall be made free and clear of and without reduction by reason of any present and future income, stamp, registration and other taxes, levies, duties, cost, and charges whatsoever imposed, assessed, levied or collected by the United States or any political subdivision or taxing authority thereof or therein, together with interest thereon and penalties with respect thereto, if any, on or in respect of this Note (such taxes, levies, duties, costs and charges being herein collectively called "Taxes").

2.      The Holder of this Note is entitled, at its option, six (6) months after the Company's receipt of the proceeds of the Note, to convert all or any lesser portion of the Outstanding Principal Amount and accrued but unpaid Interest into Common Stock at a conversion price equal to a price which is a 50% discount to the lowest trading price in the twenty-five (25) days prior to the day that the Holder requests conversion, unless otherwise modified by mutual agreement between the Parties (the "Conversion Price") (The Common stock into which the Note is converted shall be referred to in this agreement as "Conversion Shares").The Issuer will not be obligated to issue fractional Conversion Shares. The Holder may convert this Note into Common Stock by surrendering the Note to the Company, with the form of conversion notice attached to the Note as Exhibit A, executed by the Holder of the Note evidencing such Holder's intention to convert the Note. If the Borrower is unable to issue any shares under this provision due to the fact that there is an insufficient number of authorized and unissued shares available, the Holder promises not to force the Borrower to issue these shares or trigger an Event of Default, provided that Borrower takes immediate steps required to get the appropriate level of approval from shareholders or the board of directors, where applicable to raise the number of authorized shares to satisfy the Notice of Conversion.

The Company will not issue fractional shares or scrip representing fractions of shares of Common Stock on conversion, but the Company will round the number of shares of Common Stock issuable up to the nearest whole share. The date on which a Notice of Conversion is given shall be deemed to be the date on which the Holder notifies the

1

Company of its intention to so convert by delivery, by facsimile transmission or otherwise, of a copy of the Notice of Conversion. Notice of Conversion may be sent by email to the Company, attn: CEO, COO. The Holder will deliver this Note, together with original executed copy of the Notice of Conversion, to the Company within three (3) business days following the Conversion Date. At the Maturity Date, the Company will pay any unconverted Outstanding Principal Amount and accrued Interest thereon, at the option of the Company, in either (a) cash or (b) Common Stock valued at a price equal to the Conversion Price determined as if the Note was converted in accordance with its terms into Common Stock on the Maturity Date.

Notwithstanding the foregoing conversion privilege, in no event shall Issuer have the right to convert into, nor shall the Issuer issue to such Holder, shares of Common Stock to the extent that such conversion would result in the Holder and its affiliates together beneficially owning more than 9.99% of the then issued and outstanding shares of Common Stock. If the number of shares issued to Holder is greater than 4.99% of the total issued common stock of the company, the Issuer must notify the Holder immediately. For purposes hereof, beneficial ownership shall be determined in accordance with Section 13(d) of the Securities Exchange Act of 1934, as amended, and Regulation 13D-G thereunder.

3.    No provision of this Note shall alter or impair the obligation of the Company, which is absolute and unconditional, to the payment of the Outstanding Principal Amount of this Note at the Maturity Date, and in the coin or currency herein prescribed.

4.    If at any time or from time to time after the date of this Note, the Common Stock issuable upon the conversion of the Note is changed into the same or different numbers of shares of any class or classes of stock, whether by recapitalization or otherwise, then in each such event the Holder shall have the right thereafter to convert the Note into the kind of security receivable in such recapitalization, reclassification or other change by holders of Common Stock, all subject to further adjustment as provided herein. In such event, the formulae set forth herein for conversion and redemption shall be equitably adjusted to reflect such change in number of shares or, if shares of a new class of stock are issued, to reflect the market price of the class or classes of stock issued in connection with the above described transaction.

5.    Events of Default

5.1.    A default shall be deemed to have occurred upon any one of the following events:

5.1.1.    Withdrawal from registration of the Issuer under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), either voluntary or involuntary.

5.1.2.    Issuer filing for bankruptcy protection under the federal bankruptcy laws, the calling of a meeting of creditors, or any act of insolvency under any state law regarding insolvency, without written notification to the Investor within five business days of such filing, meeting or action.

5.1.3.    The Borrower fails to issue shares of Common Stock to the Holder (or announces or threatens in writing that it will not honor its obligation to do so) upon exercise by the Holder of the conversion rights of the Holder in accordance with the terms of this Note, fails to transfer or cause its transfer agent to transfer (issue) (electronically or in certificated form) any certificate for shares of Common Stock issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, the Borrower directs its transfer agent not to transfer or delays, impairs, and/or hinders its transfer agent in transferring or issuing (electronically or in certificated form) any certificate for shares of Common Stock to be issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, or fails to remove (or directs its transfer agent not to remove or impairs, delays, and/or hinders its transfer agent from removing) any restrictive legend (or to withdraw any stop transfer instructions in respect thereof) on any certificate for any shares of Common Stock issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note (or makes any written announcement, statement or threat that it does not intend to honor the obligations described in this paragraph) and any such failure shall continue uncured (or any written announcement, statement or threat not to honor its obligations shall not be rescinded in writing) for three (3) business days after the Holder shall have delivered a Notice

of Conversion.

5.1.4.    Failure to pay the principal and unpaid but accrued interest on the Note when due.

5.1.5.    Any dissolution, liquidation, or winding up of Borrower or any substantial portion of its business.

5.1.6.    Any cessation of operations by Borrower or Borrower admits it is otherwise generally unable to pay its debts as such debts become due, provided, however, that any disclosure of the Borrower's ability to continue as a "going concern" shall not be an admission that the Borrower cannot pay its debts as they become due.

5.1.7.    The failure by Borrower to maintain any material intellectual property rights, personal, real property or other assets which are necessary to conduct its business (whether now or in the future).

5.1.8.    The Borrower effectuates a reverse split of its Common Stock without twenty (20) days prior written notice to the Holder.

5.1.9.    In the event that the Borrower proposes to replace its transfer agent, the Borrower fails to provide, prior to the effective date of such replacement, fully executed Irrevocable Transfer Agent Instructions in a form as initially delivered pursuant to the Purchase Agreement (including but not limited to the provision to irrevocable reserve shares of Common Stock in the Reserved Amount) signed by the success or transfer agent to Holder and the Borrower.

5.1.10.    The failure by Borrower to pay any and all Post-Closing Expenses as defined herein.

5.1.11.    From and after the initial trading, listing or quotation of the Common Stock on a Principal Market, an event resulting in the Common Stock no longer being traded, listed or quoted on a Principal Market; failure to comply with the requirements for continued quotation on a Principal Market; or notification from a Principal Market that the Borrower is not in compliance with the conditions for such continued quotation and such non-compliance continues for seven (7) trading days following such notification.

5.2.    Default remedies. Upon the occurrence and during the continuation of any Event of Default specified in Section 5.1. (solely with respect to failure to pay the principal hereof or interest thereon when due at the Maturity Date), the Note shall become immediately due and payable and the Borrower shall pay to the Holder, in full satisfaction of its obligations hereunder, an amount equal to the Default Sum (as defined herein). UPON THE OCCURRENCE AND DURING THE CONTINUATION OF ANY EVENT OF DEFAULT SPECIFIED IN SECTION 5.1., THE NOTE SHALL BECOME IMMEDIATELY DUE AND PAYABLE AND THE BORROWER SHALL PAY TO THE HOLDER, IN FULL SATISFACTION OF ITS OBLIGTAIONS HEREUNDER, AN AMOUNT EQUAL TO: (Y) THE DEFAULT SUM (AS DEFINED HEREIN)). Upon the occurrence and during the continuation of any Event of Default specified in Sections 5.1. (solely with respect to failure to pay the principal hereof or interest thereon when due on this Note, 5.1.1, 5.1.2, 5.1.5, 5.1.6, 5.1.7, 5.1.8, 5.1.9, 5.1.10, 5.1.11 exercisable through the delivery of written notice to the Borrower by such Holders (the "Default Notice"), and upon the occurrence of an Event of Default specified in the remaining sections of Section 5.1. (other than failure to pay the principal hereof or interest thereon at the Maturity Date specified in Section 5.1. hereof), the Note shall become immediately due and payable and the Borrower shall pay to the Holder, in full satisfaction of its obligations hereunder, an amount equal to the greater of (i) 150% times the sum of (w) the then outstanding principal amount of this Note plus (x) accrued and unpaid interest on the unpaid principal amount of this Note to the date of payment (the "Mandatory Prepayment Date") plus (y) Default Interest, if any, on the amounts referred to in clauses (w) and/or (x) (the then outstanding principal amount of this Note to the date of payment plus the amounts referred to in clauses (x) and (y) shall collectively be known as the "Default Sum") or (ii) the "parity value" of the Default Sum to be prepaid, where parity value means (a) the highest number of shares of

3

Case 1:21-cv-10300-LLS   Document 1-2   Filed 12/03/21   Page 43 of 173

Common Stock issuable upon conversion of or otherwise pursuant to such Default Sum, treating the Trading Day immediately preceding the Mandatory Prepayment Date as the "Conversion Date" for purposes of determining the lowest applicable Conversion Price, unless the Default Event arises as a result of such breach in respect of a specific Conversion Date in which case such Conversion Date shall be the Conversion Date, **multiplied by** (b) the highest Closing Price for the Common Stock during the period beginning on the date of first occurrence of the Event of Default and ending one day prior to the Mandatory Prepayment Date (the "Default Amount") and all other amounts payable hereunder shall immediately become due and payable, all without demand, presentment or notice, all of which hereby are expressly waived, together with all costs, including, without limitation, legal fees and expenses, of collection, and the Holder shall be entitled to exercise all other rights and remedies available at law or in equity.

If the Borrower fails to pay the Default Amount within five (5) business days of written notice that such amount is due and payable, then the Holder shall have the right at any time, so long as the Borrower remains in default (and so long and to the extent that there are sufficient authorized shares), to require the Borrower, upon written notice, to immediately issue, in lieu of the Default Amount, the number of shares of Common Stock of the Borrower equal to the Default Amount divided by the Conversion Price then in effect.

6.   Prepayment. Notwithstanding anything to the contrary contained in this Note, at any time during  the periods set forth on the table immediately following this paragraph (the "Prepayment Periods"), the Borrower shall have the right, exercisable on not more than three (3) Trading Days prior written notice to the Holder of the Note to prepay the outstanding Note (principal and accrued interest), in full, in accordance with this Section 6. Any notice of prepayment hereunder (an "Optional Prepayment Notice") shall be delivered to the Holder of the Note at its registered addresses and shall state: (1) that the Borrower is exercising its right to prepay the Note, and (2) the date of prepayment which shall be not more than three (3) Trading Days from the date of the Optional Prepayment Notice. On the date fixed for prepayment (the "Optional Prepayment Date"), the Borrower shall make payment of the Optional Prepayment Amount (as defined below) to Holder, or upon the direction of the Holder as specified by the Holder in a writing to the Borrower (which direction shall to be sent to Borrower by the Holder at least one (1) business day prior to the Optional Prepayment Date). If the Borrower exercises its right to prepay the Note, the Borrower shall make payment to the Holder of an amount in cash equal to the percentage ("Prepayment Percentage") as set forth in the table immediately following this paragraph opposite the applicable Prepayment Period, multiplied by the sum of: (i)the then outstanding principal amount of this Note plus (ii) accrued and unpaid interest on the unpaid principal amount of this Note to the Optional Prepayment Date plus (iii) Default Interest, if any accrued thereon. If the Borrower delivers an Optional Prepayment Notice and fails to pay the Optional Prepayment Amount due to the Holder of the Note within two (2) business days following the Optional Prepayment Date, the Borrower shall forever forfeit its right to prepay the Note pursuant to this Section 6.

| Prepayment Period | Prepayment Percentage |
|---|---|
| 1. The period beginning on the Issue Date and ending on the date which is one hundred eighty (180) days following the Issue Date. | 120% |

After the expiration of one hundred eighty (180) days following the Issue Date, the Borrower shall have no right of prepayment.

7.   The Company covenants that until all amounts due under this Note are paid in full, by conversion or otherwise, unless waived by the Holder or subsequent Holder in writing, the Company shall:

give prompt written notice to the Holder of any Event of Default or of any other matter which has resulted in, or could reasonably be expected to result in a materially adverse change in its financial condition or operations;

give prompt notice to the Holder of any claim, action or proceeding which, in the event of any unfavorable outcome, would or could reasonably be expected to have a Material Adverse Effect (as defined below) on the financial condition of the Company;

at all times reserve and keep available out of its authorized but unissued Common Stock, for the purpose of effecting the conversion of this Note into Common Stock, such number of its duly authorized shares of Common Stock as shall from time to time be sufficient to effect the conversion of the Outstanding Principal Amount of this Note into Common Stock.

*"Material Adverse Effect"* means (i) any condition, occurrence, state of facts or event having, or insofar as reasonably can be foreseen would likely have, any material adverse effect on the legality, validity or enforceability of the Transaction Documents or the transactions contemplated thereby, (ii) any condition, occurrence, state of facts or event having, or insofar as reasonably can be foreseen would likely have, any effect on the business, operations, properties or financial condition of the Company that is material and adverse to the Company and its Subsidiaries, taken as a whole, and/or (iii) any condition, occurrence, state of facts or event that would, or insofar as reasonably can be foreseen would likely, prohibit or otherwise materially interfere with or delay the ability of the Company to perform any of its obligations under any of the Transaction Documents to which it is a party.

8.    Upon receipt by the Company of evidence from the Holder reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Note,

(i)    in the case of loss, theft or destruction, upon provision of indemnity reasonably satisfactory to it and/or its transfer agent, or

(ii)    in the case of mutilation, upon surrender and cancellation of this Note, then the Company at its expense will execute and deliver to the Holder a new Note, dated the date of the lost, stolen, destroyed or mutilated Note, and evidencing the outstanding and unpaid principal amount of the lost, stolen, destroyed or mutilated Note.

9.    If any term in this Note is found by a court of competent jurisdiction to be unenforceable, then the entire Note shall be rescinded, the consideration proffered by the Holder for the remaining Debt acquired by the Holder not converted by the Holder in accordance with this Note shall be returned in its entirety and any Conversion Shares in the possession or control of the Investor shall be returned to the Issuer.

10.    The Note and the Agreement between the Company and the Holder (including all Exhibits thereto) constitute the full and entire understanding and agreement between the Company and the Holder with respect to the subject hereof. Neither this Note nor any term hereof may be amended, waived, discharged or terminated other than by a written instrument signed by the Company and the Holder.

11.    This Note shall be governed by and construed in accordance with the laws of the State of Florida without regard to principles of conflicts of laws. Any action brought by either party against the other concerning the transactions contemplated by this Agreement shall be brought only in the state courts of Florida.

12.    Conditions. The Issuer acknowledges the Investor's participation in respect to this Agreement is on a conditions permitting basis. In the event that the transaction risk profile substantially changes, market pricing or implied volatility substantially change, due diligence raises concerns or any other conditions material to the successful closing of the transaction change, the Investor reserves the right to terminate the Agreement at any time before delivering to the Non-Affiliate Debtholder the cash consideration as described hereof.

13.    Miscellaneous.

13.1.    Counterparts. This Agreement may be executed in any number of counterparts by original, facsimile or email signature. All executed counterparts shall constitute one Agreement not withstanding that all signatories are not signatories to the original or the same counterpart. Facsimile and scanned signatures are considered original signatures.

13.2.    Severability. This Agreement is not severable. If any term in this Agreement is found by a court of competent jurisdiction to be unenforceable, then the entire Agreement shall be rescinded, the outstanding principal and accrued and unpaid interest including Default Interest, at such time, not converted by the Investor in

accordance with this Agreement shall be returned in its entirety and all remaining Conversion Shares in the possession or control of the Investor or reserved by the Company's Transfer Agent shall be released and returned to the Issuer.

13.3.    Legal Fees. Except as provided in this agreement, each Party will bear its own legal expenses in the execution of this Agreement. If the Issuer defaults and the Investor is required to expend funds for legal fees and expenses, such costs will be reimbursed to the Investor, solely by the Issuer.

13.4.    Trading Activities. Neither the Buyer nor their affiliates has an open short position in the common stock of the Company and the Buyer agree that they shall not, and that they will cause their affiliates not to, engage in any short sales of or hedging transactions with respect to the common stock of the Company.

13.5.    Modification. This Agreement and the Note may only be modified in a writing signed by all Parties.

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed by an officer thereunto duly authorized, as of the date first written above.

GENTECH HOLDINGS, INC.

By: _____

David Lovatt, Chief Executive Officer

7

Exhibit A.

## NOTICE OF CONVERSION

The undersigned hereby elects to convert $_____ of the principal amount of the Note (defined below) into Shares of Common Stock of GenTech Holdings, Inc., a Florida Corporation (the **"Borrower"**) according to the conditions of the Convertible Note of the Borrower dated as of June 24, 2019 (the **"Note"**). No fee will be charged to the Holder or Holder's Custodian for any conversion, except for transfer taxes, if any.

Box Checked as to applicable instructions:

[ ]    The Borrower shall electronically transmit the Common Stock issuable pursuant to this Notice of Conversion to the account of the undersigned or its nominee with DTC through its Deposit Withdrawal Agent Commission system (**"DWAC Transfer"**).

        Name of DTC Prime Broker: _____

        Account Number: _____

[ ]    The undersigned _____ hereby requests that the Borrower issue a certificate or certificates for the number of shares of Common Stock set forth below (which numbers are based on the Holder's calculation attached hereto) in the name(s) specified immediately below:

        Essex Global Investment Corp
        EIN #: _____

Date of Conversion:

Conversion Price: _____

Shares to Be Delivered: _____

Remaining Principal Balance Due After This Conversion: _____

Signature

_____

Print Name: _____

# EXHIBIT 6

Principal Amount: $100,000

## 10% CONVERTIBLE NOTE
### DATED June 27, 2019

THIS NOTE (the "Note") is a duly authorized Convertible Note of GenTech Holdings, Inc., a Florida corporation (the "Company").

FOR VALUE RECEIVED, the Company therefore promises to pay the Holder, the principal sum of $100,000 (the "Principal Amount") or such lesser principal amount following the conversion or conversions of this Note in accordance with Paragraph 2 (the "Outstanding Principal Amount") twelve (12) months from the date of issuance hereof (the "Maturity Date"), and to pay interest on the Outstanding Principal Amount ("Interest") in a lump sum on the Maturity Date, at the rate of twelve percent (10%) per Annum(the "Rate") from the date of issuance.

Accrual of Interest shall commence on the date of this Note and continue until the Company repays or provides for repayment in full the Outstanding Principal Amount and all accrued but unpaid Interest. Accrued and unpaid Interest shall bear Interest at the Rate until paid, compounded monthly. The Outstanding Principal Amount of this Note is payable on the Maturity Date in such coin or currency of the United States as at the time of payment is legal tender for payment of public and private debts, at the address last appearing on the Note Register of the Company as designated in writing by the Holder from time to time. The Company may prepay principal and interest on this Note at any time before the Maturity Date.

The Company will pay the Outstanding Principal Amount of this Note on the Maturity Date, free of any withholding or deduction of any kind (subject to the provision of paragraph 2 below), to the Holder as of the Maturity Date and addressed to the Holder at the address appearing on the Note Register.

This Note is subject to the following additional provisions:

1.    All payments on account of the Outstanding Principal Amount of this Note and all other amounts payable under this Note (whether made by the Company or any other person) to or for the account of the Holder hereunder shall be made free and clear of and without reduction by reason of any present and future income, stamp, registration and other taxes, levies, duties, cost, and charges whatsoever imposed, assessed, levied or collected by the United States or any political subdivision or taxing authority thereof or therein, together with interest thereon and penalties with respect thereto, if any, on or in respect of this Note (such taxes, levies, duties, costs and charges being herein collectively called "Taxes").

2.    The Holder of this Note is entitled, at its option, six (6) months after the Company's receipt of the proceeds of the Note, to convert all or any lesser portion of the Outstanding Principal Amount and accrued but unpaid Interest into Common Stock at a conversion price equal to a price which is a 50% discount to the lowest trading price in the twenty-five (25) days prior to the day that the Holder requests conversion, unless otherwise modified by mutual agreement between the Parties (the "Conversion Price") (The Common stock into which the Note is converted shall be referred to in this agreement as "Conversion Shares").The Issuer will not be obligated to issue fractional Conversion Shares. The Holder may convert this Note into Common Stock by surrendering the Note to the Company, with the form of conversion notice attached to the Note as Exhibit A, executed by the Holder of the Note evidencing such Holder's intention to convert the Note. If the Borrower is unable to issue any shares under this provision due to the fact that there is an insufficient number of authorized and unissued shares available, the Holder promises not to force the Borrower to issue these shares or trigger an Event of Default, provided that Borrower takes immediate steps required to get the appropriate level of approval from shareholders or the board of directors, where applicable to raise the number of authorized shares to satisfy the Notice of Conversion.

The Company will not issue fractional shares or scrip representing fractions of shares of Common Stock on conversion, but the Company will round the number of shares of Common Stock issuable up to the nearest whole share. The date on which a Notice of Conversion is given shall be deemed to be the date on which the Holder notifies the

1

Company of its intention to so convert by delivery, by facsimile transmission or otherwise, of a copy of the Notice of Conversion. Notice of Conversion may be sent by email to the Company, attn: CEO, COO. The Holder will deliver this Note, together with original executed copy of the Notice of Conversion, to the Company within three (3) business days following the Conversion Date. At the Maturity Date, the Company will pay any unconverted Outstanding Principal Amount and accrued Interest thereon, at the option of the Company, in either (a) cash or (b) Common Stock valued at a price equal to the Conversion Price determined as if the Note was converted in accordance with its terms into Common Stock on the Maturity Date.

Notwithstanding the foregoing conversion privilege, in no event shall Issuer have the right to convert into, nor shall the Issuer issue to such Holder, shares of Common Stock to the extent that such conversion would result in the Holder and its affiliates together beneficially owning more than 9.99% of the then issued and outstanding shares of Common Stock. If the number of shares issued to Holder is greater than 4.99% of the total issued common stock of the company, the Issuer must notify the Holder immediately. For purposes hereof, beneficial ownership shall be determined in accordance with Section 13(d) of the Securities Exchange Act of 1934, as amended, and Regulation 13D-G thereunder.

3.      No provision of this Note shall alter or impair the obligation of the Company, which is absolute and unconditional, to the payment of the Outstanding Principal Amount of this Note at the Maturity Date, and in the coin or currency herein prescribed.

4.      If at any time or from time to time after the date of this Note, the Common Stock issuable upon the conversion of the Note is changed into the same or different numbers of shares of any class or classes of stock, whether by recapitalization or otherwise, then in each such event the Holder shall have the right thereafter to convert the Note into the kind of security receivable in such recapitalization, reclassification or other change by holders of Common Stock, all subject to further adjustment as provided herein. In such event, the formulae set forth herein for conversion and redemption shall be equitably adjusted to reflect such change in number of shares or, if shares of a new class of stock are issued, to reflect the market price of the class or classes of stock issued in connection with the above described transaction.

5.      Events of Default

5.1.    A default shall be deemed to have occurred upon any one of the following events:

5.1.1.      Withdrawal from registration of the Issuer under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), either voluntary or involuntary.

5.1.2.      Issuer filing for bankruptcy protection under the federal bankruptcy laws, the calling of a meeting of creditors, or any act of insolvency under any state law regarding insolvency, without written notification to the Investor within five business days of such filing, meeting or action.

5.1.3.      The Borrower fails to issue shares of Common Stock to the Holder (or announces or threatens in writing that it will not honor its obligation to do so) upon exercise by the Holder of the conversion rights of the Holder in accordance with the terms of this Note, fails to transfer or cause its transfer agent to transfer (issue) (electronically or in certificated form) any certificate for shares of Common Stock issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, the Borrower directs its transfer agent not to transfer or delays, impairs, and/or hinders its transfer agent in transferring or issuing (electronically or in certificated form) any certificate for shares of Common Stock to be issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, or fails to remove (or directs its transfer agent not to remove or impairs, delays, and/or hinders its transfer agent from removing) any restrictive legend (or to withdraw any stop transfer instructions in respect thereof) on any certificate for any shares of Common Stock issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note (or makes any written announcement, statement or threat that it does not intend to honor the obligations described in this paragraph) and any such failure shall continue uncured (or any written announcement, statement or threat not to honor its obligations shall not be rescinded in writing) for three (3) business days after the Holder shall have delivered a Notice

of Conversion.

5.1.4. Failure to pay the principal and unpaid but accrued interest on the Note when due.

5.1.5. Any dissolution, liquidation, or winding up of Borrower or any substantial portion of its business.

5.1.6. Any cessation of operations by Borrower or Borrower admits it is otherwise generally unable to pay its debts as such debts become due, provided, however, that any disclosure of the Borrower's ability to continue as a "going concern" shall not be an admission that the Borrower cannot pay its debts as they become due.

5.1.7. The failure by Borrower to maintain any material intellectual property rights, personal, real property or other assets which are necessary to conduct its business (whether now or in the future).

5.1.8. The Borrower effectuates a reverse split of its Common Stock without twenty (20) days prior written notice to the Holder.

5.1.9. In the event that the Borrower proposes to replace its transfer agent, the Borrower fails to provide, prior to the effective date of such replacement, fully executed Irrevocable Transfer Agent Instructions in a form as initially delivered pursuant to the Purchase Agreement (including but not limited to the provision to irrevocable reserve shares of Common Stock in the Reserved Amount) signed by the success or transfer agent to Holder and the Borrower.

5.1.10. The failure by Borrower to pay any and all Post-Closing Expenses as defined herein.

5.1.11. From and after the initial trading, listing or quotation of the Common Stock on a Principal Market, an event resulting in the Common Stock no longer being traded, listed or quoted on a Principal Market; failure to comply with the requirements for continued quotation on a Principal Market; or notification from a Principal Market that the Borrower is not in compliance with the conditions for such continued quotation and such non-compliance continues for seven (7) trading days following such notification.

5.2. Default remedies. Upon the occurrence and during the continuation of any Event of Default specified in Section 5.1. (solely with respect to failure to pay the principal hereof or interest thereon when due at the Maturity Date), the Note shall become immediately due and payable and the Borrower shall pay to the Holder, in full satisfaction of its obligations hereunder, an amount equal to the Default Sum (as defined herein). UPON THE OCCURRENCE AND DURING THE CONTINUATION OF ANY EVENT OF DEFAULT SPECIFIED IN SECTION 5.1., THE NOTE SHALL BECOME IMMEDIATELY DUE AND PAYABLE AND THE BORROWER SHALL PAY TO THE HOLDER, IN FULL SATISFACTION OF ITS OBLIGTAIONS HEREUNDER, AN AMOUNT EQUAL TO: (Y) THE DEFAULT SUM (AS DEFINED HEREIN)). Upon the occurrence and during the continuation of any Event of Default specified in Sections 5.1. (solely with respect to failure to pay the principal hereof or interest thereon when due on this Note, 5.1.1, 5.1.2, 5.1.5, 5.1.6, 5.1.7, 5.1.8, 5.1.9, 5.1.10, 5.1.11 exercisable through the delivery of written notice to the Borrower by such Holders (the "Default Notice"), and upon the occurrence of an Event of Default specified in the remaining sections of Section 5.1. (other than failure to pay the principal hereof or interest thereon at the Maturity Date specified in Section 5.1. hereof), the Note shall become immediately due and payable and the Borrower shall pay to the Holder, in full satisfaction of its obligations hereunder, an amount equal to the greater of (i) 150% times the sum of (w) the then outstanding principal amount of this Note plus (x) accrued and unpaid interest on the unpaid principal amount of this Note to the date of payment (the "Mandatory Prepayment Date") plus (y) Default Interest, if any, on the amounts referred to in clauses (w) and/or (x) (the then outstanding principal amount of this Note to the date of payment plus the amounts referred to in clauses (x) and (y) shall collectively be known as the "Default Sum") or (ii) the "parity value" of the Default Sum to be prepaid, where parity value means (a) the highest number of shares of

Common Stock issuable upon conversion of or otherwise pursuant to such Default Sum, treating the Trading Day immediately preceding the Mandatory Prepayment Date as the "Conversion Date" for purposes of determining the lowest applicable Conversion Price, unless the Default Event arises as a result of such breach in respect of a specific Conversion Date in which case such Conversion Date shall be the Conversion Date, **multiplied by** (b) the highest Closing Price for the Common Stock during the period beginning on the date of first occurrence of the Event of Default and ending one day prior to the Mandatory Prepayment Date (the "Default Amount") and all other amounts payable hereunder shall immediately become due and payable, all without demand, presentment or notice, all of which hereby are expressly waived, together with all costs, including, without limitation, legal fees and expenses, of collection, and the Holder shall be entitled to exercise all other rights and remedies available at low or in equity.

If the Borrower fails to pay the Default Amount within five (5) business days of written notice that such amount is due and payable, then the Holder shall have the right at any time, so long as the Borrower remains in default (and so long and to the extent that there are sufficient authorized shares), to require the Borrower, upon written notice, to immediately issue, in lieu of the Default Amount, the number of shares of Common Stock of the Borrower equal to the Default Amount divided by the Conversion Price then in effect.

6.   Prepayment. Notwithstanding anything to the contrary contained in this Note, at any time during the periods set forth on the table immediately following this paragraph (the "Prepayment Periods"), the Borrower shall have the right, exercisable on not more than three (3) Trading Days prior written notice to the Holder of the Note to prepay the outstanding Note (principal and accrued interest), in full, in accordance with this Section 6. Any notice of prepayment hereunder (an "Optional Prepayment Notice") shall be delivered to the Holder of the Note at its registered addresses and shall state: (1) that the Borrower is exercising its right to prepay the Note, and (2) the date of prepayment which shall be not more than three (3) Trading Days from the date of the Optional Prepayment Notice. On the date fixed for prepayment (the "Optional Prepayment Date"), the Borrower shall make payment of the Optional Prepayment Amount (as defined below) to Holder, or upon the direction of the Holder as specified by the Holder in a writing to the Borrower (which direction shall to be sent to Borrower by the Holder at least one (1) business day prior to the Optional Prepayment Date). If the Borrower exercises its right to prepay the Note, the Borrower shall make payment to the Holder of an amount in cash equal to the percentage ("Prepayment Percentage") as set forth in the table immediately following this paragraph opposite the applicable Prepayment Period, multiplied by the sum of: (i)the then outstanding principal amount of this Note plus (ii) accrued and unpaid interest on the unpaid principal amount of this Note to the Optional Prepayment Date plus (iii) Default Interest, if any accrued thereon. If the Borrower delivers an Optional Prepayment Notice and fails to pay the Optional Prepayment Amount due to the Holder of the Note within two (2) business days following the Optional Prepayment Date, the Borrower shall forever forfeit its right to prepay the Note pursuant to this Section 6.

| Prepayment Period | Prepayment Percentage |
|---|---|
| 1. The period beginning on the Issue Date and ending on the date which is one hundred eighty (180) days following the Issue Date. | 120% |

After the expiration of one hundred eighty (180) days following the Issue Date, the Borrower shall have no right of prepayment.

7.   The Company covenants that until all amounts due under this Note are paid in full, by conversion or otherwise, unless waived by the Holder or subsequent Holder in writing, the Company shall:

give prompt written notice to the Holder of any Event of Default or of any other matter which has resulted in, or could reasonably be expected to result in a materially adverse change in its financial condition or operations;

give prompt notice to the Holder of any claim, action or proceeding which, in the event of any unfavorable outcome, would or could reasonably be expected to have a Material Adverse Effect (as defined below) on the financial condition of the Company;

at all times reserve and keep available out of its authorized but unissued Common Stock, for the purpose of effecting the conversion of this Note into Common Stock, such number of its duly authorized shares of Common Stock as shall from time to time be sufficient to effect the conversion of the Outstanding Principal Amount of this Note into Common Stock.

*"Material Adverse Effect"* means (i) any condition, occurrence, state of facts or event having, or insofar as reasonably can be foreseen would likely have, any material adverse effect on the legality, validity or enforceability of the Transaction Documents or the transactions contemplated thereby, (ii) any condition, occurrence, state of facts or event having, or insofar as reasonably can be foreseen would likely have, any effect on the business, operations, properties or financial condition of the Company that is material and adverse to the Company and its Subsidiaries, taken as a whole, and/or (iii) any condition, occurrence, state of facts or event that would, or insofar as reasonably can be foreseen would likely, prohibit or otherwise materially interfere with or delay the ability of the Company to perform any of its obligations under any of the Transaction Documents to which it is a party.

8.    Upon receipt by the Company of evidence from the Holder reasonably satisfactory to the Company of theloss, theft, destruction or mutilation of this Note,

  (i)    in the case of loss, theft or destruction, upon provision of indemnity reasonably satisfactory to it and/or its transfer agent, or

  (ii)    in the case of mutilation, upon surrender and cancellation of this Note, then the Company at its expense will execute and deliver to the Holder a new Note, dated the date of the lost, stolen, destroyed or mutilated Note, and evidencing the outstanding and unpaid principal amount of the lost, stolen, destroyed or mutilated Note.

9.    If any term in this Note is found by a court of competent jurisdiction to be unenforceable, then the entire Note shall be rescinded, the consideration proffered by the Holder for the remaining Debt acquired by the Holder not converted by the Holder in accordance with this Note shall be returned in its entirety and any Conversion Shares in the possession or control of the Investor shall be returned to the Issuer.

10.    The Note and the Agreement between the Company and the Holder (including all Exhibits thereto) constitute the full and entire understanding and agreement between the Company and the Holder with respect to the subject hereof. Neither this Note nor any term hereof may be amended, waived, discharged or terminated other than by a written instrument signed by the Company and the Holder.

11.    This Note shall be governed by and construed in accordance with the laws of the State of Florida without regard to principles of conflicts of laws. Any action brought by either party against the other concerning the transactions contemplated by this Agreement shall be brought only in the state courts of Florida.

12.    Conditions. The Issuer acknowledges the Investor's participation in respect to this Agreement is on a conditions permitting basis. In the event that the transaction risk profile substantially changes, market pricing or implied volatility substantially change, due diligence raises concerns or any other conditions material to the successful closing of the transaction change, the Investor reserves the right to terminate the Agreement at any time before delivering to the Non-Affiliate Debtholder the cash consideration as described hereof.

13.    Miscellaneous.

  13.1.    Counterparts. This Agreement may be executed in any number of counterparts by original, facsimile or email signature. All executed counterparts shall constitute one Agreement not withstanding that all signatories are not signatories to the original or the same counterpart. Facsimile and scanned signatures are considered original signatures.

  13.2.    Severability. This Agreement is not severable. If any term in this Agreement is found by a court of competent jurisdiction to be unenforceable, then the entire Agreement shall be rescinded, the outstanding principal and accrued and unpaid interest including Default Interest, at such time, not converted by the Investor in

Case 1:21-cv-10300-LLS   Document 1-2   Filed 12/03/21   Page 54 of 173

accordance with this Agreement shall be returned in its entirety and all remaining Conversion Shares in the possession or control of the Investor or reserved by the Company's Transfer Agent shall be released and returned to the Issuer.

13.3.    Legal Fees. Except as provided in this agreement, each Party will bear its own legal expenses in the execution of this Agreement. If the Issuer defaults and the Investor is required to expend funds for legal fees and expenses, such costs will be reimbursed to the Investor, solely by the Issuer.

13.4.    Trading Activities. Neither the Buyer nor their affiliates has an open short position in the common stock of the Company and the Buyer agree that they shall not, and that they will cause their affiliates not to, engage in any short sales of or hedging transactions with respect to the common stock of the Company.

13.5.    Modification. This Agreement and the Note may only be modified in a writing signed by all Parties.

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed by an officer thereunto duly authorized, as of the date first written above.

GENTECH HOLDINGS, INC.

By: _____

David Lovatt, Chief Executive Officer

7

Exhibit A.

## NOTICE OF CONVERSION

The undersigned hereby elects to convert $_____ of the principal amount of the Note (defined below) into Shares of Common Stock of GenTech Holdings, Inc., a Florida Corporation (the **"Borrower"**) according to the conditions of the Convertible Note of the Borrower dated as of June 27, 2019 (the **"Note"**). No fee will be charged to the Holder or Holder's Custodian for any conversion, except for transfer taxes, if any.

Box Checked as to applicable instructions:

[ ]   The Borrower shall electronically transmit the Common Stock issuable pursuant to this Notice of Conversion to the account of the undersigned or its nominee with DTC through its Deposit Withdrawal Agent Commission system (**"DWAC Transfer"**).

Name of DTC Prime Broker: _____

Account Number: _____

[ ]   The undersigned _____ hereby requests that the Borrower issue a certificate or certificates for the number of shares of Common Stock set forth below (which numbers are based on the Holder's calculation attached hereto) in the name(s) specified immediately below:

Essex Global Investment Corp
EIN #: _____

Date of Conversion:

Conversion Price:                     _____

Shares to Be Delivered:          _____

Remaining Principal Balance Due
After This Conversion:            _____

Signature

_____

Print Name:                            _____

# EXHIBIT 7

Principal Amount: $100,000

## 10% CONVERTIBLE NOTE
DATED July 24, 2019

THIS NOTE (the "Note") is a duly authorized Convertible Note of GenTech Holdings, Inc., a Florida corporation (the "Company").

FOR VALUE RECEIVED, the Company therefore promises to pay the Holder, the principal sum of $100,000 (the "Principal Amount") or such lesser principal amount following the conversion or conversions of this Note in accordance with Paragraph 2 (the "Outstanding Principal Amount") twelve (12) months from the date of issuance hereof (the "Maturity Date"), and to pay interest on the Outstanding Principal Amount ("Interest") in a lump sum on the Maturity Date, at the rate of twelve percent (10%) per Annum(the "Rate") from the date of issuance.

Accrual of Interest shall commence on the date of this Note and continue until the Company repays or provides for repayment in full the Outstanding Principal Amount and all accrued but unpaid Interest. Accrued and unpaid Interest shall bear Interest at the Rate until paid, compounded monthly. The Outstanding Principal Amount of this Note is payable on the Maturity Date in such coin or currency of the United States as at the time of payment is legal tender for payment of public and private debts, at the address last appearing on the Note Register of the Company as designated in writing by the Holder from time to time. The Company may prepay principal and interest on this Note at any time before the Maturity Date.

The Company will pay the Outstanding Principal Amount of this Note on the Maturity Date, free of any withholding or deduction of any kind (subject to the provision of paragraph 2 below), to the Holder as of the Maturity Date and addressed to the Holder at the address appearing on the Note Register.

This Note is subject to the following additional provisions:

1.      All payments on account of the Outstanding Principal Amount of this Note and all other amounts payable under this Note (whether made by the Company or any other person) to or for the account of the Holder hereunder shall be made free and clear of and without reduction by reason of any present and future income, stamp, registration and other taxes, levies, duties, cost, and charges whatsoever imposed, assessed, levied or collected by the United States or any political subdivision or taxing authority thereof or therein, together with interest thereon and penalties with respect thereto, if any, on or in respect of this Note (such taxes, levies, duties, costs and charges being herein collectively called "Taxes").

2.      The Holder of this Note is entitled, at its option, six (6) months after the Company's receipt of the proceeds of the Note, to convert all or any lesser portion of the Outstanding Principal Amount and accrued but unpaid Interest into Common Stock at a conversion price equal to a price which is a 50% discount to the lowest trading price in the twenty-five (25) days prior to the day that the Holder requests conversion, unless otherwise modified by mutual agreement between the Parties (the "Conversion Price") (The Common stock into which the Note is converted shall be referred to in this agreement as "Conversion Shares").The Issuer will not be obligated to issue fractional Conversion Shares. The Holder may convert this Note into Common Stock by surrendering the Note to the Company, with the form of conversion notice attached to the Note as Exhibit A, executed by the Holder of the Note evidencing such Holder's intention to convert the Note. If the Borrower is unable to issue any shares under this provision due to the fact that there is an insufficient number of authorized and unissued shares available, the Holder promises not to force the Borrower to issue these shares or trigger an Event of Default, provided that Borrower takes immediate steps required to get the appropriate level of approval from shareholders or the board of directors, where applicable to raise the number of authorized shares to satisfy the Notice of Conversion.

The Company will not issue fractional shares or scrip representing fractions of shares of Common Stock on conversion, but the Company will round the number of shares of Common Stock issuable up to the nearest whole share. The date on which a Notice of Conversion is given shall be deemed to be the date on which the Holder notifies the

1

Company of its intention to so convert by delivery, by facsimile transmission or otherwise, of a copy of the Notice of Conversion. Notice of Conversion may be sent by email to the Company, attn: CEO, COO. The Holder will deliver this Note, together with original executed copy of the Notice of Conversion, to the Company within three (3) business days following the Conversion Date. At the Maturity Date, the Company will pay any unconverted Outstanding Principal Amount and accrued Interest thereon, at the option of the Company, in either (a) cash or (b) Common Stock valued at a price equal to the Conversion Price determined as if the Note was converted in accordance with its terms into Common Stock on the Maturity Date.

Notwithstanding the foregoing conversion privilege, in no event shall Issuer have the right to convert into, nor shall the Issuer issue to such Holder, shares of Common Stock to the extent that such conversion would result in the Holder and its affiliates together beneficially owning more than 9.99% of the then issued and outstanding shares of Common Stock. If the number of shares issued to Holder is greater than 4.99% of the total issued common stock of the company, the Issuer must notify the Holder immediately. For purposes hereof, beneficial ownership shall be determined in accordance with Section 13(d) of the Securities Exchange Act of 1934, as amended, and Regulation 13D-G thereunder.

3.    No provision of this Note shall alter or impair the obligation of the Company, which is absolute and unconditional, to the payment of the Outstanding Principal Amount of this Note at the Maturity Date, and in the coin or currency herein prescribed.

4.    If at any time or from time to time after the date of this Note, the Common Stock issuable upon the conversion of the Note is changed into the same or different numbers of shares of any class or classes of stock, whether by recapitalization or otherwise, then in each such event the Holder shall have the right thereafter to convert the Note into the kind of security receivable in such recapitalization, reclassification or other change by holders of Common Stock, all subject to further adjustment as provided herein. In such event, the formulae set forth herein for conversion and redemption shall be equitably adjusted to reflect such change in number of shares or, if shares of a new class of stock are issued, to reflect the market price of the class or classes of stock issued in connection with the above described transaction.

5.    Events of Default

5.1.    A default shall be deemed to have occurred upon any one of the following events:

5.1.1.    Withdrawal from registration of the Issuer under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), either voluntary or involuntary.

5.1.2.    Issuer filing for bankruptcy protection under the federal bankruptcy laws, the calling of a meeting of creditors, or any act of insolvency under any state law regarding insolvency, without written notification to the Investor within five business days of such filing, meeting or action.

5.1.3.    The Borrower fails to issue shares of Common Stock to the Holder (or announces or threatens in writing that it will not honor its obligation to do so) upon exercise by the Holder of the conversion rights of the Holder in accordance with the terms of this Note, fails to transfer or cause its transfer agent to transfer (issue) (electronically or in certificated form) any certificate for shares of Common Stock issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, the Borrower directs its transfer agent not to transfer or delays, impairs, and/or hinders its transfer agent in transferring or issuing (electronically or in certificated form) any certificate for shares of Common Stock to be issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, or fails to remove (or directs its transfer agent not to remove or impairs, delays, and/or hinders its transfer agent from removing) any restrictive legend (or to withdraw any stop transfer instructions in respect thereof) on any certificate for any shares of Common Stock issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note (or makes any written announcement, statement or threat that it does not intend to honor the obligations described in this paragraph) and any such failure shall continue uncured (or any written announcement, statement or threat not to honor its obligations shall not be rescinded in writing) for three (3) business days after the Holder shall have delivered a Notice

of Conversion.

5.1.4.    Failure to pay the principal and unpaid but accrued interest on the Note when due.

5.1.5.    Any dissolution, liquidation, or winding up of Borrower or any substantial portion of its business.

5.1.6.    Any cessation of operations by Borrower or Borrower admits it is otherwise generally unable to pay its debts as such debts become due, provided, however, that any disclosure of the Borrower's ability to continue as a "going concern" shall not be an admission that the Borrower cannot pay its debts as they become due.

5.1.7.    The failure by Borrower to maintain any material intellectual property rights, personal, real property or other assets which are necessary to conduct its business (whether now or in the future).

5.1.8.    The Borrower effectuates a reverse split of its Common Stock without twenty (20) days prior written notice to the Holder.

5.1.9.    In the event that the Borrower proposes to replace its transfer agent, the Borrower fails to provide, prior to the effective date of such replacement, fully executed Irrevocable Transfer Agent Instructions in a form as initially delivered pursuant to the Purchase Agreement (including but not limited to the provision to irrevocable reserve shares of Common Stock in the Reserved Amount) signed by the success or transfer agent to Holder and the Borrower.

5.1.10.    The failure by Borrower to pay any and all Post-Closing Expenses as defined herein.

5.1.11.    From and after the initial trading, listing or quotation of the Common Stock on a Principal Market, an event resulting in the Common Stock no longer being traded, listed or quoted on a Principal Market; failure to comply with the requirements for continued quotation on a Principal Market; or notification from a Principal Market that the Borrower is not in compliance with the conditions for such continued quotation and such non-compliance continues for seven (7) trading days following such notification.

5.2.    Default remedies. Upon the occurrence and during the continuation of any Event of Default specified in Section 5.1. (solely with respect to failure to pay the principal hereof or interest thereon when due at the Maturity Date), the Note shall become immediately due and payable and the Borrower shall pay to the Holder, in full satisfaction of its obligations hereunder, an amount equal to the Default Sum (as defined herein). UPON THE OCCURRENCE AND DURING THE CONTINUATION OF ANY EVENT OF DEFAULT SPECIFIED IN SECTION 5.1., THE NOTE SHALL BECOME IMMEDIATELY DUE AND PAYABLE AND THE BORROWER SHALL PAY TO THE HOLDER, IN FULL SATISFACTION OF ITS OBLIGTAIONS HEREUNDER, AN AMOUNT EQUAL TO: (Y) THE DEFAULT SUM (AS DEFINED HEREIN)). Upon the occurrence and during the continuation of any Event of Default specified in Sections 5.1. (solely with respect to failure to pay the principal hereof or interest thereon when due on this Note, 5.1.1, 5.1.2, 5.1.5, 5.1.6, 5.1.7, 5.1.8, 5.1.9, 5.1.10, 5.1.11 exercisable through the delivery of written notice to the Borrower by such Holders (the "Default Notice"), and upon the occurrence of an Event of Default specified in the remaining sections of Section 5.1. (other than failure to pay the principal hereof or interest thereon at the Maturity Date specified in Section 5.1. hereof), the Note shall become immediately due and payable and the Borrower shall pay to the Holder, in full satisfaction of its obligations hereunder, an amount equal to the greater of (i) 150% times the sum of (w) the then outstanding principal amount of this Note plus (x) accrued and unpaid interest on the unpaid principal amount of this Note to the date of payment (the "Mandatory Prepayment Date") plus (y) Default Interest, if any, on the amounts referred to in clauses (w) and/or (x) (the then outstanding principal amount of this Note to the date of payment plus the amounts referred to in clauses (x) and (y) shall collectively be known as the "Default Sum") or (ii) the "parity value" of the Default Sum to be prepaid, where parity value means (a) the highest number of shares of

Common Stock issuable upon conversion of or otherwise pursuant to such Default Sum, treating the Trading Day immediately preceding the Mandatory Prepayment Date as the "Conversion Date" for purposes of determining the lowest applicable Conversion Price, unless the Default Event arises as a result of such breach in respect of a specific Conversion Date in which case such Conversion Date shall be the Conversion Date, **multiplied by** (b) the highest Closing Price for the Common Stock during the period beginning on the date of first occurrence of the Event of Default and ending one day prior to the Mandatory Prepayment Date (the "Default Amount") and all other amounts payable hereunder shall immediately become due and payable, all without demand, presentment or notice, all of which hereby are expressly waived, together with all costs, including, without limitation, legal fees and expenses, of collection, and the Holder shall be entitled to exercise all other rights and remedies available at low or in equity.

If the Borrower fails to pay the Default Amount within five (5) business days of written notice that such amount is due and payable, then the Holder shall have the right at any time, so long as the Borrower remains in default (and so long and to the extent that there are sufficient authorized shares), to require the Borrower, upon written notice, to immediately issue, in lieu of the Default Amount, the number of shares of Common Stock of the Borrower equal to the Default Amount divided by the Conversion Price then in effect.

6.   Prepayment. Notwithstanding anything to the contrary contained in this Note, at any time during the periods set forth on the table immediately following this paragraph (the "Prepayment Periods"), the Borrower shall have the right, exercisable on not more than three (3) Trading Days prior written notice to the Holder of the Note to prepay the outstanding Note (principal and accrued interest), in full, in accordance with this Section 6. Any notice of prepayment hereunder (an "Optional Prepayment Notice") shall be delivered to the Holder of the Note at its registered addresses and shall state: (1) that the Borrower is exercising its right to prepay the Note, and (2) the date of prepayment which shall be not more than three (3) Trading Days from the date of the Optional Prepayment Notice. On the date fixed for prepayment (the "Optional Prepayment Date"), the Borrower shall make payment of the Optional Prepayment Amount (as defined below) to Holder, or upon the direction of the Holder as specified by the Holder in a writing to the Borrower (which direction shall to be sent to Borrower by the Holder at least one (1) business day prior to the Optional Prepayment Date). If the Borrower exercises its right to prepay the Note, the Borrower shall make payment to the Holder of an amount in cash equal to the percentage ("Prepayment Percentage") as set forth in the table immediately following this paragraph opposite the applicable Prepayment Period, multiplied by the sum of: (i)the then outstanding principal amount of this Note plus (ii) accrued and unpaid interest on the unpaid principal amount of this Note to the Optional Prepayment Date plus (iii) Default Interest, if any accrued thereon. If the Borrower delivers an Optional Prepayment Notice and fails to pay the Optional Prepayment Amount due to the Holder of the Note within two (2) business days following the Optional Prepayment Date, the Borrower shall forever forfeit its right to prepay the Note pursuant to this Section 6.

| Prepayment Period | Prepayment Percentage |
|---|---|
| 1. The period beginning on the Issue Date and ending on the date which is one hundred eighty (180) days following the Issue Date. | 120% |

After the expiration of one hundred eighty (180) days following the Issue Date, the Borrower shall have no right of prepayment.

7.   The Company covenants that until all amounts due under this Note are paid in full, by conversion or otherwise, unless waived by the Holder or subsequent Holder in writing, the Company shall:

give prompt written notice to the Holder of any Event of Default or of any other matter which has resulted in, or could reasonably be expected to result in a materially adverse change in its financial condition or operations;

give prompt notice to the Holder of any claim, action or proceeding which, in the event of any unfavorable outcome, would or could reasonably be expected to have a Material Adverse Effect (as defined below) on the financial condition of the Company;

4

at all times reserve and keep available out of its authorized but unissued Common Stock, for the purpose of effecting the conversion of this Note into Common Stock, such number of its duly authorized shares of Common Stock as shall from time to time be sufficient to effect the conversion of the Outstanding Principal Amount of this Note into Common Stock.

*"Material Adverse Effect"* means (i) any condition, occurrence, state of facts or event having, or insofar as reasonably can be foreseen would likely have, any material adverse effect on the legality, validity or enforceability of the Transaction Documents or the transactions contemplated thereby, (ii) any condition, occurrence, state of facts or event having, or insofar as reasonably can be foreseen would likely have, any effect on the business, operations, properties or financial condition of the Company that is material and adverse to the Company and its Subsidiaries, taken as a whole, and/or (iii) any condition, occurrence, state of facts or event that would, or insofar as reasonably can be foreseen would likely, prohibit or otherwise materially interfere with or delay the ability of the Company to perform any of its obligations under any of the Transaction Documents to which it is a party.

8.    Upon receipt by the Company of evidence from the Holder reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Note,

    (i)    in the case of loss, theft or destruction, upon provision of indemnity reasonably satisfactory to it and/or its transfer agent, or

    (ii)    in the case of mutilation, upon surrender and cancellation of this Note, then the Company at its expense will execute and deliver to the Holder a new Note, dated the date of the lost, stolen, destroyed or mutilated Note, and evidencing the outstanding and unpaid principal amount of the lost, stolen, destroyed or mutilated Note.

9.    If any term in this Note is found by a court of competent jurisdiction to be unenforceable, then the entire Note shall be rescinded, the consideration proffered by the Holder for the remaining Debt acquired by the Holder not converted by the Holder in accordance with this Note shall be returned in its entirety and any Conversion Shares in the possession or control of the Investor shall be returned to the Issuer.

10.    The Note and the Agreement between the Company and the Holder (including all Exhibits thereto) constitute the full and entire understanding and agreement between the Company and the Holder with respect to the subject hereof. Neither this Note nor any term hereof may be amended, waived, discharged or terminated other than by a written instrument signed by the Company and the Holder.

11.    This Note shall be governed by and construed in accordance with the laws of the State of Florida without regard to principles of conflicts of laws. Any action brought by either party against the other concerning the transactions contemplated by this Agreement shall be brought only in the state courts of Florida.

12.    Conditions. The Issuer acknowledges the Investor's participation in respect to this Agreement is on a conditions permitting basis. In the event that the transaction risk profile substantially changes, market pricing or implied volatility substantially change, due diligence raises concerns or any other conditions material to the successful closing of the transaction change, the Investor reserves the right to terminate the Agreement at any time before delivering to the Non-Affiliate Debtholder the cash consideration as described hereof.

13.    Miscellaneous.

    13.1.    Counterparts. This Agreement may be executed in any number of counterparts by original, facsimile or email signature. All executed counterparts shall constitute one Agreement not withstanding that all signatories are not signatories to the original or the same counterpart. Facsimile and scanned signatures are considered original signatures.

    13.2.    Severability. This Agreement is not severable. If any term in this Agreement is found by a court of competent jurisdiction to be unenforceable, then the entire Agreement shall be rescinded, the outstanding principal and accrued and unpaid interest including Default Interest, at such time, not converted by the Investor in

accordance with this Agreement shall be returned in its entirety and all remaining Conversion Shares in the possession or control of the Investor or reserved by the Company's Transfer Agent shall be released and returned to the Issuer.

13.3.    Legal Fees. Except as provided in this agreement, each Party will bear its own legal expenses in the execution of this Agreement. If the Issuer defaults and the Investor is required to expend funds for legal fees and expenses, such costs will be reimbursed to the Investor, solely by the Issuer.

13.4.    Trading Activities. Neither the Buyer nor their affiliates has an open short position in the common stock of the Company and the Buyer agree that they shall not, and that they will cause their affiliates not to, engage in any short sales of or hedging transactions with respect to the common stock of the Company.

13.5.    Modification. This Agreement and the Note may only be modified in a writing signed by all Parties.

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed by an officer thereunto duly authorized, as of the date first written above.

GENTECH HOLDINGS, INC.

By: _____

David Lovatt, Chief Executive Officer

Exhibit A.

## NOTICE OF CONVERSION

    The undersigned hereby elects to convert $_____ of the principal amount of the Note (defined below) into Shares of Common Stock of GenTech Holdings, Inc., a Florida Corporation (the **"Borrower"**) according to the conditions of the Convertible Note of the Borrower dated as of July 24, 2019 (the **"Note"**). No fee will be charged to the Holder or Holder's Custodian for any conversion, except for transfer taxes, if any.

Box Checked as to applicable instructions:

      [ ]    The Borrower shall electronically transmit the Common Stock issuable pursuant to this Notice of Conversion to the account of the undersigned or its nominee with DTC through its Deposit Withdrawal Agent Commission system **("DWAC Transfer").**

          Name of DTC Prime Broker: _____

          Account Number: _____

      [ ]    The undersigned _____ hereby requests that the Borrower issue a certificate or certificates for the number of shares of Common Stock set forth below (which numbers are based on the Holder's calculation attached hereto) in the name(s) specified immediately below:

          Essex Global Investment Corp
          EIN #: _____

Date of Conversion: _____

Conversion Price: _____

Shares to Be Delivered: _____

Remaining Principal Balance Due After This Conversion: _____

Signature

          _____

Print Name: _____

8

# EXHIBIT 8

Case 1:21-cv-10300-LLS   Document 1-2   Filed 12/03/21   Page 67 of 173

Principal Amount: $90,000

**10% CONVERTIBLE NOTE**
DATED August 23, 2019

THIS NOTE (the "Note") is a duly authorized Convertible Note of GenTech Holdings, Inc., a Florida corporation (the "Company").

FOR VALUE RECEIVED, the Company therefore promises to pay the Holder, the principal sum of $90,000 (the "Principal Amount") or such lesser principal amount following the conversion or conversions of this Note in accordance with Paragraph 2 (the "Outstanding Principal Amount") twelve (12) months from the date of issuance hereof (the "Maturity Date"), and to pay interest on the Outstanding Principal Amount ("Interest") in a lump sum on the Maturity Date, at the rate of twelve percent (10%) per Annum(the "Rate") from the date of issuance.

Accrual of Interest shall commence on the date of this Note and continue until the Company repays or provides for repayment in full the Outstanding Principal Amount and all accrued but unpaid Interest. Accrued and unpaid Interest shall bear Interest at the Rate until paid, compounded monthly. The Outstanding Principal Amount of this Note is payable on the Maturity Date in such coin or currency of the United States as at the time of payment is legal tender for payment of public and private debts, at the address last appearing on the Note Register of the Company as designated in writing by the Holder from time to time. The Company may prepay principal and interest on this Note at any time before the Maturity Date.

The Company will pay the Outstanding Principal Amount of this Note on the Maturity Date, free of any withholding or deduction of any kind (subject to the provision of paragraph 2 below), to the Holder as of the Maturity Date and addressed to the Holder at the address appearing on the Note Register.

This Note is subject to the following additional provisions:

    1.    All payments on account of the Outstanding Principal Amount of this Note and all other amounts payable under this Note (whether made by the Company or any other person) to or for the account of the Holder hereunder shall be made free and clear of and without reduction by reason of any present and future income, stamp, registration and other taxes, levies, duties, cost, and charges whatsoever imposed, assessed, levied or collected by the United States or any political subdivision or taxing authority thereof or therein, together with interest thereon and penalties with respect thereto, if any, on or in respect of this Note (such taxes, levies, duties, costs and charges being herein collectively called "Taxes").

    2.    The Holder of this Note is entitled, at its option, six (6) months after the Company's receipt of the proceeds of the Note, to convert all or any lesser portion of the Outstanding Principal Amount and accrued but unpaid Interest into Common Stock at a conversion price equal to a price which is a 50% discount to the lowest trading price in the twenty-five (25) days prior to the day that the Holder requests conversion, unless otherwise modified by mutual agreement between the Parties (the "Conversion Price") (The Common stock into which the Note is converted shall be referred to in this agreement as "Conversion Shares").The Issuer will not be obligated to issue fractional Conversion Shares. The Holder may convert this Note into Common Stock by surrendering the Note to the Company, with the form of conversion notice attached to the Note as Exhibit A, executed by the Holder of the Note evidencing such Holder's intention to convert the Note. If the Borrower is unable to issue any shares under this provision due to the fact that there is an insufficient number of authorized and unissued shares available, the Holder promises not to force the Borrower to issue these shares or trigger an Event of Default, provided that Borrower takes immediate steps required to get the appropriate level of approval from shareholders or the board of directors, where applicable to raise the number of authorized shares to satisfy the Notice of Conversion.

    The Company will not issue fractional shares or scrip representing fractions of shares of Common Stock on conversion, but the Company will round the number of shares of Common Stock issuable up to the nearest whole share. The date on which a Notice of Conversion is given shall be deemed to be the date on which the Holder notifies the

1

Company of its intention to so convert by delivery, by facsimile transmission or otherwise, of a copy of the Notice of Conversion. Notice of Conversion may be sent by email to the Company, attn: CEO, COO. The Holder will deliver this Note, together with original executed copy of the Notice of Conversion, to the Company within three (3) business days following the Conversion Date. At the Maturity Date, the Company will pay any unconverted Outstanding Principal Amount and accrued Interest thereon, at the option of the Company, in either (a) cash or (b) Common Stock valued at a price equal to the Conversion Price determined as if the Note was converted in accordance with its terms into Common Stock on the Maturity Date.

Notwithstanding the foregoing conversion privilege, in no event shall Issuer have the right to convert into, nor shall the Issuer issue to such Holder, shares of Common Stock to the extent that such conversion would result in the Holder and its affiliates together beneficially owning more than 9.99% of the then issued and outstanding shares of Common Stock. If the number of shares issued to Holder is greater than 4.99% of the total issued common stock of the company, the Issuer must notify the Holder immediately. For purposes hereof, beneficial ownership shall be determined in accordance with Section 13(d) of the Securities Exchange Act of 1934, as amended, and Regulation 13D-G thereunder.

3.   No provision of this Note shall alter or impair the obligation of the Company, which is absolute and unconditional, to the payment of the Outstanding Principal Amount of this Note at the Maturity Date, and in the coin or currency herein prescribed.

4.   If at any time or from time to time after the date of this Note, the Common Stock issuable upon the conversion of the Note is changed into the same or different numbers of shares of any class or classes of stock, whether by recapitalization or otherwise, then in each such event the Holder shall have the right thereafter to convert the Note into the kind of security receivable in such recapitalization, reclassification or other change by holders of Common Stock, all subject to further adjustment as provided herein. In such event, the formulae set forth herein for conversion and redemption shall be equitably adjusted to reflect such change in number of shares or, if shares of a new class of stock are issued, to reflect the market price of the class or classes of stock issued in connection with the above described transaction.

5.   Events of Default

5.1.   A default shall be deemed to have occurred upon any one of the following events:

5.1.1.   Withdrawal from registration of the Issuer under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), either voluntary or involuntary.

5.1.2.   Issuer filing for bankruptcy protection under the federal bankruptcy laws, the calling of a meeting of creditors, or any act of insolvency under any state law regarding insolvency, without written notification to the Investor within five business days of such filing, meeting or action.

5.1.3.   The Borrower fails to issue shares of Common Stock to the Holder (or announces or threatens in writing that it will not honor its obligation to do so) upon exercise by the Holder of the conversion rights of the Holder in accordance with the terms of this Note, fails to transfer or cause its transfer agent to transfer (issue) (electronically or in certificated form) any certificate for shares of Common Stock issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, the Borrower directs its transfer agent not to transfer or delays, impairs, and/or hinders its transfer agent in transferring or issuing (electronically or in certificated form) any certificate for shares of Common Stock to be issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, or fails to remove (or directs its transfer agent not to remove or impairs, delays, and/or hinders its transfer agent from removing) any restrictive legend (or to withdraw any stop transfer instructions in respect thereof) on any certificate for any shares of Common Stock issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note (or makes any written announcement, statement or threat that it does not intend to honor the obligations described in this paragraph) and any such failure shall continue uncured (or any written announcement, statement or threat not to honor its obligations shall not be rescinded in writing) for three (3) business days after the Holder shall have delivered a Notice

2

of Conversion.

5.1.4.    Failure to pay the principal and unpaid but accrued interest on the Note when due.

5.1.5.    Any dissolution, liquidation, or winding up of Borrower or any substantial portion of its business.

5.1.6.    Any cessation of operations by Borrower or Borrower admits it is otherwise generally unable to pay its debts as such debts become due, provided, however, that any disclosure of the Borrower's ability to continue as a "going concern" shall not be an admission that the Borrower cannot pay its debts as they become due.

5.1.7.    The failure by Borrower to maintain any material intellectual property rights, personal, real property or other assets which are necessary to conduct its business (whether now or in the future).

5.1.8.    The Borrower effectuates a reverse split of its Common Stock without twenty (20) days prior written notice to the Holder.

5.1.9.    In the event that the Borrower proposes to replace its transfer agent, the Borrower fails to provide, prior to the effective date of such replacement, fully executed Irrevocable Transfer Agent Instructions in a form as initially delivered pursuant to the Purchase Agreement (including but not limited to the provision to irrevocable reserve shares of Common Stock in the Reserved Amount) signed by the success or transfer agent to Holder and the Borrower.

5.1.10.    The failure by Borrower to pay any and all Post-Closing Expenses as defined herein.

5.1.11.    From and after the initial trading, listing or quotation of the Common Stock on a Principal Market, an event resulting in the Common Stock no longer being traded, listed or quoted on a Principal Market; failure to comply with the requirements for continued quotation on a Principal Market; or notification from a Principal Market that the Borrower is not in compliance with the conditions for such continued quotation and such non-compliance continues for seven (7) trading days following such notification.

5.2. Default remedies. Upon the occurrence and during the continuation of any Event of Default specified in Section 5.1. (solely with respect to failure to pay the principal hereof or interest thereon when due at the Maturity Date), the Note shall become immediately due and payable and the Borrower shall pay to the Holder, in full satisfaction of its obligations hereunder, an amount equal to the Default Sum (as defined herein). UPON THE OCCURRENCE AND DURING THE CONTINUATION OF ANY EVENT OF DEFAULT SPECIFIED IN SECTION 5.1., THE NOTE SHALL BECOME IMMEDIATELY DUE AND PAYABLE AND THE BORROWER SHALL PAY TO THE HOLDER, IN FULL SATISFACTION OF ITS OBLIGTAIONS HEREUNDER, AN AMOUNT EQUAL TO: (Y) THE DEFAULT SUM (AS DEFINED HEREIN)). Upon the occurrence and during the continuation of any Event of Default specified in Sections 5.1. (solely with respect to failure to pay the principal hereof or interest thereon when due on this Note, 5.1.1, 5.1.2, 5.1.5, 5.1.6, 5.1.7, 5.1.8, 5.1.9, 5.1.10, 5.1.11 exercisable through the delivery of written notice to the Borrower by such Holders (the "Default Notice"), and upon the occurrence of an Event of Default specified in the remaining sections of Section 5.1. (other than failure to pay the principal hereof or interest thereon at the Maturity Date specified in Section 5.1. hereof), the Note shall become immediately due and payable and the Borrower shall pay to the Holder, in full satisfaction of its obligations hereunder, an amount equal to the greater of (i) 150% times the sum of (w) the then outstanding principal amount of this Note plus (x) accrued and unpaid interest on the unpaid principal amount of this Note to the date of payment (the "Mandatory Prepayment Date") plus (y) Default Interest, if any, on the amounts referred to in clauses (w) and/or (x) (the then outstanding principal amount of this Note to the date of payment plus the amounts referred to in clauses (x) and (y) shall collectively be known as the "Default Sum") or (ii) the "parity value" of the Default Sum to be prepaid, where parity value means (a) the highest number of shares of

3

Common Stock issuable upon conversion of or otherwise pursuant to such Default Sum, treating the Trading Day immediately preceding the Mandatory Prepayment Date as the "Conversion Date" for purposes of determining the lowest applicable Conversion Price, unless the Default Event arises as a result of such breach in respect of a specific Conversion Date in which case such Conversion Date shall be the Conversion Date, **multiplied by** (b) the highest Closing Price for the Common Stock during the period beginning on the date of first occurrence of the Event of Default and ending one day prior to the Mandatory Prepayment Date (the "Default Amount") and all other amounts payable hereunder shall immediately become due and payable, all without demand, presentment or notice, all of which hereby are expressly waived, together with all costs, including, without limitation, legal fees and expenses, of collection, and the Holder shall be entitled to exercise all other rights and remedies available at low or in equity.

If the Borrower fails to pay the Default Amount within five (5) business days of written notice that such amount is due and payable, then the Holder shall have the right at any time, so long as the Borrower remains in default (and so long and to the extent that there are sufficient authorized shares), to require the Borrower, upon written notice, to immediately issue, in lieu of the Default Amount, the number of shares of Common Stock of the Borrower equal to the Default Amount divided by the Conversion Price then in effect.

6.  Prepayment. Notwithstanding anything to the contrary contained in this Note, at any time during the periods set forth on the table immediately following this paragraph (the "Prepayment Periods"), the Borrower shall have the right, exercisable on not more than three (3) Trading Days prior written notice to the Holder of the Note to prepay the outstanding Note (principal and accrued interest), in full, in accordance with this Section 6. Any notice of prepayment hereunder (an "Optional Prepayment Notice") shall be delivered to the Holder of the Note at its registered addresses and shall state: (1) that the Borrower is exercising its right to prepay the Note, and (2) the date of prepayment which shall be not more than three (3) Trading Days from the date of the Optional Prepayment Notice. On the date fixed for prepayment (the "Optional Prepayment Date"), the Borrower shall make payment of the Optional Prepayment Amount (as defined below) to Holder, or upon the direction of the Holder as specified by the Holder in a writing to the Borrower (which direction shall to be sent to Borrower by the Holder at least one (1) business day prior to the Optional Prepayment Date). If the Borrower exercises its right to prepay the Note, the Borrower shall make payment to the Holder of an amount in cash equal to the percentage ("Prepayment Percentage") as set forth in the table immediately following this paragraph opposite the applicable Prepayment Period, multiplied by the sum of: (i)the then outstanding principal amount of this Note plus (ii) accrued and unpaid interest on the unpaid principal amount of this Note to the Optional Prepayment Date plus (iii) Default Interest, if any accrued thereon. If the Borrower delivers an Optional Prepayment Notice and fails to pay the Optional Prepayment Amount due to the Holder of the Note within two (2) business days following the Optional Prepayment Date, the Borrower shall forever forfeit its right to prepay the Note pursuant to this Section 6.

| Prepayment Period | Prepayment Percentage |
|---|---|
| 1. The period beginning on the Issue Date and ending on the date which is one hundred eighty (180) days following the Issue Date. | 120% |

After the expiration of one hundred eighty (180) days following the Issue Date, the Borrower shall have no right of prepayment.

7.  The Company covenants that until all amounts due under this Note are paid in full, by conversion or otherwise, unless waived by the Holder or subsequent Holder in writing, the Company shall:

give prompt written notice to the Holder of any Event of Default or of any other matter which has resulted in, or could reasonably be expected to result in a materially adverse change in its financial condition or operations;

give prompt notice to the Holder of any claim, action or proceeding which, in the event of any unfavorable outcome, would or could reasonably be expected to have a Material Adverse Effect (as defined below) on the financial condition of the Company;

at all times reserve and keep available out of its authorized but unissued Common Stock, for the purpose of effecting the conversion of this Note into Common Stock, such number of its duly authorized shares of Common Stock as shall from time to time be sufficient to effect the conversion of the Outstanding Principal Amount of this Note into Common Stock.

*"Material Adverse Effect"* means (i) any condition, occurrence, state of facts or event having, or insofar as reasonably can be foreseen would likely have, any material adverse effect on the legality, validity or enforceability of the Transaction Documents or the transactions contemplated thereby, (ii) any condition, occurrence, state of facts or event having, or insofar as reasonably can be foreseen would likely have, any effect on the business, operations, properties or financial condition of the Company that is material and adverse to the Company and its Subsidiaries, taken as a whole, and/or (iii) any condition, occurrence, state of facts or event that would, or insofar as reasonably can be foreseen would likely, prohibit or otherwise materially interfere with or delay the ability of the Company to perform any of its obligations under any of the Transaction Documents to which it is a party.

8.    Upon receipt by the Company of evidence from the Holder reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Note,

(i)    in the case of loss, theft or destruction, upon provision of indemnity reasonably satisfactory to it and/or its transfer agent, or

(ii)    in the case of mutilation, upon surrender and cancellation of this Note, then the Company at its expense will execute and deliver to the Holder a new Note, dated the date of the lost, stolen, destroyed or mutilated Note, and evidencing the outstanding and unpaid principal amount of the lost, stolen, destroyed or mutilated Note.

9.    If any term in this Note is found by a court of competent jurisdiction to be unenforceable, then the entire Note shall be rescinded, the consideration proffered by the Holder for the remaining Debt acquired by the Holder not converted by the Holder in accordance with this Note shall be returned in its entirety and any Conversion Shares in the possession or control of the Investor shall be returned to the Issuer.

10.    The Note and the Agreement between the Company and the Holder (including all Exhibits thereto) constitute the full and entire understanding and agreement between the Company and the Holder with respect to the subject hereof. Neither this Note nor any term hereof may be amended, waived, discharged or terminated other than by a written instrument signed by the Company and the Holder.

11.    This Note shall be governed by and construed in accordance with the laws of the State of Florida without regard to principles of conflicts of laws. Any action brought by either party against the other concerning the transactions contemplated by this Agreement shall be brought only in the state courts of Florida.

12.    Conditions. The Issuer acknowledges the Investor's participation in respect to this Agreement is on a conditions permitting basis. In the event that the transaction risk profile substantially changes, market pricing or implied volatility substantially change, due diligence raises concerns or any other conditions material to the successful closing of the transaction change, the Investor reserves the right to terminate the Agreement at any time before delivering to the Non-Affiliate Debtholder the cash consideration as described hereof.

13.    Miscellaneous.

13.1.    Counterparts. This Agreement may be executed in any number of counterparts by original, facsimile or email signature. All executed counterparts shall constitute one Agreement not withstanding that all signatories are not signatories to the original or the same counterpart. Facsimile and scanned signatures are considered original signatures.

13.2.    Severability. This Agreement is not severable. If any term in this Agreement is found by a court of competent jurisdiction to be unenforceable, then the entire Agreement shall be rescinded, the outstanding principal and accrued and unpaid interest including Default Interest, at such time, not converted by the Investor in

accordance with this Agreement shall be returned in its entirety and all remaining Conversion Shares in the possession or control of the Investor or reserved by the Company's Transfer Agent shall be released and returned to the Issuer.

13.3.    Legal Fees. Except as provided in this agreement, each Party will bear its own legal expenses in the execution of this Agreement. If the Issuer defaults and the Investor is required to expend funds for legal fees and expenses, such costs will be reimbursed to the Investor, solely by the Issuer.

13.4.    Trading Activities. Neither the Buyer nor their affiliates has an open short position in the common stock of the Company and the Buyer agree that they shall not, and that they will cause their affiliates not to, engage in any short sales of or hedging transactions with respect to the common stock of the Company.

13.5.    Modification. This Agreement and the Note may only be modified in a writing signed by all Parties.

Case 1:21-cv-10300-LLS   Document 1-2   Filed 12/03/21   Page 73 of 173

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed by an officer thereunto duly authorized, as of the date first written above.

GENTECH HOLDINGS, INC.

By: _____

David Lovatt, Chief Executive Officer

7

Exhibit A.

## NOTICE OF CONVERSION

The undersigned hereby elects to convert $_____ of the principal amount of the Note (defined below) into Shares of Common Stock of GenTech Holdings, Inc., a Florida Corporation (the **"Borrower"**) according to the conditions of the Convertible Note of the Borrower dated as of August 23, 2019 (the **"Note"**). No fee will be charged to the Holder or Holder's Custodian for any conversion, except for transfer taxes, if any.

Box Checked as to applicable instructions:

[ ]   The Borrower shall electronically transmit the Common Stock issuable pursuant to this Notice of Conversion to the account of the undersigned or its nominee with DTC through its Deposit Withdrawal Agent Commission system **("DWAC Transfer").**

Name of DTC Prime Broker: _____

Account Number: _____

[ ]   The undersigned _____ hereby requests that the Borrower issue a certificate or certificates for the number of shares of Common Stock set forth below (which numbers are based on the Holder's calculation attached hereto) in the name(s) specified immediately below:

Essex Global Investment Corp
EIN #: _____

Date of Conversion:          _____

Conversion Price:            _____

Shares to Be Delivered:      _____

Remaining Principal Balance Due
After This Conversion:       _____


Signature

                             _____


Print Name:                  _____

8

# EXHIBIT 9

# ASSIGNMENT AGREEMENT

### KNOW ALL MEN BY THESE PRESENTS:

That Essex Global Investment Corp. (the "Assignor"), for good and valuable consideration and cash, the receipt and sufficiency of which are hereby acknowledged, does hereby assign the remaining balance of that certain promissory note issued by GenTech Holdings, Inc., fka Pocket Games, Inc., a Florida corporation (the "Company"), dated May 23, 2019, in the face amount of $135,000, which balance, inclusive of principal, interest and penalties accrued thereon is $143,950.68 (the "Note").

The Assignor covenants and agrees to, on behalf of and for the benefit of the Assignee, warrant and defend title to the Note hereby sold and assigned to the Assignee, against all and every person and persons whomsoever. The Assignor warrants that it is the lawful holder in every respect of the Assigned Amount and that the Assigned Amount is held free and clear of any and all liens, security agreements, encumbrances, claims, demands and charges of every kind and character whatsoever.

IN WITNESS WHEREOF, the Assignor has executed this Assignment as of the 21st day of February, 2020.


"Assignor"

Essex Global Investment Corp.

By: _____

    Ben Conde, President

# EXHIBIT 10

# ASSIGNMENT AGREEMENT

### KNOW ALL MEN BY THESE PRESENTS:

That Essex Global Investment Corp. (the "Assignor"), for good and valuable consideration and cash, the receipt and sufficiency of which are hereby acknowledged, does hereby assign the remaining balance of that certain promissory note issued by GenTech Holdings, Inc., fka Pocket Games, Inc., a Florida corporation (the "Company"), dated May 24, 2019, in the face amount of $72,500, which balance, inclusive of principal, interest and penalties accrued thereon is $77,286.99 (the "Note").

The Assignor covenants and agrees to, on behalf of and for the benefit of the Assignee, warrant and defend title to the Note hereby sold and assigned to the Assignee, against all and every person and persons whomsoever. The Assignor warrants that it is the lawful holder in every respect of the Assigned Amount and that the Assigned Amount is held free and clear of any and all liens, security agreements, encumbrances, claims, demands and charges of every kind and character whatsoever.

IN WITNESS WHEREOF, the Assignor has executed this Assignment as of the 21st day of February, 2020.

"Assignor"

Essex Global Investment Corp.

By: _____

Ben Conde, President

1

# EXHIBIT 11

# ASSIGNMENT AGREEMENT

### KNOW ALL MEN BY THESE PRESENTS:

That Essex Global Investment Corp. (the "Assignor"), for good and valuable consideration and cash, the receipt and sufficiency of which are hereby acknowledged, does hereby assign the remaining balance of that certain promissory note issued by GenTech Holdings, Inc., fka Pocket Games, Inc., a Florida corporation (the "Company"), dated July 10, 2019, in the face amount of $100,000, which balance, inclusive of principal, interest and penalties accrued thereon is $105,315.07 (the "Note").

The Assignor covenants and agrees to, on behalf of and for the benefit of the Assignee, warrant and defend title to the Note hereby sold and assigned to the Assignee, against all and every person and persons whomsoever. The Assignor warrants that it is the lawful holder in every respect of the Assigned Amount and that the Assigned Amount is held free and clear of any and all liens, security agreements, encumbrances, claims, demands and charges of every kind and character whatsoever.

IN WITNESS WHEREOF, the Assignor has executed this Assignment as of the 21st day of February, 2020.

"Assignor"

Essex Global Investment Corp.

By: _____

Ben Conde, President

1

# EXHIBIT 12

# ASSIGNMENT AGREEMENT

### KNOW ALL MEN BY THESE PRESENTS:

That Essex Global Investment Corp. (the "Assignor"), for good and valuable consideration and cash, the receipt and sufficiency of which are hereby acknowledged, does hereby assign the remaining balance of that certain promissory note issued by GenTech Holdings, Inc., fka Pocket Games, Inc., a Florida corporation (the "Company"), dated June 20, 2019, in the face amount of $32,000, which balance, inclusive of principal, interest and penalties accrued thereon is $33,876.16 (the "Note").

The Assignor covenants and agrees to, on behalf of and for the benefit of the Assignee, warrant and defend title to the Note hereby sold and assigned to the Assignee, against all and every person and persons whomsoever. The Assignor warrants that it is the lawful holder in every respect of the Assigned Amount and that the Assigned Amount is held free and clear of any and all liens, security agreements, encumbrances, claims, demands and charges of every kind and character whatsoever.

IN WITNESS WHEREOF, the Assignor has executed this Assignment as of the 21st day of February, 2020.

"Assignor"

Essex Global Investment Corp.

By: _____
Ben Conde, President

1

# EXHIBIT 13

FILED: NEW YORK COUNTY CLERK 10/27/2021 06:17 PM
NYSCEF DOC. NO. 19
Case 1:21-cv-10300-LLS    Document 1-2    Filed 12/03/21    Page 84 of 173

INDEX NO. 656202/2021
RECEIVED NYSCEF: 10/27/2021

# ASSIGNMENT AGREEMENT

## KNOW ALL MEN BY THESE PRESENTS:

That Essex Global Investment Corp. (the "Assignor"), for good and valuable consideration and cash, the receipt and sufficiency of which are hereby acknowledged, does hereby assign the remaining balance of that certain promissory note issued by GenTech Holdings, Inc., fka Pocket Games, Inc., a Florida corporation (the "Company"), dated June 21, 2019, in the face amount of $71,000, which balance, inclusive of principal, interest and penalties accrued thereon is $75,143.29 (the "Note").

The Assignor covenants and agrees to, on behalf of and for the benefit of the Assignee, warrant and defend title to the Note hereby sold and assigned to the Assignee, against all and every person and persons whomsoever. The Assignor warrants that it is the lawful holder in every respect of the Assigned Amount and that the Assigned Amount is held free and clear of any and all liens, security agreements, encumbrances, claims, demands and charges of every kind and character whatsoever.

IN WITNESS WHEREOF, the Assignor has executed this Assignment as of the 21st day of February, 2020.

"Assignor"

Essex Global Investment Corp.

By: _____

Ben Conde, President

1

# EXHIBIT 14

# ASSIGNMENT AGREEMENT

## KNOW ALL MEN BY THESE PRESENTS:

That Essex Global Investment Corp. (the "Assignor"), for good and valuable consideration and cash, the receipt and sufficiency of which are hereby acknowledged, does hereby assign the remaining balance of that certain promissory note issued by GenTech Holdings, Inc., fka Pocket Games, Inc., a Florida corporation (the "Company"), dated July 10, 2019, in the face amount of $100,000, which balance, inclusive of principal, interest and penalties accrued thereon is $105,315.07 (the "Note").

The Assignor covenants and agrees to, on behalf of and for the benefit of the Assignee, warrant and defend title to the Note hereby sold and assigned to the Assignee, against all and every person and persons whomsoever. The Assignor warrants that it is the lawful holder in every respect of the Assigned Amount and that the Assigned Amount is held free and clear of any and all liens, security agreements, encumbrances, claims, demands and charges of every kind and character whatsoever.

IN WITNESS WHEREOF, the Assignor has executed this Assignment as of the 21st day of February, 2020.

"Assignor"

Essex Global Investment Corp.

By: _____

Ben Conde, President

# EXHIBIT 15

# ASSIGNMENT AGREEMENT

## KNOW ALL MEN BY THESE PRESENTS:

That Essex Global Investment Corp. (the "Assignor"), for good and valuable consideration and cash, the receipt and sufficiency of which are hereby acknowledged, does hereby assign the remaining balance of that certain promissory note issued by GenTech Holdings, Inc., fka Pocket Games, Inc., a Florida corporation (the "Company"), dated August 12, 2019, in the face amount of $100,000, which balance, inclusive of principal, interest and penalties accrued thereon is $104,410.96 (the "Note").

The Assignor covenants and agrees to, on behalf of and for the benefit of the Assignee, warrant and defend title to the Note hereby sold and assigned to the Assignee, against all and every person and persons whomsoever. The Assignor warrants that it is the lawful holder in every respect of the Assigned Amount and that the Assigned Amount is held free and clear of any and all liens, security agreements, encumbrances, claims, demands and charges of every kind and character whatsoever.

IN WITNESS WHEREOF, the Assignor has executed this Assignment as of the 21st day of February, 2020.

"Assignor"

Essex Global Investment Corp.

By: _____

Ben Conde, President

# EXHIBIT 16

# ASSIGNMENT AGREEMENT

### KNOW ALL MEN BY THESE PRESENTS:

That Essex Global Investment Corp. (the "Assignor"), for good and valuable consideration and cash, the receipt and sufficiency of which are hereby acknowledged, does hereby assign the remaining balance of that certain promissory note issued by GenTech Holdings, Inc., fka Pocket Games, Inc., a Florida corporation (the "Company"), dated August 29, 2019, in the face amount of $90,000, which balance, inclusive of principal, interest and penalties accrued thereon is $93,550.68 (the "Note").

The Assignor covenants and agrees to, on behalf of and for the benefit of the Assignee, warrant and defend title to the Note hereby sold and assigned to the Assignee, against all and every person and persons whomsoever. The Assignor warrants that it is the lawful holder in every respect of the Assigned Amount and that the Assigned Amount is held free and clear of any and all liens, security agreements, encumbrances, claims, demands and charges of every kind and character whatsoever.

IN WITNESS WHEREOF, the Assignor has executed this Assignment as of the 21st day of February, 2020.

"Assignor"

Essex Global Investment Corp.

By: _____

Ben Conde, President

1

Case 1:21-cv-10300-LLS   Document 1-2   Filed 12/03/21   Page 91 of 173

# EXHIBIT 17

## NOTE PURCHASE AGREEMENT

This Note Purchase Agreement (this "Agreement") is made and entered into as of the 21st day of February, 2020, by and between Essex Global Investments Corp., a Nevada corporation (the "Seller"), and East Capital Investment Corp., a New Jersey corporation (the "Purchaser"), collectively referred to herein as the "Parties" or individually as a "Party".

WITNESSETH:

WHEREAS, Seller is the holder of a certain promissory note issued by GenTech Holdings, Inc., fka Pocket Games, Inc., a Florida corporation (the "Company"), dated May 23, 2019, in the face amount of $135,000 (the "Note"), a copy of which is attached hereto as Exhibit A; and

WHEREAS, pursuant to the representations in Section 4.2 herein, the balance of the Note as of the date hereof, inclusive of principal, interest and penalties accrued thereon is $143,950.68; and

WHEREAS, the Seller desires to sell all of its rights, title and interest to the Note to Purchaser, and the Purchaser desires to purchase the Note from the Seller in consideration for Buyer's forgiveness of certain liabilities due and payable to the Buyer by Seller, and such other consideration and undertakings as more particularly hereinafter described.

NOW THEREFORE, in consideration of the mutual covenants, agreements, conditions, representation, and warranties contained in this Agreement, the Seller and the Purchaser hereby agree as follows:

1. PURCHASE AND SALE OF THE ASSIGNED PORTION OF THE NOTE

1.1    **Purchase and Sale of Assigned Portion of Note.** Subject to the terms and conditions of this Agreement, the Seller hereby agrees to sell and assign to the Purchaser and the Purchaser hereby agrees to acquire from the Seller the Note in exchange for the forgiveness of certain debts payable on the books and records of the Company to Buyer and its affiliates in the amount of Ninety-One Thousand Four Hundred Forty-Nine Dollars and 58/100 (US $91,449.58).

1.2    **Closing.** The purchase and sale of the Note shall take place at such time and place as the Seller and Purchaser shall mutually agree (which time and place are designated as the "**Closing**"). At the Closing, the Seller shall deliver to the Purchaser (i) a duly executed Assignment Agreement in the form attached hereto as Exhibit B; and (ii) a duly executed Settlement and Release Agreement in the form attached hereto as Exhibit C with respect to the purchase price hereunder.

1

2.  REPRESENTATIONS AND WARRANTIES OF THE SELLER

As a material inducement to the Purchaser to enter into this Agreement, the Seller makes the following representations and warranties to the Purchaser as of the date of this Agreement and as of the Closing:

2.1     Organization, Standing, and Qualification.  The Seller is duly organized, validly existing, and in good standing under the laws of Nevada. The Seller has full corporate power and authority to enter into this Agreement and this Agreement has been duly and validly authorized, executed and delivered by the Seller and is a valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms, except as such enforcement may be limited by the United States Bankruptcy Code and laws affecting creditors' rights, generally.

2.2     Authorization.  All action on the part of the Seller and its directors, officers and shareholders necessary for (i) the authorization, execution, delivery, and performance of all the obligations of the Seller under this Agreement and the consummation of the transactions contemplated herein, and (ii) the authorization, issuance, execution, and delivery of the Agreement and Assignment by the Seller hereunder have been taken by such officers and directors. This Agreement constitutes a valid and binding obligation of the Seller enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, and moratorium laws and other laws of general application affecting enforcement of creditors' rights generally and to general equitable principles.  The Seller has provided the Purchaser and its counsel with true and accurate copies of the appropriate resolutions of directors and shareholders relating to this transaction and effective as of the date of this Agreement and the Seller undertakes that it will procure that all such resolutions remain in full force and effect as of the Closing.

2.3     Title to the Note.  The Seller has good and marketable title to the Note, free and clear of any and all restrictions on or conditions to transfer or assignment, and free and clear of any and all liens, claims, mortgages, pledges, charges, equities, easements, rights of way, covenants, conditions, security interests, encumbrances, or restrictions.

2.4     Agreement Will Not Cause Breach or Violation.  The consummation of the transactions contemplated by this Agreement will not result in any violation of or constitute a default or an event that, with notice or lapse of time, or both, would conflict with or constitute a breach or default of the Articles of Incorporation or Bylaws of the Seller (as amended or restated) or of any material contract of the Seller or any applicable provision of state or federal law and will not result in the creation or imposition of any lien or encumbrance on any of the Seller's property.

3.  REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

3.1     Authorization.  The Purchaser represents and warrants that all action on the part of Purchaser necessary for the authorization, execution, delivery, and performance of all the obligations of Purchaser under this Agreement has been taken prior to the Closing and that

this Agreement constitutes a valid and legally binding obligation of Purchaser enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, and moratorium laws and other laws of general application affecting enforcement of creditors' rights generally and to general equitable principles.

3.2     "Accredited Investor".  The Purchaser represents that it is an "accredited investor" as such term is defined in the SEC's Rule 501 under Regulation D.

3.3     Transfer or Resale. Purchaser acknowledges that the Note has not been registered under the Securities Act or any state securities laws, and may not be offered for sale, sold, assigned or transferred unless an opinion of counsel, in a generally acceptable form, to the effect that such Securities to be sold, assigned or transferred may be sold, assigned or transferred pursuant to an exemption from such registration requirements.

5.     MISCELLANEOUS PROVISIONS

5.1     Modifications and Waivers.  This Agreement may not be amended or modified, nor may the rights of any Party hereunder be waived, except by a written document that is executed by the Purchaser and the Seller.

5.2     Assignment.  This Agreement is and shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

5.3     Rights and Obligations of Third Parties.  Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties to it and their respective successors and permitted assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third parties to any party to this Agreement, nor shall any provision give any third party any right of subrogation or action against any party to this Agreement.

5.4     Notices.  Any notice, request, consent, or other communication hereunder shall be in writing, and shall be sent by one of the following means: (i) by registered or certified first class mail, postage prepaid; (ii) by facsimile transmission; (iii) by reputable overnight courier service; or (iv) by personal delivery, and shall be properly addressed as follows:

   If to the Seller, to:

     _____

     _____

   If to the Purchaser, to:

     _____

     _____

or to such other address or addresses as the Seller or the Purchaser shall hereafter designate to the other Party in writing. Notices sent by mail or by courier shall be effective seven (7) days after they are sent, and notices delivered personally or by facsimile shall be effective at the time of delivery thereof.

5.2 <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the parties hereto in relation to the subject matter hereof. Any prior written or oral negotiations, correspondence, or understandings relating to the subject matter hereof shall be superseded by this Agreement and shall have no force or effect. The representations, warranties, covenants and agreements made herein shall survive any investigation made by the Purchaser.

5.3 <u>Severability</u>. If any provision which is not essential to the effectuation of the basic purpose of this Agreement is determined by a court of competent jurisdiction to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of the remaining provisions of this Agreement.

5.4 <u>Headings</u>. The headings of the Sections of this Agreement are inserted for convenience of reference only and shall not affect the construction or interpretation of any provisions hereof.

5.5 <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall be an original, but all of which together shall constitute one and the same instrument.

5.6 <u>Expenses</u>. Each Party shall bear and pay the legal and other expenses incurred in connection with negotiating and preparing this Agreement on its behalf.

5.7 <u>Governing Law</u>. This Agreement shall be construed in accordance with and governed by the laws of the State of New Jersey.

5.8 <u>Delays or Omissions</u>. No delay or omission to exercise any right, power, or remedy accruing to either Party, upon any breach or default of the other Party under this Agreement, shall impair any such right, power, or remedy, nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent, or approval of any kind or character on the part of either Party of any breach or default by the other Party under this Agreement, or any waiver of any provisions or conditions of this Agreement must be made in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to either Party, shall be cumulative and not alternative.

5.9   <u>Attorneys' Fees</u>.  If either Party elects to pursue legal action to enforce its rights under this Agreement, and if a court of competent jurisdiction adjudicates the matter, then the prevailing party in such action shall be entitled to receive from the losing party all costs and expenses, including but not limited to the reasonable fees of attorneys, accountants, and other experts, incurred by the prevailing party in investigating and prosecuting (or defending) such action at the initial trial and appellate levels.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

SIGNATURE PAGE TO NOTE PURCHASE AGREEMENT

IN WITNESS WHEREOF, the Seller and the Purchaser have each caused this Note Purchase Agreement to be executed by their duly authorized representatives to be effective as of the day and year first above written.

SELLER:                          Essex Global Investments Corp.

                                 By_____
                                 Ben Conde, President

PURCHASER:                       East Capital Investment Corp.

                                 By_____
                                 Christopher Danzi, Chief Executive Officer

Acknowledged and Agreed:

VINCENT DANZI

By_____
Vincent Danzi, individually

PHYLLIS DANZI

By_____
Phyllis Danzi, individually

6

# EXHIBIT 18

## NOTE PURCHASE AGREEMENT

This Note Purchase Agreement (this "Agreement") is made and entered into as of the 21st day of February, 2020, by and between Essex Global Investments Corp., a Nevada corporation (the "Seller"), and East Capital Investment Corp., a New Jersey corporation (the "Purchaser"), collectively referred to herein as the "Parties" or individually as a "Party".

W I T N E S S E T H :

WHEREAS, Seller is the holder of a certain promissory note issued by GenTech Holdings, Inc., fka Pocket Games, Inc., a Florida corporation (the "Company"), dated May 24, 2019, in the face amount of $72,500 (the "Note"), a copy of which is attached hereto as Exhibit A; and

WHEREAS, pursuant to the representations in Section 4.2 herein, the balance of the Note as of the date hereof, inclusive of principal, interest and penalties accrued thereon is $77,286.99; and

WHEREAS, the Seller desires to sell all of its rights, title and interest to the Note to Purchaser, and the Purchaser desires to purchase the Note from the Seller in consideration for Buyer's forgiveness of certain liabilities due and payable to the Buyer by Seller, and such other consideration and undertakings as more particularly hereinafter described.

NOW THEREFORE, in consideration of the mutual covenants, agreements, conditions, representation, and warranties contained in this Agreement, the Seller and the Purchaser hereby agree as follows:

1. PURCHASE AND SALE OF THE ASSIGNED PORTION OF THE NOTE

1.1    **Purchase and Sale of Assigned Portion of Note.**  Subject to the terms and conditions of this Agreement, the Seller hereby agrees to sell and assign to the Purchaser and the Purchaser hereby agrees to acquire from the Seller the Note in exchange for the forgiveness of certain debts payable on the books and records of the Company to Buyer and its affiliates in the amount of Forty-Nine Thousand Ninety-Nine Dollars and 19/100 (US $49,099.19).

1.2    **Closing.**  The purchase and sale of the Note shall take place at such time and place as the Seller and Purchaser shall mutually agree (which time and place are designated as the "Closing").  At the Closing, the Seller shall deliver to the Purchaser (i) a duly executed Assignment Agreement in the form attached hereto as Exhibit B; and (ii) a duly executed Settlement and Release Agreement in the form attached hereto as Exhibit C with respect to the purchase price hereunder.

Case 1:21-cv-10300-LLS   Document 1-2   Filed 12/03/21   Page 100 of 173

2.  REPRESENTATIONS AND WARRANTIES OF THE SELLER

As a material inducement to the Purchaser to enter into this Agreement, the Seller makes the following representations and warranties to the Purchaser as of the date of this Agreement and as of the Closing:

2.1  **Organization, Standing, and Qualification**.  The Seller is duly organized, validly existing, and in good standing under the laws of Nevada. The Seller has full corporate power and authority to enter into this Agreement and this Agreement has been duly and validly authorized, executed and delivered by the Seller and is a valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms, except as such enforcement may be limited by the United States Bankruptcy Code and laws affecting creditors' rights, generally.

2.2  **Authorization**.  All action on the part of the Seller and its directors, officers and shareholders necessary for (i) the authorization, execution, delivery, and performance of all the obligations of the Seller under this Agreement and the consummation of the transactions contemplated herein, and (ii) the authorization, issuance, execution, and delivery of the Agreement and Assignment by the Seller hereunder have been taken by such officers and directors.  This Agreement constitutes a valid and binding obligation of the Seller enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, and moratorium laws and other laws of general application affecting enforcement of creditors' rights generally and to general equitable principles.  The Seller has provided the Purchaser and its counsel with true and accurate copies of the appropriate resolutions of directors and shareholders relating to this transaction and effective as of the date of this Agreement and the Seller undertakes that it will procure that all such resolutions remain in full force and effect as of the Closing.

2.3  **Title to the Note**.  The Seller has good and marketable title to the Note, free and clear of any and all restrictions on or conditions to transfer or assignment, and free and clear of any and all liens, claims, mortgages, pledges, charges, equities, easements, rights of way, covenants, conditions, security interests, encumbrances, or restrictions.

2.4  **Agreement Will Not Cause Breach or Violation**.  The consummation of the transactions contemplated by this Agreement will not result in any violation of or constitute a default or an event that, with notice or lapse of time, or both, would conflict with or constitute a breach or default of the Articles of Incorporation or Bylaws of the Seller (as amended or restated) or of any material contract of the Seller or any applicable provision of state or federal law and will not result in the creation or imposition of any lien or encumbrance on any of the Seller's property.

3.  REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

3.1  Authorization.  The Purchaser represents and warrants that all action on the part of Purchaser necessary for the authorization, execution, delivery, and performance of all the obligations of Purchaser under this Agreement has been taken prior to the Closing and that

2

this Agreement constitutes a valid and legally binding obligation of Purchaser enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, and moratorium laws and other laws of general application affecting enforcement of creditors' rights generally and to general equitable principles.

3.2    "Accredited Investor".  The Purchaser represents that it is an "accredited investor" as such term is defined in the SEC's Rule 501 under Regulation D.

3.3    Transfer or Resale. Purchaser acknowledges that the Note has not been registered under the Securities Act or any state securities laws, and may not be offered for sale, sold, assigned or transferred unless an opinion of counsel, in a generally acceptable form, to the effect that such Securities to be sold, assigned or transferred may be sold, assigned or transferred pursuant to an exemption from such registration requirements.

5.    MISCELLANEOUS PROVISIONS

5.1    Modifications and Waivers.  This Agreement may not be amended or modified, nor may the rights of any Party hereunder be waived, except by a written document that is executed by the Purchaser and the Seller.

5.2    **Assignment**.  This Agreement is and shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

5.3    **Rights and Obligations of Third Parties**.  Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties to it and their respective successors and permitted assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third parties to any party to this Agreement, nor shall any provision give any third party any right of subrogation or action against any party to this Agreement.

5.4    **Notices**.  Any notice, request, consent, or other communication hereunder shall be in writing, and shall be sent by one of the following means:  (i) by registered or certified first class mail, postage prepaid; (ii) by facsimile transmission; (iii) by reputable overnight courier service; or (iv) by personal delivery, and shall be properly addressed as follows:

If to the Seller, to:

_____

_____

If to the Purchaser, to:

_____

_____

3

or to such other address or addresses as the Seller or the Purchaser shall hereafter designate to the other Party in writing. Notices sent by mail or by courier shall be effective seven (7) days after they are sent, and notices delivered personally or by facsimile shall be effective at the time of delivery thereof.

5.2 <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the parties hereto in relation to the subject matter hereof. Any prior written or oral negotiations, correspondence, or understandings relating to the subject matter hereof shall be superseded by this Agreement and shall have no force or effect. The representations, warranties, covenants and agreements made herein shall survive any investigation made by the Purchaser.

5.3 <u>Severability</u>. If any provision which is not essential to the effectuation of the basic purpose of this Agreement is determined by a court of competent jurisdiction to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of the remaining provisions of this Agreement.

5.4 <u>Headings</u>. The headings of the Sections of this Agreement are inserted for convenience of reference only and shall not affect the construction or interpretation of any provisions hereof.

5.5 <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall be an original, but all of which together shall constitute one and the same instrument.

5.6 <u>Expenses</u>. Each Party shall bear and pay the legal and other expenses incurred in connection with negotiating and preparing this Agreement on its behalf.

5.7 <u>Governing Law</u>. This Agreement shall be construed in accordance with and governed by the laws of the State of New Jersey.

5.8 <u>Delays or Omissions</u>. No delay or omission to exercise any right, power, or remedy accruing to either Party, upon any breach or default of the other Party under this Agreement, shall impair any such right, power, or remedy, nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent, or approval of any kind or character on the part of either Party of any breach or default by the other Party under this Agreement, or any waiver of any provisions or conditions of this Agreement must be made in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to either Party, shall be cumulative and not alternative.

5.9   <u>Attorneys' Fees</u>.  If either Party elects to pursue legal action to enforce its rights under this Agreement, and if a court of competent jurisdiction adjudicates the matter, then the prevailing party in such action shall be entitled to receive from the losing party all costs and expenses, including but not limited to the reasonable fees of attorneys, accountants, and other experts, incurred by the prevailing party in investigating and prosecuting (or defending) such action at the initial trial and appellate levels.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

SIGNATURE PAGE TO NOTE PURCHASE AGREEMENT

**IN WITNESS WHEREOF,** the Seller and the Purchaser have each caused this Note Purchase Agreement to be executed by their duly authorized representatives to be effective as of the day and year first above written.

SELLER:             Essex Global Investments Corp.

By_____
Ben Conde, President

PURCHASER:          East Capital Investment Corp.

By_____
Christopher Danzi, Chief Executive Officer

Acknowledged and Agreed:

VINCENT DANZI

By_____
Vincent Danzi, individually

PHYLLIS DANZI

By_____
Phyllis Danzi, individually

# EXHIBIT 19

## NOTE PURCHASE AGREEMENT

This Note Purchase Agreement (this "Agreement") is made and entered into as of the 21st day of February, 2020, by and between Essex Global Investments Corp., a Nevada corporation (the "Seller"), and East Capital Investment Corp., a New Jersey corporation (the "Purchaser"), collectively referred to herein as the "Parties" or individually as a "Party".

W I T N E S S E T H :

WHEREAS, Seller is the holder of a certain promissory note issued by GenTech Holdings, Inc., fka Pocket Games, Inc., a Florida corporation (the "Company"), dated July 10, 2019, in the face amount of $100,000 (the "Note"), a copy of which is attached hereto as Exhibit A; and

WHEREAS, pursuant to the representations in Section 4.2 herein, the balance of the Note as of the date hereof, inclusive of principal, interest and penalties accrued thereon is $105,315.07; and

WHEREAS, the Seller desires to sell all of its rights, title and interest to the Note to Purchaser, and the Purchaser desires to purchase the Note from the Seller in consideration for Buyer's forgiveness of certain liabilities due and payable to the Buyer by Seller, and such other consideration and undertakings as more particularly hereinafter described.

NOW THEREFORE, in consideration of the mutual covenants, agreements, conditions, representation, and warranties contained in this Agreement, the Seller and the Purchaser hereby agree as follows:

1. PURCHASE AND SALE OF THE ASSIGNED PORTION OF THE NOTE

1.1 **Purchase and Sale of Assigned Portion of Note.** Subject to the terms and conditions of this Agreement, the Seller hereby agrees to sell and assign to the Purchaser and the Purchaser hereby agrees to acquire from the Seller the Note in exchange for the forgiveness of certain debts payable on the books and records of the Company to Buyer and its affiliates in the amount of Sixty-Six Thousand Nine Hundred Four Dollars and 99/100 (US $66,904.99).

1.2 **Closing.** The purchase and sale of the Note shall take place at such time and place as the Seller and Purchaser shall mutually agree (which time and place are designated as the "Closing"). At the Closing, the Seller shall deliver to the Purchaser (i) a duly executed Assignment Agreement in the form attached hereto as Exhibit B; and (ii) a duly executed Settlement and Release Agreement in the form attached hereto as Exhibit C with respect to the purchase price hereunder.

2. <u>REPRESENTATIONS AND WARRANTIES OF THE SELLER</u>

As a material inducement to the Purchaser to enter into this Agreement, the Seller makes the following representations and warranties to the Purchaser as of the date of this Agreement and as of the Closing:

2.1    <u>Organization, Standing, and Qualification</u>.  The Seller is duly organized, validly existing, and in good standing under the laws of Nevada. The Seller has full corporate power and authority to enter into this Agreement and this Agreement has been duly and validly authorized, executed and delivered by the Seller and is a valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms, except as such enforcement may be limited by the United States Bankruptcy Code and laws affecting creditors' rights, generally.

2.2    <u>Authorization</u>.  All action on the part of the Seller and its directors, officers and shareholders necessary for (i) the authorization, execution, delivery, and performance of all the obligations of the Seller under this Agreement and the consummation of the transactions contemplated herein, and (ii) the authorization, issuance, execution, and delivery of the Agreement and Assignment by the Seller hereunder have been taken by such officers and directors.  This Agreement constitutes a valid and binding obligation of the Seller enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, and moratorium laws and other laws of general application affecting enforcement of creditors' rights generally and to general equitable principles.  The Seller has provided the Purchaser and its counsel with true and accurate copies of the appropriate resolutions of directors and shareholders relating to this transaction and effective as of the date of this Agreement and the Seller undertakes that it will procure that all such resolutions remain in full force and effect as of the Closing.

2.3    <u>Title to the Note</u>.  The Seller has good and marketable title to the Note, free and clear of any and all restrictions on or conditions to transfer or assignment, and free and clear of any and all liens, claims, mortgages, pledges, charges, equities, easements, rights of way, covenants, conditions, security interests, encumbrances, or restrictions.

2.4    <u>Agreement Will Not Cause Breach or Violation</u>.  The consummation of the transactions contemplated by this Agreement will not result in any violation of or constitute a default or an event that, with notice or lapse of time, or both, would conflict with or constitute a breach or default of the Articles of Incorporation or Bylaws of the Seller (as amended or restated) or of any material contract of the Seller or any applicable provision of state or federal law and will not result in the creation or imposition of any lien or encumbrance on any of the Seller's property.

3. <u>REPRESENTATIONS AND WARRANTIES OF THE PURCHASER</u>

3.1    <u>Authorization</u>.  The Purchaser represents and warrants that all action on the part of Purchaser necessary for the authorization, execution, delivery, and performance of all the obligations of Purchaser under this Agreement has been taken prior to the Closing and that

2

this Agreement constitutes a valid and legally binding obligation of Purchaser enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, and moratorium laws and other laws of general application affecting enforcement of creditors' rights generally and to general equitable principles.

3.2     "Accredited Investor".  The Purchaser represents that it is an "accredited investor" as such term is defined in the SEC's Rule 501 under Regulation D.

3.3     Transfer or Resale.  Purchaser acknowledges that the Note has not been registered under the Securities Act or any state securities laws, and may not be offered for sale, sold, assigned or transferred unless an opinion of counsel, in a generally acceptable form, to the effect that such Securities to be sold, assigned or transferred may be sold, assigned or transferred pursuant to an exemption from such registration requirements.

5.     MISCELLANEOUS PROVISIONS

5.1     Modifications and Waivers.  This Agreement may not be amended or modified, nor may the rights of any Party hereunder be waived, except by a written document that is executed by the Purchaser and the Seller.

5.2     Assignment.  This Agreement is and shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

5.3     Rights and Obligations of Third Parties.  Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties to it and their respective successors and permitted assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third parties to any party to this Agreement, nor shall any provision give any third party any right of subrogation or action against any party to this Agreement.

5.4     Notices.  Any notice, request, consent, or other communication hereunder shall be in writing, and shall be sent by one of the following means: (i) by registered or certified first class mail, postage prepaid; (ii) by facsimile transmission; (iii) by reputable overnight courier service; or (iv) by personal delivery, and shall be properly addressed as follows:

If to the Seller, to:

_____
_____

If to the Purchaser, to:

_____
_____

3

or to such other address or addresses as the Seller or the Purchaser shall hereafter designate to the other Party in writing. Notices sent by mail or by courier shall be effective seven (7) days after they are sent, and notices delivered personally or by facsimile shall be effective at the time of delivery thereof.

5.2   <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the parties hereto in relation to the subject matter hereof. Any prior written or oral negotiations, correspondence, or understandings relating to the subject matter hereof shall be superseded by this Agreement and shall have no force or effect. The representations, warranties, covenants and agreements made herein shall survive any investigation made by the Purchaser.

5.3   <u>Severability</u>. If any provision which is not essential to the effectuation of the basic purpose of this Agreement is determined by a court of competent jurisdiction to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of the remaining provisions of this Agreement.

5.4   <u>Headings</u>. The headings of the Sections of this Agreement are inserted for convenience of reference only and shall not affect the construction or interpretation of any provisions hereof.

5.5   <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall be an original, but all of which together shall constitute one and the same instrument.

5.6   <u>Expenses</u>. Each Party shall bear and pay the legal and other expenses incurred in connection with negotiating and preparing this Agreement on its behalf.

5.7   <u>Governing Law</u>. This Agreement shall be construed in accordance with and governed by the laws of the State of New Jersey.

5.8   <u>Delays or Omissions</u>. No delay or omission to exercise any right, power, or remedy accruing to either Party, upon any breach or default of the other Party under this Agreement, shall impair any such right, power, or remedy, nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent, or approval of any kind or character on the part of either Party of any breach or default by the other Party under this Agreement, or any waiver of any provisions or conditions of this Agreement must be made in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to either Party, shall be cumulative and not alternative.

4

5.9    <u>Attorneys' Fees</u>.  If either Party elects to pursue legal action to enforce its rights under this Agreement, and if a court of competent jurisdiction adjudicates the matter, then the prevailing party in such action shall be entitled to receive from the losing party all costs and expenses, including but not limited to the reasonable fees of attorneys, accountants, and other experts, incurred by the prevailing party in investigating and prosecuting (or defending) such action at the initial trial and appellate levels.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

SIGNATURE PAGE TO NOTE PURCHASE AGREEMENT

IN WITNESS WHEREOF, the Seller and the Purchaser have each caused this Note Purchase Agreement to be executed by their duly authorized representatives to be effective as of the day and year first above written.

SELLER:                              Essex Global Investments Corp.

                                     By_____
                                        Ben Conde, President

PURCHASER:                           East Capital Investment Corp.

                                     By_____
                                        Christopher Danzi, Chief Executive Officer

Acknowledged and Agreed:

VINCENT DANZI

By_____
   Vincent Danzi, individually

PHYLLIS DANZI

By_____
   Phyllis Danzi, individually

# EXHIBIT 20

## NOTE PURCHASE AGREEMENT

This Note Purchase Agreement (this "Agreement") is made and entered into as of the 21st day of February, 2020, by and between Essex Global Investments Corp., a Nevada corporation (the "Seller"), and East Capital Investment Corp., a New Jersey corporation (the "Purchaser"), collectively referred to herein as the "Parties" or individually as a "Party".

W I T N E S S E T H :

WHEREAS, Seller is the holder of a certain promissory note issued by GenTech Holdings, Inc., fka Pocket Games, Inc., a Florida corporation (the "Company"), dated June 20, 2019, in the face amount of $32,000 (the "Note"), a copy of which is attached hereto as Exhibit A; and

WHEREAS, pursuant to the representations in Section 4.2 herein, the balance of the Note as of the date hereof, inclusive of principal, interest and penalties accrued thereon is $33,876.16; and

WHEREAS, the Seller desires to sell all of its rights, title and interest to the Note to Purchaser, and the Purchaser desires to purchase the Note from the Seller in consideration for Buyer's forgiveness of certain liabilities due and payable to the Buyer by Seller, and such other consideration and undertakings as more particularly hereinafter described.

NOW THEREFORE, in consideration of the mutual covenants, agreements, conditions, representation, and warranties contained in this Agreement, the Seller and the Purchaser hereby agree as follows:

1. PURCHASE AND SALE OF THE ASSIGNED PORTION OF THE NOTE

1.1    **Purchase and Sale of Assigned Portion of Note.** Subject to the terms and conditions of this Agreement, the Seller hereby agrees to sell and assign to the Purchaser and the Purchaser hereby agrees to acquire from the Seller the Note in exchange for the forgiveness of certain debts payable on the books and records of the Company to Buyer and its affiliates in the amount of Twenty-One Thousand Five Hundred Twenty Dollars and 99/100 (US $21,520.99).

1.2    **Closing.** The purchase and sale of the Note shall take place at such time and place as the Seller and Purchaser shall mutually agree (which time and place are designated as the "Closing"). At the Closing, the Seller shall deliver to the Purchaser (i) a duly executed Assignment Agreement in the form attached hereto as Exhibit B; and (ii) a duly executed Settlement and Release Agreement in the form attached hereto as Exhibit C with respect to the purchase price hereunder.

Case 1:21-cv-10300-LLS   Document 1-2   Filed 12/03/21   Page 114 of 173

2.  REPRESENTATIONS AND WARRANTIES OF THE SELLER

As a material inducement to the Purchaser to enter into this Agreement, the Seller makes the following representations and warranties to the Purchaser as of the date of this Agreement and as of the Closing:

2.1  **Organization, Standing, and Qualification**. The Seller is duly organized, validly existing, and in good standing under the laws of Nevada. The Seller has full corporate power and authority to enter into this Agreement and this Agreement has been duly and validly authorized, executed and delivered by the Seller and is a valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms, except as such enforcement may be limited by the United States Bankruptcy Code and laws affecting creditors' rights, generally.

2.2  **Authorization**. All action on the part of the Seller and its directors, officers and shareholders necessary for (i) the authorization, execution, delivery, and performance of all the obligations of the Seller under this Agreement and the consummation of the transactions contemplated herein, and (ii) the authorization, issuance, execution, and delivery of the Agreement and Assignment by the Seller hereunder have been taken by such officers and directors. This Agreement constitutes a valid and binding obligation of the Seller enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, and moratorium laws and other laws of general application affecting enforcement of creditors' rights generally and to general equitable principles. The Seller has provided the Purchaser and its counsel with true and accurate copies of the appropriate resolutions of directors and shareholders relating to this transaction and effective as of the date of this Agreement and the Seller undertakes that it will procure that all such resolutions remain in full force and effect as of the Closing.

2.3  **Title to the Note**. The Seller has good and marketable title to the Note, free and clear of any and all restrictions on or conditions to transfer or assignment, and free and clear of any and all liens, claims, mortgages, pledges, charges, equities, easements, rights of way, covenants, conditions, security interests, encumbrances, or restrictions.

2.4  **Agreement Will Not Cause Breach or Violation**. The consummation of the transactions contemplated by this Agreement will not result in any violation of or constitute a default or an event that, with notice or lapse of time, or both, would conflict with or constitute a breach or default of the Articles of Incorporation or Bylaws of the Seller (as amended or restated) or of any material contract of the Seller or any applicable provision of state or federal law and will not result in the creation or imposition of any lien or encumbrance on any of the Seller's property.

3.  REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

3.1  **Authorization**. The Purchaser represents and warrants that all action on the part of Purchaser necessary for the authorization, execution, delivery, and performance of all the obligations of Purchaser under this Agreement has been taken prior to the Closing and that

this Agreement constitutes a valid and legally binding obligation of Purchaser enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, and moratorium laws and other laws of general application affecting enforcement of creditors' rights generally and to general equitable principles.

3.2 "Accredited Investor". The Purchaser represents that it is an "accredited investor" as such term is defined in the SEC's Rule 501 under Regulation D.

3.3 Transfer or Resale. Purchaser acknowledges that the Note has not been registered under the Securities Act or any state securities laws, and may not be offered for sale, sold, assigned or transferred unless an opinion of counsel, in a generally acceptable form, to the effect that such Securities to be sold, assigned or transferred may be sold, assigned or transferred pursuant to an exemption from such registration requirements.

5. MISCELLANEOUS PROVISIONS

5.1 Modifications and Waivers. This Agreement may not be amended or modified, nor may the rights of any Party hereunder be waived, except by a written document that is executed by the Purchaser and the Seller.

5.2 Assignment. This Agreement is and shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

5.3 Rights and Obligations of Third Parties. Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties to it and their respective successors and permitted assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third parties to any party to this Agreement, nor shall any provision give any third party any right of subrogation or action against any party to this Agreement.

5.4 Notices. Any notice, request, consent, or other communication hereunder shall be in writing, and shall be sent by one of the following means: (i) by registered or certified first class mail, postage prepaid; (ii) by facsimile transmission; (iii) by reputable overnight courier service; or (iv) by personal delivery, and shall be properly addressed as follows:

If to the Seller, to:

_____

_____

If to the Purchaser, to:

_____

_____

or to such other address or addresses as the Seller or the Purchaser shall hereafter designate to the other Party in writing. Notices sent by mail or by courier shall be effective seven (7) days after they are sent, and notices delivered personally or by facsimile shall be effective at the time of delivery thereof.

5.2   <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the parties hereto in relation to the subject matter hereof. Any prior written or oral negotiations, correspondence, or understandings relating to the subject matter hereof shall be superseded by this Agreement and shall have no force or effect. The representations, warranties, covenants and agreements made herein shall survive any investigation made by the Purchaser.

5.3   <u>Severability</u>. If any provision which is not essential to the effectuation of the basic purpose of this Agreement is determined by a court of competent jurisdiction to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of the remaining provisions of this Agreement.

5.4   <u>Headings</u>. The headings of the Sections of this Agreement are inserted for convenience of reference only and shall not affect the construction or interpretation of any provisions hereof.

5.5   <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall be an original, but all of which together shall constitute one and the same instrument.

5.6   <u>Expenses</u>. Each Party shall bear and pay the legal and other expenses incurred in connection with negotiating and preparing this Agreement on its behalf.

5.7   <u>Governing Law</u>. This Agreement shall be construed in accordance with and governed by the laws of the State of New Jersey.

5.8   <u>Delays or Omissions</u>. No delay or omission to exercise any right, power, or remedy accruing to either Party, upon any breach or default of the other Party under this Agreement, shall impair any such right, power, or remedy, nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent, or approval of any kind or character on the part of either Party of any breach or default by the other Party under this Agreement, or any waiver of any provisions or conditions of this Agreement must be made in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to either Party, shall be cumulative and not alternative.

Case 1:21-cv-10300-LLS   Document 1-2   Filed 12/03/21   Page 117 of 173

5.9     <u>Attorneys' Fees</u>.  If either Party elects to pursue legal action to enforce its rights under this Agreement, and if a court of competent jurisdiction adjudicates the matter, then the prevailing party in such action shall be entitled to receive from the losing party all costs and expenses, including but not limited to the reasonable fees of attorneys, accountants, and other experts, incurred by the prevailing party in investigating and prosecuting (or defending) such action at the initial trial and appellate levels.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

SIGNATURE PAGE TO NOTE PURCHASE AGREEMENT

IN WITNESS WHEREOF, the Seller and the Purchaser have each caused this Note Purchase Agreement to be executed by their duly authorized representatives to be effective as of the day and year first above written.

SELLER:                           Essex Global Investments Corp.

By _____
Ben Conde, President

PURCHASER:                        East Capital Investment Corp.

By _____
Christopher Danzi, Chief Executive Officer

Acknowledged and Agreed:

VINCENT DANZI

By _____
Vincent Danzi, individually

PHYLLIS DANZI

By _____
Phyllis Danzi, individually

# EXHIBIT 21

Case 1:21-cv-10300-LLS Document 1-2 Filed 12/03/21 Page 120 of 173

## NOTE PURCHASE AGREEMENT

This Note Purchase Agreement (this "Agreement") is made and entered into as of the 21st day of February, 2020, by and between Essex Global Investments Corp., a Nevada corporation (the "Seller"), and East Capital Investment Corp., a New Jersey corporation (the "Purchaser"), collectively referred to herein as the "Parties" or individually as a "Party".

WITNESSETH:

WHEREAS, Seller is the holder of a certain promissory note issued by GenTech Holdings, Inc., fka Pocket Games, Inc., a Florida corporation (the "Company"), dated June 21, 2019, in the face amount of $71,000 (the "Note"), a copy of which is attached hereto as Exhibit A; and

WHEREAS, pursuant to the representations in Section 4.2 herein, the balance of the Note as of the date hereof, inclusive of principal, interest and penalties accrued thereon is $75,143.29; and

WHEREAS, the Seller desires to sell all of its rights, title and interest to the Note to Purchaser, and the Purchaser desires to purchase the Note from the Seller in consideration for Buyer's forgiveness of certain liabilities due and payable to the Buyer by Seller, and such other consideration and undertakings as more particularly hereinafter described.

NOW THEREFORE, in consideration of the mutual covenants, agreements, conditions, representation, and warranties contained in this Agreement, the Seller and the Purchaser hereby agree as follows:

1. PURCHASE AND SALE OF THE ASSIGNED PORTION OF THE NOTE

1.1 **Purchase and Sale of Assigned Portion of Note.** Subject to the terms and conditions of this Agreement, the Seller hereby agrees to sell and assign to the Purchaser and the Purchaser hereby agrees to acquire from the Seller the Note in exchange for the forgiveness of certain debts payable on the books and records of the Company to Buyer and its affiliates in the amount of Forty-Seven Thousand Seven Hundred Thirty-Seven Dollars and 34/100 (US $47,737.34).

1.2 **Closing.** The purchase and sale of the Note shall take place at such time and place as the Seller and Purchaser shall mutually agree (which time and place are designated as the "Closing"). At the Closing, the Seller shall deliver to the Purchaser (i) a duly executed Assignment Agreement in the form attached hereto as Exhibit B; and (ii) a duly executed Settlement and Release Agreement in the form attached hereto as Exhibit C with respect to the purchase price hereunder.

1

## 2. REPRESENTATIONS AND WARRANTIES OF THE SELLER

As a material inducement to the Purchaser to enter into this Agreement, the Seller makes the following representations and warranties to the Purchaser as of the date of this Agreement and as of the Closing:

2.1 **Organization, Standing, and Qualification**. The Seller is duly organized, validly existing, and in good standing under the laws of Nevada. The Seller has full corporate power and authority to enter into this Agreement and this Agreement has been duly and validly authorized, executed and delivered by the Seller and is a valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms, except as such enforcement may be limited by the United States Bankruptcy Code and laws affecting creditors' rights, generally.

2.2 **Authorization**. All action on the part of the Seller and its directors, officers and shareholders necessary for (i) the authorization, execution, delivery, and performance of all the obligations of the Seller under this Agreement and the consummation of the transactions contemplated herein, and (ii) the authorization, issuance, execution, and delivery of the Agreement and Assignment by the Seller hereunder have been taken by such officers and directors. This Agreement constitutes a valid and binding obligation of the Seller enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, and moratorium laws and other laws of general application affecting enforcement of creditors' rights generally and to general equitable principles. The Seller has provided the Purchaser and its counsel with true and accurate copies of the appropriate resolutions of directors and shareholders relating to this transaction and effective as of the date of this Agreement and the Seller undertakes that it will procure that all such resolutions remain in full force and effect as of the Closing.

2.3 **Title to the Note**. The Seller has good and marketable title to the Note, free and clear of any and all restrictions on or conditions to transfer or assignment, and free and clear of any and all liens, claims, mortgages, pledges, charges, equities, easements, rights of way, covenants, conditions, security interests, encumbrances, or restrictions.

2.4 **Agreement Will Not Cause Breach or Violation**. The consummation of the transactions contemplated by this Agreement will not result in any violation of or constitute a default or an event that, with notice or lapse of time, or both, would conflict with or constitute a breach or default of the Articles of Incorporation or Bylaws of the Seller (as amended or restated) or of any material contract of the Seller or any applicable provision of state or federal law and will not result in the creation or imposition of any lien or encumbrance on any of the Seller's property.

## 3. REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

3.1 **Authorization**. The Purchaser represents and warrants that all action on the part of Purchaser necessary for the authorization, execution, delivery, and performance of all the obligations of Purchaser under this Agreement has been taken prior to the Closing and that

this Agreement constitutes a valid and legally binding obligation of Purchaser enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, and moratorium laws and other laws of general application affecting enforcement of creditors' rights generally and to general equitable principles.

3.2     "Accredited Investor".  The Purchaser represents that it is an "accredited investor" as such term is defined in the SEC's Rule 501 under Regulation D.

3.3     Transfer or Resale. Purchaser acknowledges that the Note has not been registered under the Securities Act or any state securities laws, and may not be offered for sale, sold, assigned or transferred unless an opinion of counsel, in a generally acceptable form, to the effect that such Securities to be sold, assigned or transferred may be sold, assigned or transferred pursuant to an exemption from such registration requirements.

5.     MISCELLANEOUS PROVISIONS

5.1     Modifications and Waivers.  This Agreement may not be amended or modified, nor may the rights of any Party hereunder be waived, except by a written document that is executed by the Purchaser and the Seller.

5.2     Assignment.  This Agreement is and shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

5.3     Rights and Obligations of Third Parties.  Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties to it and their respective successors and permitted assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third parties to any party to this Agreement, nor shall any provision give any third party any right of subrogation or action against any party to this Agreement.

5.4     Notices.  Any notice, request, consent, or other communication hereunder shall be in writing, and shall be sent by one of the following means:  (i) by registered or certified first class mail, postage prepaid; (ii) by facsimile transmission; (iii) by reputable overnight courier service; or (iv) by personal delivery, and shall be properly addressed as follows:

        If to the Seller, to:

        _____
        _____


        If to the Purchaser, to:

        _____
        _____

or to such other address or addresses as the Seller or the Purchaser shall hereafter designate to the other Party in writing. Notices sent by mail or by courier shall be effective seven (7) days after they are sent, and notices delivered personally or by facsimile shall be effective at the time of delivery thereof.

5.2   **Entire Agreement**. This Agreement constitutes the entire agreement between the parties hereto in relation to the subject matter hereof. Any prior written or oral negotiations, correspondence, or understandings relating to the subject matter hereof shall be superseded by this Agreement and shall have no force or effect. The representations, warranties, covenants and agreements made herein shall survive any investigation made by the Purchaser.

5.3   **Severability**. If any provision which is not essential to the effectuation of the basic purpose of this Agreement is determined by a court of competent jurisdiction to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of the remaining provisions of this Agreement.

5.4   **Headings**. The headings of the Sections of this Agreement are inserted for convenience of reference only and shall not affect the construction or interpretation of any provisions hereof.

5.5   **Counterparts**. This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall be an original, but all of which together shall constitute one and the same instrument.

5.6   **Expenses**. Each Party shall bear and pay the legal and other expenses incurred in connection with negotiating and preparing this Agreement on its behalf.

5.7   **Governing Law**. This Agreement shall be construed in accordance with and governed by the laws of the State of New Jersey.

5.8   **Delays or Omissions**. No delay or omission to exercise any right, power, or remedy accruing to either Party, upon any breach or default of the other Party under this Agreement, shall impair any such right, power, or remedy, nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent, or approval of any kind or character on the part of either Party of any breach or default by the other Party under this Agreement, or any waiver of any provisions or conditions of this Agreement must be made in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to either Party, shall be cumulative and not alternative.

4

5.9    <u>Attorneys' Fees</u>.  If either Party elects to pursue legal action to enforce its rights under this Agreement, and if a court of competent jurisdiction adjudicates the matter, then the prevailing party in such action shall be entitled to receive from the losing party all costs and expenses, including but not limited to the reasonable fees of attorneys, accountants, and other experts, incurred by the prevailing party in investigating and prosecuting (or defending) such action at the initial trial and appellate levels.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

## SIGNATURE PAGE TO NOTE PURCHASE AGREEMENT

IN WITNESS WHEREOF, the Seller and the Purchaser have each caused this Note Purchase Agreement to be executed by their duly authorized representatives to be effective as of the day and year first above written.

SELLER:                          Essex Global Investments Corp.

                                 By _____
                                    Ben Conde, President

PURCHASER:                       East Capital Investment Corp.

                                 By _____
                                    Christopher Danzi, Chief Executive Officer

Acknowledged and Agreed:

VINCENT DANZI

By _____
   Vincent Danzi, individually

PHYLLIS DANZI

By _____
   Phyllis Danzi, individually

# EXHIBIT 22

## NOTE PURCHASE AGREEMENT

This Note Purchase Agreement (this "Agreement") is made and entered into as of the 21st day of February, 2020, by and between Essex Global Investments Corp., a Nevada corporation (the "Seller"), and East Capital Investment Corp., a New Jersey corporation (the "Purchaser"), collectively referred to herein as the "Parties" or individually as a "Party".

## W I T N E S S E T H :

WHEREAS, Seller is the holder of a certain promissory note issued by GenTech Holdings, Inc., fka Pocket Games, Inc., a Florida corporation (the "Company"), dated July 10, 2019, in the face amount of $100,000 (the "Note"), a copy of which is attached hereto as Exhibit A; and

WHEREAS, pursuant to the representations in Section 4.2 herein, the balance of the Note as of the date hereof, inclusive of principal, interest and penalties accrued thereon is $105,315.07; and

WHEREAS, the Seller desires to sell all of its rights, title and interest to the Note to Purchaser, and the Purchaser desires to purchase the Note from the Seller in consideration for Buyer's forgiveness of certain liabilities due and payable to the Buyer by Seller, and such other consideration and undertakings as more particularly hereinafter described.

NOW THEREFORE, in consideration of the mutual covenants, agreements, conditions, representation, and warranties contained in this Agreement, the Seller and the Purchaser hereby agree as follows:

## 1. PURCHASE AND SALE OF THE ASSIGNED PORTION OF THE NOTE

1.1  Purchase and Sale of Assigned Portion of Note. Subject to the terms and conditions of this Agreement, the Seller hereby agrees to sell and assign to the Purchaser and the Purchaser hereby agrees to acquire from the Seller the Note in exchange for the forgiveness of certain debts payable on the books and records of the Company to Buyer and its affiliates in the amount of Sixty-Six Thousand Nine Hundred Four Dollars and 99/100 (US $66,904.99).

1.2  Closing. The purchase and sale of the Note shall take place at such time and place as the Seller and Purchaser shall mutually agree (which time and place are designated as the "Closing"). At the Closing, the Seller shall deliver to the Purchaser (i) a duly executed Assignment Agreement in the form attached hereto as Exhibit B; and (ii) a duly executed Settlement and Release Agreement in the form attached hereto as Exhibit C with respect to the purchase price hereunder.

2. REPRESENTATIONS AND WARRANTIES OF THE SELLER

   As a material inducement to the Purchaser to enter into this Agreement, the Seller makes the following representations and warranties to the Purchaser as of the date of this Agreement and as of the Closing:

2.1   Organization, Standing, and Qualification. The Seller is duly organized, validly existing, and in good standing under the laws of Nevada. The Seller has full corporate power and authority to enter into this Agreement and this Agreement has been duly and validly authorized, executed and delivered by the Seller and is a valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms, except as such enforcement may be limited by the United States Bankruptcy Code and laws affecting creditors' rights, generally.

2.2   Authorization. All action on the part of the Seller and its directors, officers and shareholders necessary for (i) the authorization, execution, delivery, and performance of all the obligations of the Seller under this Agreement and the consummation of the transactions contemplated herein, and (ii) the authorization, issuance, execution, and delivery of the Agreement and Assignment by the Seller hereunder have been taken by such officers and directors. This Agreement constitutes a valid and binding obligation of the Seller enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, and moratorium laws and other laws of general application affecting enforcement of creditors' rights generally and to general equitable principles. The Seller has provided the Purchaser and its counsel with true and accurate copies of the appropriate resolutions of directors and shareholders relating to this transaction and effective as of the date of this Agreement and the Seller undertakes that it will procure that all such resolutions remain in full force and effect as of the Closing.

2.3   Title to the Note. The Seller has good and marketable title to the Note, free and clear of any and all restrictions on or conditions to transfer or assignment, and free and clear of any and all liens, claims, mortgages, pledges, charges, equities, easements, rights of way, covenants, conditions, security interests, encumbrances, or restrictions.

2.4   Agreement Will Not Cause Breach or Violation. The consummation of the transactions contemplated by this Agreement will not result in any violation of or constitute a default or an event that, with notice or lapse of time, or both, would conflict with or constitute a breach or default of the Articles of Incorporation or Bylaws of the Seller (as amended or restated) or of any material contract of the Seller or any applicable provision of state or federal law and will not result in the creation or imposition of any lien or encumbrance on any of the Seller's property.

3. REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

3.1   Authorization.  The Purchaser represents and warrants that all action on the part of Purchaser necessary for the authorization, execution, delivery, and performance of all the obligations of Purchaser under this Agreement has been taken prior to the Closing and that this Agreement constitutes a valid and legally binding obligation of Purchaser enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, and moratorium laws and other laws of general application affecting enforcement of creditors' rights generally and to general equitable principles.

3.2   "Accredited Investor".  The Purchaser represents that it is an "accredited investor" as such term is defined in the SEC's Rule 501 under Regulation D.

3.3   Transfer or Resale.  Purchaser acknowledges that the Note has not been registered under the Securities Act or any state securities laws, and may not be offered for sale, sold, assigned or transferred unless an opinion of counsel, in a generally acceptable form, to the effect that such Securities to be sold, assigned or transferred may be sold, assigned or transferred pursuant to an exemption from such registration requirements.

5.   MISCELLANEOUS PROVISIONS

5.1   Modifications and Waivers.  This Agreement may not be amended or modified, nor may the rights of any Party hereunder be waived, except by a written document that is executed by the Purchaser and the Seller.

5.2   Assignment.  This Agreement is and shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

5.3   Rights and Obligations of Third Parties.  Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties to it and their respective successors and permitted assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third parties to any party to this Agreement, nor shall any provision give any third party any right of subrogation or action against any party to this Agreement.

5.4   Notices.  Any notice, request, consent, or other communication hereunder shall be in writing, and shall be sent by one of the following means: (i) by registered or certified first class mail, postage prepaid; (ii) by facsimile transmission; (iii) by reputable overnight courier service; or (iv) by personal delivery, and shall be properly addressed as follows:

       If to the Seller, to:

If to the Purchaser, to:

_____

_____

or to such other address or addresses as the Seller or the Purchaser shall hereafter designate to the other Party in writing.  Notices sent by mail or by courier shall be effective seven (7) days after they are sent, and notices delivered personally or by facsimile shall be effective at the time of delivery thereof.

5.2     Entire Agreement.  This Agreement constitutes the entire agreement between the parties hereto in relation to the subject matter hereof.  Any prior written or oral negotiations, correspondence, or understandings relating to the subject matter hereof shall be superseded by this Agreement and shall have no force or effect.  The representations, warranties, covenants and agreements made herein shall survive any investigation made by the Purchaser.

5.3     Severability.  If any provision which is not essential to the effectuation of the basic purpose of this Agreement is determined by a court of competent jurisdiction to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of the remaining provisions of this Agreement.

5.4     Headings.  The headings of the Sections of this Agreement are inserted for convenience of reference only and shall not affect the construction or interpretation of any provisions hereof.

5.5     Counterparts.  This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall be an original, but all of which together shall constitute one and the same instrument.

5.6     Expenses.  Each Party shall bear and pay the legal and other expenses incurred in connection with negotiating and preparing this Agreement on its behalf.

5.7     Governing Law.  This Agreement shall be construed in accordance with and governed by the laws of the State of New Jersey.

5.8     Delays or Omissions.  No delay or omission to exercise any right, power, or remedy accruing to either Party, upon any breach or default of the other Party under this Agreement, shall impair any such right, power, or remedy, nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.  Any waiver, permit, consent, or approval of any kind or character on the part of either Party of any breach or default by the other Party under this Agreement,

or any waiver of any provisions or conditions of this Agreement must be made in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to either Party, shall be cumulative and not alternative.

5.9     Attorneys' Fees. If either Party elects to pursue legal action to enforce its rights under this Agreement, and if a court of competent jurisdiction adjudicates the matter, then the prevailing party in such action shall be entitled to receive from the losing party all costs and expenses, including but not limited to the reasonable fees of attorneys, accountants, and other experts, incurred by the prevailing party in investigating and prosecuting (or defending) such action at the initial trial and appellate levels.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

## SIGNATURE PAGE TO NOTE PURCHASE AGREEMENT

IN WITNESS WHEREOF, the Seller and the Purchaser have each caused this Note Purchase Agreement to be executed by their duly authorized representatives to be effective as of the day and year first above written.

SELLER:                                  Essex Global Investments Corp.

By _____
Ben Conde, President

PURCHASER:                               East Capital Investment Corp.

By _____
Christopher Danzi, Chief Executive Officer

Acknowledged and Agreed:

VINCENT DANZI

By _____
Vincent Danzi, individually

PHYLLIS DANZI

By _____
Phyllis Danzi, individually

6

# EXHIBIT 23

## NOTE PURCHASE AGREEMENT

This Note Purchase Agreement (this "Agreement") is made and entered into as of the 21st day of February, 2020, by and between Essex Global Investments Corp., a Nevada corporation (the "Seller"), and East Capital Investment Corp., a New Jersey corporation (the "Purchaser"), collectively referred to herein as the "Parties" or individually as a "Party".

## W I T N E S S E T H :

WHEREAS, Seller is the holder of a certain promissory note issued by GenTech Holdings, Inc., fka Pocket Games, Inc., a Florida corporation (the "Company"), dated August 12, 2019, in the face amount of $100,000 (the "Note"), a copy of which is attached hereto as Exhibit A; and

WHEREAS, pursuant to the representations in Section 4.2 herein, the balance of the Note as of the date hereof, inclusive of principal, interest and penalties accrued thereon is $104,410.96; and

WHEREAS, the Seller desires to sell all of its rights, title and interest to the Note to Purchaser, and the Purchaser desires to purchase the Note from the Seller in consideration for Buyer's forgiveness of certain liabilities due and payable to the Buyer by Seller, and such other consideration and undertakings as more particularly hereinafter described.

NOW THEREFORE, in consideration of the mutual covenants, agreements, conditions, representation, and warranties contained in this Agreement, the Seller and the Purchaser hereby agree as follows:

1. PURCHASE AND SALE OF THE ASSIGNED PORTION OF THE NOTE

1.1 **Purchase and Sale of Assigned Portion of Note**.  Subject to the terms and conditions of this Agreement, the Seller hereby agrees to sell and assign to the Purchaser and the Purchaser hereby agrees to acquire from the Seller the Note in exchange for the forgiveness of certain debts payable on the books and records of the Company to Buyer and its affiliates in the amount of Sixty-Six Thousand Three Hundred Thirty Dollars and 62/100 (US $66,330.62).

1.2 <u>Closing.</u>  The purchase and sale of the Note shall take place at such time and place as the Seller and Purchaser shall mutually agree (which time and place are designated as the "<u>Closing</u>").  At the Closing, the Seller shall deliver to the Purchaser (i) a duly executed Assignment Agreement in the form attached hereto as Exhibit B; and (ii) a duly executed Settlement and Release Agreement in the form attached hereto as Exhibit C with respect to the purchase price hereunder.

1

2. REPRESENTATIONS AND WARRANTIES OF THE SELLER

As a material inducement to the Purchaser to enter into this Agreement, the Seller makes the following representations and warranties to the Purchaser as of the date of this Agreement and as of the Closing:

2.1    Organization, Standing, and Qualification.  The Seller is duly organized, validly existing, and in good standing under the laws of Nevada. The Seller has full corporate power and authority to enter into this Agreement and this Agreement has been duly and validly authorized, executed and delivered by the Seller and is a valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms, except as such enforcement may be limited by the United States Bankruptcy Code and laws affecting creditors' rights, generally.

2.2    Authorization.  All action on the part of the Seller and its directors, officers and shareholders necessary for (i) the authorization, execution, delivery, and performance of all the obligations of the Seller under this Agreement and the consummation of the transactions contemplated herein, and (ii) the authorization, issuance, execution, and delivery of the Agreement and Assignment by the Seller hereunder have been taken by such officers and directors. This Agreement constitutes a valid and binding obligation of the Seller enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, and moratorium laws and other laws of general application affecting enforcement of creditors' rights generally and to general equitable principles. The Seller has provided the Purchaser and its counsel with true and accurate copies of the appropriate resolutions of directors and shareholders relating to this transaction and effective as of the date of this Agreement and the Seller undertakes that it will procure that all such resolutions remain in full force and effect as of the Closing.

2.3    Title to the Note.  The Seller has good and marketable title to the Note, free and clear of any and all restrictions on or conditions to transfer or assignment, and free and clear of any and all liens, claims, mortgages, pledges, charges, equities, easements, rights of way, covenants, conditions, security interests, encumbrances, or restrictions.

2.4    Agreement Will Not Cause Breach or Violation.  The consummation of the transactions contemplated by this Agreement will not result in any violation of or constitute a default or an event that, with notice or lapse of time, or both, would conflict with or constitute a breach or default of the Articles of Incorporation or Bylaws of the Seller (as amended or restated) or of any material contract of the Seller or any applicable provision of state or federal law and will not result in the creation or imposition of any lien or encumbrance on any of the Seller's property.

3. REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

3.1    Authorization.  The Purchaser represents and warrants that all action on the part of Purchaser necessary for the authorization, execution, delivery, and performance of all the obligations of Purchaser under this Agreement has been taken prior to the Closing and that

this Agreement constitutes a valid and legally binding obligation of Purchaser enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, and moratorium laws and other laws of general application affecting enforcement of creditors' rights generally and to general equitable principles.

3.2   "Accredited Investor".  The Purchaser represents that it is an "accredited investor" as such term is defined in the SEC's Rule 501 under Regulation D.

3.3   Transfer or Resale. Purchaser acknowledges that the Note has not been registered under the Securities Act or any state securities laws, and may not be offered for sale, sold, assigned or transferred unless an opinion of counsel, in a generally acceptable form, to the effect that such Securities to be sold, assigned or transferred may be sold, assigned or transferred pursuant to an exemption from such registration requirements.

5.   MISCELLANEOUS PROVISIONS

5.1   Modifications and Waivers.  This Agreement may not be amended or modified, nor may the rights of any Party hereunder be waived, except by a written document that is executed by the Purchaser and the Seller.

5.2   Assignment.  This Agreement is and shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

5.3   Rights and Obligations of Third Parties.  Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties to it and their respective successors and permitted assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third parties to any party to this Agreement, nor shall any provision give any third party any right of subrogation or action against any party to this Agreement.

5.4   Notices.  Any notice, request, consent, or other communication hereunder shall be in writing, and shall be sent by one of the following means:  (i) by registered or certified first class mail, postage prepaid; (ii) by facsimile transmission; (iii) by reputable overnight courier service; or (iv) by personal delivery, and shall be properly addressed as follows:

If to the Seller, to:

_____

_____

If to the Purchaser, to:

_____

_____

or to such other address or addresses as the Seller or the Purchaser shall hereafter designate to the other Party in writing. Notices sent by mail or by courier shall be effective seven (7) days after they are sent, and notices delivered personally or by facsimile shall be effective at the time of delivery thereof.

5.2   <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the parties hereto in relation to the subject matter hereof. Any prior written or oral negotiations, correspondence, or understandings relating to the subject matter hereof shall be superseded by this Agreement and shall have no force or effect. The representations, warranties, covenants and agreements made herein shall survive any investigation made by the Purchaser.

5.3   <u>Severability</u>. If any provision which is not essential to the effectuation of the basic purpose of this Agreement is determined by a court of competent jurisdiction to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of the remaining provisions of this Agreement.

5.4   <u>Headings</u>. The headings of the Sections of this Agreement are inserted for convenience of reference only and shall not affect the construction or interpretation of any provisions hereof.

5.5   <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall be an original, but all of which together shall constitute one and the same instrument.

5.6   <u>Expenses</u>. Each Party shall bear and pay the legal and other expenses incurred in connection with negotiating and preparing this Agreement on its behalf.

5.7   <u>Governing Law</u>. This Agreement shall be construed in accordance with and governed by the laws of the State of New Jersey.

5.8   <u>Delays or Omissions</u>. No delay or omission to exercise any right, power, or remedy accruing to either Party, upon any breach or default of the other Party under this Agreement, shall impair any such right, power, or remedy, nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent, or approval of any kind or character on the part of either Party of any breach or default by the other Party under this Agreement, or any waiver of any provisions or conditions of this Agreement must be made in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to either Party, shall be cumulative and not alternative.

5.9    <u>Attorneys' Fees</u>. If either Party elects to pursue legal action to enforce its rights under this Agreement, and if a court of competent jurisdiction adjudicates the matter, then the prevailing party in such action shall be entitled to receive from the losing party all costs and expenses, including but not limited to the reasonable fees of attorneys, accountants, and other experts, incurred by the prevailing party in investigating and prosecuting (or defending) such action at the initial trial and appellate levels.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

SIGNATURE PAGE TO NOTE PURCHASE AGREEMENT

IN WITNESS WHEREOF, the Seller and the Purchaser have each caused this Note Purchase Agreement to be executed by their duly authorized representatives to be effective as of the day and year first above written.

SELLER:                          Essex Global Investments Corp.

                                 By _____
                                    Ben Conde, President

PURCHASER:                       East Capital Investment Corp.

                                 By _____
                                    Christopher Danzi, Chief Executive Officer

Acknowledged and Agreed:

VINCENT DANZI

By _____
   Vincent Danzi, individually

PHYLLIS DANZI

By _____
   Phyllis Danzi, individually

6

# EXHIBIT 24

Case 1:21-cv-10300-LLS Document 1-2 Filed 12/03/21 Page 141 of 173

## NOTE PURCHASE AGREEMENT

This Note Purchase Agreement (this "Agreement") is made and entered into as of the 21st day of February, 2020, by and between Essex Global Investments Corp., a Nevada corporation (the "Seller"), and East Capital Investment Corp., a New Jersey corporation (the "Purchaser"), collectively referred to herein as the "Parties" or individually as a "Party".

W I T N E S S E T H :

WHEREAS, Seller is the holder of a certain promissory note issued by GenTech Holdings, Inc., fka Pocket Games, Inc., a Florida corporation (the "Company"), dated August 29, 2019, in the face amount of $90,000 (the "Note"), a copy of which is attached hereto as Exhibit A; and

WHEREAS, pursuant to the representations in Section 4.2 herein, the balance of the Note as of the date hereof, inclusive of principal, interest and penalties accrued thereon is $93,550.68; and

WHEREAS, the Seller desires to sell all of its rights, title and interest to the Note to Purchaser, and the Purchaser desires to purchase the Note from the Seller in consideration for Buyer's forgiveness of certain liabilities due and payable to the Buyer by Seller, and such other consideration and undertakings as more particularly hereinafter described.

NOW THEREFORE, in consideration of the mutual covenants, agreements, conditions, representation, and warranties contained in this Agreement, the Seller and the Purchaser hereby agree as follows:

1. PURCHASE AND SALE OF THE ASSIGNED PORTION OF THE NOTE

1.1  **Purchase and Sale of Assigned Portion of Note**.  Subject to the terms and conditions of this Agreement, the Seller hereby agrees to sell and assign to the Purchaser and the Purchaser hereby agrees to acquire from the Seller the Note in exchange for the forgiveness of certain debts payable on the books and records of the Company to Buyer and its affiliates in the amount of Fifty-Nine Thousand Four Hundred Thirty One Dollars and 26/100 (US $59,431.26).

1.2  **Closing.**  The purchase and sale of the Note shall take place at such time and place as the Seller and Purchaser shall mutually agree (which time and place are designated as the "Closing").  At the Closing, the Seller shall deliver to the Purchaser (i) a duly executed Assignment Agreement in the form attached hereto as Exhibit B; and (ii) a duly executed Settlement and Release Agreement in the form attached hereto as Exhibit C with respect to the purchase price hereunder.

1

2.  REPRESENTATIONS AND WARRANTIES OF THE SELLER

As a material inducement to the Purchaser to enter into this Agreement, the Seller makes the following representations and warranties to the Purchaser as of the date of this Agreement and as of the Closing:

2.1    Organization, Standing, and Qualification. The Seller is duly organized, validly existing, and in good standing under the laws of Nevada. The Seller has full corporate power and authority to enter into this Agreement and this Agreement has been duly and validly authorized, executed and delivered by the Seller and is a valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms, except as such enforcement may be limited by the United States Bankruptcy Code and laws affecting creditors' rights, generally.

2.2    Authorization. All action on the part of the Seller and its directors, officers and shareholders necessary for (i) the authorization, execution, delivery, and performance of all the obligations of the Seller under this Agreement and the consummation of the transactions contemplated herein, and (ii) the authorization, issuance, execution, and delivery of the Agreement and Assignment by the Seller hereunder have been taken by such officers and directors. This Agreement constitutes a valid and binding obligation of the Seller enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, and moratorium laws and other laws of general application affecting enforcement of creditors' rights generally and to general equitable principles. The Seller has provided the Purchaser and its counsel with true and accurate copies of the appropriate resolutions of directors and shareholders relating to this transaction and effective as of the date of this Agreement and the Seller undertakes that it will procure that all such resolutions remain in full force and effect as of the Closing.

2.3    Title to the Note. The Seller has good and marketable title to the Note, free and clear of any and all restrictions on or conditions to transfer or assignment, and free and clear of any and all liens, claims, mortgages, pledges, charges, equities, easements, rights of way, covenants, conditions, security interests, encumbrances, or restrictions.

2.4    Agreement Will Not Cause Breach or Violation. The consummation of the transactions contemplated by this Agreement will not result in any violation of or constitute a default or an event that, with notice or lapse of time, or both, would conflict with or constitute a breach or default of the Articles of Incorporation or Bylaws of the Seller (as amended or restated) or of any material contract of the Seller or any applicable provision of state or federal law and will not result in the creation or imposition of any lien or encumbrance on any of the Seller's property.

3.  REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

3.1    Authorization. The Purchaser represents and warrants that all action on the part of Purchaser necessary for the authorization, execution, delivery, and performance of all the obligations of Purchaser under this Agreement has been taken prior to the Closing and that

this Agreement constitutes a valid and legally binding obligation of Purchaser enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, and moratorium laws and other laws of general application affecting enforcement of creditors' rights generally and to general equitable principles.

3.2     "Accredited Investor".  The Purchaser represents that it is an "accredited investor" as such term is defined in the SEC's Rule 501 under Regulation D.

3.3     Transfer or Resale. Purchaser acknowledges that the Note has not been registered under the Securities Act or any state securities laws, and may not be offered for sale, sold, assigned or transferred unless an opinion of counsel, in a generally acceptable form, to the effect that such Securities to be sold, assigned or transferred may be sold, assigned or transferred pursuant to an exemption from such registration requirements.

5.     MISCELLANEOUS PROVISIONS

5.1     Modifications and Waivers.  This Agreement may not be amended or modified, nor may the rights of any Party hereunder be waived, except by a written document that is executed by the Purchaser and the Seller.

5.2     Assignment.  This Agreement is and shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

5.3     Rights and Obligations of Third Parties.  Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties to it and their respective successors and permitted assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third parties to any party to this Agreement, nor shall any provision give any third party any right of subrogation or action against any party to this Agreement.

5.4     Notices.  Any notice, request, consent, or other communication hereunder shall be in writing, and shall be sent by one of the following means: (i) by registered or certified first class mail, postage prepaid; (ii) by facsimile transmission; (iii) by reputable overnight courier service; or (iv) by personal delivery, and shall be properly addressed as follows:

If to the Seller, to:

_____

_____

If to the Purchaser, to:

_____

_____

Case 1:21-cv-10300-LLS   Document 1-2   Filed 12/03/21   Page 144 of 173

or to such other address or addresses as the Seller or the Purchaser shall hereafter designate to the other Party in writing. Notices sent by mail or by courier shall be effective seven (7) days after they are sent, and notices delivered personally or by facsimile shall be effective at the time of delivery thereof.

5.2    <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the parties hereto in relation to the subject matter hereof. Any prior written or oral negotiations, correspondence, or understandings relating to the subject matter hereof shall be superseded by this Agreement and shall have no force or effect. The representations, warranties, covenants and agreements made herein shall survive any investigation made by the Purchaser.

5.3    <u>Severability</u>. If any provision which is not essential to the effectuation of the basic purpose of this Agreement is determined by a court of competent jurisdiction to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of the remaining provisions of this Agreement.

5.4    <u>Headings</u>. The headings of the Sections of this Agreement are inserted for convenience of reference only and shall not affect the construction or interpretation of any provisions hereof.

5.5    <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall be an original, but all of which together shall constitute one and the same instrument.

5.6    <u>Expenses</u>. Each Party shall bear and pay the legal and other expenses incurred in connection with negotiating and preparing this Agreement on its behalf.

5.7    <u>Governing Law</u>. This Agreement shall be construed in accordance with and governed by the laws of the State of New Jersey.

5.8    <u>Delays or Omissions</u>. No delay or omission to exercise any right, power, or remedy accruing to either Party, upon any breach or default of the other Party under this Agreement, shall impair any such right, power, or remedy, nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent, or approval of any kind or character on the part of either Party of any breach or default by the other Party under this Agreement, or any waiver of any provisions or conditions of this Agreement must be made in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to either Party, shall be cumulative and not alternative.

5.9    <u>Attorneys' Fees</u>.  If either Party elects to pursue legal action to enforce its rights under this Agreement, and if a court of competent jurisdiction adjudicates the matter, then the prevailing party in such action shall be entitled to receive from the losing party all costs and expenses, including but not limited to the reasonable fees of attorneys, accountants, and other experts, incurred by the prevailing party in investigating and prosecuting (or defending) such action at the initial trial and appellate levels.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

SIGNATURE PAGE TO NOTE PURCHASE AGREEMENT

IN WITNESS WHEREOF, the Seller and the Purchaser have each caused this Note Purchase Agreement to be executed by their duly authorized representatives to be effective as of the day and year first above written.

SELLER:                         Essex Global Investments Corp.

                                By _____
                                   Ben Conde, President

PURCHASER:                      East Capital Investment Corp.

                                By _____
                                   Christopher Danzi, Chief Executive Officer

Acknowledged and Agreed:

VINCENT DANZI

By _____
   Vincent Danzi, individually

PHYLLIS DANZI

By _____
   Phyllis Danzi, individually

# EXHIBIT 25

Case 1:21-cv-10300-LLS   Document 1-2   Filed 12/03/21   Page 148 of 173

# Disclosure Statement Pursuant to the Pink Basic Disclosure Guidelines

GenTech Holdings, Inc.
11427 West I70 Frontage Road North
Wheat Ridge, CO. 80033

+1 800 807 4178
www.gentechholdings.com
invest@gentech.group
1591157

**Quarterly** Report
**For the Period Ending: July 31 2021**
(the "Reporting Period")

As of July 31, 2021, the number of shares outstanding of our Common Stock was:

**26,764,218,412**

As of April 30, 2021, the number of shares outstanding of our Common Stock was:

**13,995,992,699**

As of October 31, 2020, the number of shares outstanding of our Common Stock was:

**428,605,234**

Indicate by check mark whether the company is a shell company (as defined in Rule 405 of the Securities Act of 1933 and Rule 12b-2 of the Exchange Act of 1934):

Yes: ☐          No: ☒

Indicate by check mark whether the company's shell status has changed since the previous reporting period:

Yes: ☐          No: ☒

Indicate by check mark whether a Change in Control[1] of the company has occurred over this reporting period:

Yes: ☐          No: ☒

---

[1] "Change in Control" shall mean any events resulting in:

(i) Any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act) becoming the "beneficial owner" (as defined in Rule 13d-3 of the Exchange Act), directly or indirectly, of securities of the Company representing fifty percent (50%) or more of the total voting power represented by the Company's then outstanding voting securities;
(ii) The consummation of the sale or disposition by the Company of all or substantially all of the Company's assets;
(iii) A change in the composition of the Board occurring within a two (2)-year period, as a result of which fewer than a majority of the directors are directors immediately prior to such change; or
(iv) The consummation of a merger or consolidation of the Company with any other corporation, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity or its parent) at least fifty percent (50%) of the total voting power represented by the voting securities of the Company or such surviving entity or its parent outstanding immediately after such merger or consolidation.

1) **Name and address(es) of the issuer and its predecessors (if any)**

In answering this item, provide the current name of the issuer any names used by predecessor entities, along with the dates of the name changes.

Pocket Games, Inc. (the "Company") was incorporated on October 4, 2013 ("Inception") under the laws of the State of Florida. Effective November 21, 2018, the Company changed its name to GenTech Holdings, Inc.

The state of incorporation or registration of the issuer and of each of its predecessors (if any) during the past five years; Please also include the issuer's current standing in its state of incorporation (e.g. active, default, inactive):

The Company is in good standing and active with the State of Colorado and redomiciled from Florida in February 2021.

Describe any trading suspension orders issued by the SEC concerning the issuer or its predecessors since inception:

None

List any stock split, stock dividend, recapitalization, merger, acquisition, spin-off, or reorganization either currently anticipated or that occurred within the past 12 months:

The company's subsidiary, Sinfit Nutrition, Inc. acquired 75% of the common stock of Nature Spoon, LLC in July 2021

The address(es) of the issuer's principal executive office:

11427 W I-70 Frontage Road North, Wheat Ridge, CO. 80033

The address(es) of the issuer's principal place of business:
*Check box if principal executive office and principal place of business are the same address:* ☒

———

Has the issuer or any of its predecessors been in bankruptcy, receivership, or any similar proceeding in the past five years?

Yes: ☐     No: ☒

If this issuer or any of its predecessors have been the subject of such proceedings, please provide additional details in the space below:

———

2) **Security Information**

| | |
|---|---|
| Trading symbol: | GTEH |
| Exact title and class of securities outstanding: | COMMON |
| CUSIP: | 37253Y1010 |
| Par or stated value: | 0.0001 |

| | |
|---|---|
| Total shares authorized: | 40,000,000,000 as of date: 07/31/2021 |
| Total shares outstanding: | 26,764,218,412 as of date: 07/31/2021 |

Case 1:21-cv-10300-LLS   Document 1-2   Filed 12/03/21   Page 150 of 173

Number of shares in the Public Float[2]: <u>26,764,218,415</u> as of date: <u>07/31/2021</u>
Total number of shareholders of record: <u>77</u>        as of date: 07/31/2021

*All additional class(es) of publicly traded securities (if any):*

Trading symbol:                                _____
Exact title and class of securities outstanding:   _____
CUSIP:                                         _____
Par or stated value:                           _____
Total shares authorized:                       _____ as of date: _____
Total shares outstanding:                      _____ as of date: _____

### Transfer Agent

Name:    <u>Olde Monmouth Transfer Co. Inc.</u>
Phone:   <u>732 872 2727</u>
Email:   <u>matt@oldemonmouth.com</u>
Address: <u>200 Memorial Parkway, Atlantic Highlands, NY. 07716</u>

Is the Transfer Agent registered under the Exchange Act?[3] Yes: ☒        No: ☐


### 3)    Issuance History

The goal of this section is to provide disclosure with respect to each event that resulted in any direct changes to the total shares outstanding of any class of the issuer's securities **in the past two completed fiscal years and any subsequent interim period**.

Disclosure under this item shall include, in chronological order, all offerings and issuances of securities, including debt convertible into equity securities, whether private or public, and all shares, or any other securities or options to acquire such securities, issued for services. Using the tabular format below, please describe these events.


### A.  Changes to the Number of Outstanding Shares

Check this box to indicate there were no changes to the number of outstanding shares within the past two completed fiscal years and any subsequent periods: ☐

---

[2] "Public Float" shall mean the total number of unrestricted shares not held directly or indirectly by an officer, director, any person who is the beneficial owner of more than 10 percent of the total shares outstanding (a "control person"), or any affiliates thereof, or any immediate family members of officers, directors and control persons.

[3] To be included in the Pink Current Information tier, the transfer agent must be registered under the Exchange Act.

Shares Outstanding as of Second Most Recent Fiscal Year End:

**Opening Balance**

Date 10/31/19          Common: 428,605,234

Preferred: 1,000

| Date of Transaction | Transaction type (e.g. new issuance, cancellation, shares returned to treasury) | Number of Shares Issued (or cancelled) | Class of Securities | Value of shares issued ($/per share) at Issuance | Were the shares issued at a discount to market price at the time of issuance? (Yes/No) | Individual/ Entity Shares were issued to (entities must have individual with voting / investment control disclosed). | Reason for share issuance (e.g. for cash or debt conversion) -OR- Nature of | Restricted or Unrestricted as of this filing. | Exemption or Registration Type. |
|---|---|---|---|---|---|---|---|---|---|
| 11/14/19 | New Issuance | 1,000,000,000 | Common | 0.0001 | Yes | David Lovatt | Directors Renumeration | Restricted | None |
| 11/15/19 | New Issuance | 110,000,000 | Common | 0.001 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 12/11/19 | New Issuance | 50,000,000 | Common | 0.001 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 12/11/19 | New Issuance | 50,000,000 | Common | 0.001 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 1/9/20 | New Issuance | 100,000,000 | Common | 0.001 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 1/9/20 | New Issuance | 25,000,000 | Common | 0.001 | Yes | TriBridge Ventures LLC – John Forsythe III | REG A | Unrestricted | Free Trading |
| 2/19/20 | New Issuance | 87,500,000 | Common | 0.0008 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 2/20/20 | New Issuance | 52,500,000 | Common | 0.0008 | Yes | TriBridge Ventures LLC – John Forsythe III | REG A | Unrestricted | Free Trading |
| 2/25/20 | New Issuance | 101,953,400 | Common | 0.0004 | Yes | Essex Global Investments LLC, Ben Conde | Debt Conversion | Unrestricted | Rule 144 Exemption |
| 5/15/20 | New Issuance | 50,000,000 | Common | 0.0008 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 5/27/20 | New Issuance | 143,750,000 | Common | 0.0008 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 5/28/20 | New Issuance | 62,500,000 | Common | 0.0008 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 6/3/20 | New Issuance | 125,000,000 | Common | 0.0008 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 6/11/20 | New Issuance | 40,000,000 | Common | 0.0008 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 6/17/20 | New Issuance | 125,000,000 | Common | 0.0008 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 6/26/20 | New Issuance | 156,250,000 | Common | 0.0008 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 7/16/20 | New Issuance | 81,250,000 | Common | 0.0008 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 7/27/20 | New Issuance | 81,250,000 | Common | 0.0008 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 9/1/20 | New Issuance | 187,500,000 | Common | 0.0008 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 10/14/20 | New Issuance | 700,000,000 | Common | NA | NA | Ilan Freeman | Acquisition | Restricted | Restricted |
| 10/14/20 | New Issuance | 700,000,000 | Common | $350,000 | No | Sun Kissed Industries – Joseph Laden CEO | Acquisition | Restricted | Restricted |
| 10/14/20 | New Issuance | 700,000,000 | Common | 0.0001 | YES | Leonard K. Armenta | Compensation | Restricted | Restricted |
| 10/16/20 | New Issuance | 300,000,000 | Common | 0.00014 | Yes | GPL Ventures LLC – Alexander Dillon | Note Conversion | Unrestricted | Rule 144 Not Registered No Legend |
| 10/28/20 | New Issuance | 200,000,000 | Common | 0.0005 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 10/28/20 | New Issuance | 100,000,000 | Common | 0.0005 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 10/28/20 | New Issuance | 127,142,857 | Common | 0.000112 | Yes | GPL Ventures LLC – Alexander Dillon | Note Conversion | Unrestricted | Rule 144 Not Registered No Legend |
| 10/15/20 | Retired | (100,000,000) | Common | NA | NA | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 11/14/19 | New Issuance | 1,000,000,000 | Common | 0.0001 | Yes | David Lovatt | Directors Renumeration | Restricted | None |
| 11/15/19 | New Issuance | 110,000,000 | Common | 0.001 | Yes | GPL Ventures LLC – Alexander Dillon | | Unrestricted | Free Trading |

| 12/11/19 | New Issuance | 50,000,000 | Common | 0.001 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 12/11/19 | New Issuance | 50,000,000 | Common | 0.001 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 1/9/20 | New Issuance | 100,000,000 | Common | 0.001 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 1/9/20 | New Issuance | 25,000,000 | Common | 0.001 | Yes | TriBridge Ventures LLC – John Forsythe III | REG A | Unrestricted | Free Trading |
| 2/19/20 | New Issuance | 87,500,000 | Common | 0.0008 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 2/20/20 | New Issuance | 52,500,000 | Common | 0.0008 | Yes | TriBridge Ventures LLC – John Forsythe III | REG A | Unrestricted | Free Trading |
| 2/25/20 | New Issuance | 101,953,400 | Common | 0.0004 | Yes | Essex Global Investments LLC, Ben Conde | Debt Conversion | Unrestricted | Rule 144 Exemption |
| 5/15/20 | New Issuance | 50,000,000 | Common | 0.0008 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 5/27/20 | New Issuance | 143,750,000 | Common | 0.0008 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 5/28/20 | New Issuance | 62,500,000 | Common | 0.0008 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 6/3/20 | New Issuance | 125,000,000 | Common | 0.0008 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 6/11/20 | New Issuance | 40,000,000 | Common | 0.0008 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 6/17/20 | New Issuance | 125,000,000 | Common | 0.0008 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 6/26/20 | New Issuance | 156,250,000 | Common | 0.0008 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 7/16/20 | New Issuance | 81,250,000 | Common | 0.0008 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 7/27/20 | New Issuance | 81,250,000 | Common | 0.0008 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 9/1/20 | New Issuance | 187,500,000 | Common | 0.0008 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 10/14/20 | New Issuance | 700,000,000 | Common | NA | NA | Ilan Freeman | Acquisition | Restricted | Restricted |
| 10/14/20 | New Issuance | 700,000,000 | Common | $350,000 | No | Sun Kissed Industries – Joseph Laden CEO | Acquisition | Restricted | Restricted |
| 10/14/20 | New Issuance | 700,000,000 | Common | 0.0001 | YES | Leonard K. Armenta | Compensation | Restricted | Restricted |
| 10/16/20 | New Issuance | 300,000,000 | Common | 0.00014 | Yes | GPL Ventures LLC – Alexander Dillon | Note Conversion | Unrestricted | Rule 144 Not Registered No Legend |
| 10/28/20 | New Issuance | 200,000,000 | Common | 0.0005 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 11/12/20 | New Issuance | 100,000,000 | Common | 0.0005 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 11/19/20 | New Issuance | 480,000,000 | Common | $24,000 | Yes | GPL Ventures LLC – Alexander Dillon | Note Conversion | Unrestricted | 144 Exemption |
| 11/30/20 | New Issuance | 75,000,000 | Common | NA | NA | Fidelis Capital – Anthony Lotto | Note Conversion | Unrestricted | 144 Exemption |
| 11/30/20 | New Issuance | 120,000,000 | Common | $6,000 | Yes | GPL Ventures LLC – Alexander Dillon | Note Conversion | Unrestricted | 144 Exemption |
| 12/4/20 | New Issuance | 520,000,000 | Common | $10,400 | Yes | GPL Ventures LLC – Alexander Dillon | Note Conversion | Unrestricted | 144 Exemption |
| 12/4/20 | Retired Common | (75,000,000) | Common | NA | NA | Fidelis Capital LLC – Anthony Lotto | NA | NA | NA |
| 12/7/20 | New Issuance | 130,000,000 | Common | $0.00 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 12/10/20 | New Issuance | 480,000,000 | Common | $9,600 | Yes | GPL Ventures LLC – Alexander Dillon | Note Conversion | Unrestricted | 144 Exemption |
| 12/16/20 | New Issuance | 120,000,000 | Common | $0.00 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 12/28/20 | New Issuance | 530,000,000 | Common | $5,300 | Yes | GPL Ventures LLC – Alexander Dillon | Note Conversion | Unrestricted | 144 Exemption |
| 1/6/21 | New Issuance | 650,000,000 | Common | NA | NA | GPL Ventures LLC – Alexander Dillon | Note Conversion | Unrestricted | 144 Exemption |
| 1/7/21 | New Issuance | 200,000,000 | Common | $0.00 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 1/13/21 | New Issuance | 57,791,208 | Common | NA | NA | East Capital Investments LLC - Chris Danzi | Note Conversion | Unrestricted | 144 Exemption |
| 1/21/21 | New Issuance | 100,000,000 | Common | $0.00 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |

| 1/22/21 | New Issuance | 820,000,000 | Common | $8,200 | Yes | GPL Ventures LLC – Alexander Dillon | Note Conversion | Unrestricted | 144 Exemption |
|---|---|---|---|---|---|---|---|---|---|
| 1/22/21 | Retired | (1,000,000,000) | Common | NA | NA | David Lovatt | Retired | Restricted | Restricted |
| 1/26/21 | New Issuance | 250,000,000 | Common | $0.00 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 1/27/21 | New Issuance | 10,000,000 | Common | $0.00 | Yes | Elliott Polatoff | REG A | Unrestricted | Free Trading |
| 12/15/20 | Shares Returned | (999) | Preferred A | NA | NA | David Lovatt | Compensation | Restricted | Restricted |
| 12/15/20 | New Issuance | - 1 | Preferred A | NA | NA | Leonard Armenta | Compensation | Restricted | Restricted |
| 2/2/21 | New Issuance | 500,000,000 | Common | 0.0005 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 2/4/21 | New Issuance | 500,000,000 | Common | 0.0005 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 2/7/21 | New Issuance | 600,000,000 | Common | 0.0005 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 2/10/21 | New Issuance | 500,000,000 | Common | 0.0005 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 2/17/21 | New Issuance | 620,000,000 | Common | 0.0005 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 3/3/21 | New Issuance | 600,000,000 | Common | 0.0005 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 3/10/21 | New Issuance | 600,000,000 | Common | 0.0005 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 3/15/21 | New Issuance | 730,000,000 | Common | 0.0005 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 3/24/21 | New Issuance | 1,000,000,000 | Common | 0.0005 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 3/30/21 | New Issuance | 200,000,000 | Common | 0.0005 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 2/10/21 | New Issuance | 500,000,000 | Common | 0.0005 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 2/25/21 | New Issuance | 29,000,000 | Common | 0.0005 | Yes | Carl Grant | REG A | Unrestricted | Free Trading |
| 3/23/21 | New Issuance | 60,000,000 | Common | 0.0005 | Yes | Carl Grant | REG A | Unrestricted | Free Trading |
| 3/30/21 | New Issuance | 60,000,000 | Common | 0.0005 | Yes | Carl Grant | REG A | Unrestricted | Free Trading |
| 2/7/21 | New Issuance | 60,000,000 | Common | 0.0005 | Yes | Suares Capital LLC | REG A | Unrestricted | Free Trading |
| 3/24/21 | New Issuance | 200,000,000 | Common | 0.0005 | Yes | Suares Capital LLC | REG A | Unrestricted | Free Trading |
| 3/29/21 | New Issuance | 400,000,000 | Common | 0.0005 | Yes | Suares Capital LLC | REG A | Unrestricted | Free Trading |
| 2/7/21 | New Issuance | 50,000,000 | Common | 0.0005 | Yes | Elliott Polatoff | REG A | Unrestricted | Free Trading |
| 2/9/21 | New Issuance | 40,000,000 | Common | 0.0005 | Yes | Elliott Polatoff | REG A | Unrestricted | Free Trading |
| 3/25/21 | New Issuance | 50,000,000 | Common | 0.0005 | Yes | Elliott Polatoff | REG A | Unrestricted | Free Trading |
| 3/30/21 | New Issuance | 60,000,000 | Common | 0.0005 | Yes | Elliott Polatoff | REG A | Unrestricted | Free Trading |
| 4/5/21 | New Issuance | 30,000,000 | Common | 0.0005 | Yes | Elliott Polatoff | REG A | Unrestricted | Free Trading |
| 06/10/2021 | New Issuance | 100,000,000 | Common | 0.0005 | Yes | Carl Grant | REG A | Unrestricted | Restricted |
| 06/11/2021 | New Issuance | 1,000,000,000 | Common | 0.0005 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Restricted |
| 06/11/2021 | New Issuance | 100,000,000 | Common | 0.0005 | Yes | Elliott S Polatoff | REG A | Unrestricted | Restricted |
| 6/13/21 | New Issuance | 120,000,000 | Common | 0.0005 | Yes | Donell Suares, Attorney at Law. | REG A | Unrestricted | Restricted |
| 6/14/21 | New Issuance | 100,000,000 | Common | 0.0005 | Yes | Donell Suares, Attorney at Law. | REG A | Unrestricted | Restricted |
| 06/15/2021 | New Issuance | 600,000,000 | Common | 0.0005 | Yes | Suares Capital LLC | REG A | Unrestricted | Restricted |
| 06/17/2021 | New Issuance | 100,000,000 | Common | 0.0005 | Yes | Elliott S Polatoff | REG A | Unrestricted | Restricted |
| 06/21/2021 | New Issuance | 600,000,000 | Common | 0.0005 | Yes | Suares Capital LLC | REG A | Unrestricted | Restricted |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 06/21/2021 | New Issuance | 100,000,000 | Common | 0.0005 | Yes | Carl Grant | REG A | Unrestricted | Restricted |
| 06/22/2021 | New Issuance | 1,000,000,000 | Common | 0.0005 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Restricted |
| 6/23/21 | New Issuance | 53,000,000 | Common | 0.0005 | Yes | Donell Suares, Attorney at Law. | REG A | Unrestricted | Restricted |
| 06/24/2021 | New Issuance | 200,000,000 | Common | 0.0005 | Yes | Elliott S Polatoff | REG A | Unrestricted | Restricted |
| 06/25/2021 | New Issuance | 1,200,000,000 | Common | 0.0005 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | **Unrestricted** | Restricted |
| 06/25/2021 | New Issuance | 600,000,000 | Common | 0.0005 | Yes | Suares Capital LLC | REG A | Unrestricted | Restricted |
| 06/25/2021 | New Issuance | 200,000,000 | Common | 0.0005 | Yes | Carl Grant | REG A | Unrestricted | Restricted |
| 6/29/21 | New Issuance | 43,759,961 | Common | 0.00174 | No | Brian Poplin | NXTBar Acquisition | Restricted | Restricted |
| 6/29/21 | New Issuance | 10,939,990 | Common | 0.00174 | No | Adam Seifer | NXTBar Acquisition | Restricted | Restricted |
| 6/29/21 | New Issuance | 10,939,990 | Common | 0.00174 | No | William C Laffoday Jr. | NXTBar Acquisition | Restricted | Restricted |
| 6/29/21 | New Issuance | 10,939,990 | Common | 0.00174 | No | Robert Rossi | NXTBar Acquisition | Restricted | Restricted |
| 6/29/21 | New Issuance | 10,939,990 | Common | 0.00174 | No | Brenton Bersin | NXTBar Acquisition | Restricted | Restricted |
| 6/29/21 | New Issuance | 21,879,981 | Common | 0.00174 | No | Chad Marion | NXTBar Acquisition | Restricted | Restricted |
| 6/29/21 | New Issuance | 6,563,994 | Common | 0.00174 | No | Charlotte Lindemanis | NXTBar Acquisition | Restricted | Restricted |
| 6/29/21 | New Issuance | 43,759,961 | Common | 0.00174 | No | Clark Stewart | NXTBar Acquisition | Restricted | Restricted |
| 6/29/21 | New Issuance | 16,409,986 | Common | 0.00174 | No | Connie Furr | NXTBar Acquisition | Restricted | Restricted |
| 6/29/21 | New Issuance | 10,939,990 | Common | 0.00174 | No | Dave Grounds | NXTBar Acquisition | **Restricted** | Restricted |
| 6/29/21 | New Issuance | 16,409,986 | Common | 0.00174 | No | David Furr | NXTBar Acquisition | **Restric**ted | Restricted |
| 6/29/21 | New Issuance | 43,759,961 | Common | 0.00174 | No | Edward Jaffe | NXTBar Acquisition | Restricted | Restricted |
| 6/29/21 | New Issuance | 10,939,990 | Common | 0.00174 | No | George J Trappey IV | NXTBar Acquisition | Restricted | Restricted |
| 6/29/21 | New Issuance | 6,563,994 | Common | 0.00174 | No | Grant Johnston | NXTBar Acquisition | Restricted | Restricted |
| 6/29/21 | New Issuance | 10,939,990 | Common | 0.00174 | No | Jason Shade Burgess | NXTBar Acquisition | Restricted | Restricted |
| 6/29/21 | New Issuance | 13,127,988 | Common | 0.00174 | No | John Epsey | NXTBar Acquisition | Restricted | Restricted |
| 6/29/21 | New Issuance | 32,819,971 | Common | 0.00174 | No | Jonathan Stewart | NXTBar Acquisition | Restricted | Restricted |
| 6/29/21 | New Issuance | 13,127,988 | Common | 0.00174 | No | Jordan Hitchens | NXTBar Acquisition | Restricted | Restricted |
| 6/29/21 | New Issuance | 32,819,971 | Common | 0.00174 | No | Josh McCown | NXTBar Acquisition | Restricted | Restricted |
| 6/29/21 | New Issuance | 43,759,961 | Common | 0.00174 | No | Karl Brown | NXTBar Acquisition | Restricted | Restricted |
| 6/29/21 | New Issuance | 21,879,981 | Common | 0.00174 | No | Kent Ellington 1 | NXTBar Acquisition | Restricted | Restricted |
| 6/29/21 | New Issuance | 21,879,981 | Common | 0.00174 | No | Kent Ellington 2 | NXTBar Acquisition | Restricted | Restricted |
| 6/29/21 | New Issuance | 5,580,546 | Common | 0.00174 | No | Kristi Wheeler | NXTBar Acquisition | **Restricted** | Restricted |
| 6/29/21 | New Issuance | 13,127,988 | Common | 0.00174 | No | Kurt Coleman | NXTBar Acquisition | Restricted | Restricted |
| 6/29/21 | New Issuance | 8,751,992 | Common | 0.00174 | No | Matthew Ronald Wogan | NXTBar Acquisition | Restricted | Restricted |
| 6/29/21 | New Issuance | 14,213,100 | Common | 0.00174 | No | Melissa Wheeler | NXTBar Acquisition | Restricted | Restricted |
| 6/29/21 | New Issuance | 10,939,990 | Common | 0.00174 | No | Pamela Furr | NXTBar Acquisition | Restricted | Restricted |
| 6/29/21 | New Issuance | 4,376,434 | Common | 0.00174 | No | Parth Patel | NXTBar Acquisition | Restricted | Restricted |
| 6/29/21 | New Issuance | 21,879,981 | Common | 0.00174 | No | R. James Touissant | NXTBar Acquisition | Restricted | Restricted |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 6/29/21 | New Issuance | 43,759,961 | Common | 0.00174 | No | Richard G. Horton | NXTBar Acquisition | Restricted | Restricted |
| 6/29/21 | New Issuance | 10,939,990 | Common | 0.00174 | No | Ryan Garcia | NXTBar Acquisition | Restricted | Restricted |
| 6/29/21 | New Issuance | 43,759,961 | Common | 0.00174 | No | Salvatore Balsamo | NXTBar Acquisition | Restricted | Restricted |
| 6/29/21 | New Issuance | 10,939,990 | Common | 0.00174 | No | Scott Brinton Shawen | NXTBar Acquisition | Restricted | Restricted |
| 6/29/21 | New Issuance | 21,879,981 | Common | 0.00174 | No | Tre Boston | NXTBar Acquisition | Restricted | Restricted |
| 6/29/21 | New Issuance | 4,376,434 | Common | 0.00174 | No | Vachan Shetty | NXTBar Acquisition | **Restricted** | **Restricted** |
| 6/29/21 | New Issuance | 10,939,990 | Common | 0.00174 | No | Vyncint Smith | NXTBar Acquisition | Restricted | Restricted |
| 6/29/21 | New Issuance | 10,939,990 | Common | 0.00174 | No | Scott O'Neal | NXTBar Acquisition | Restricted | Restricted |
| 07/08/2021 | New Issuance | 2,000,000,000 | Common | 0.0005 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 07/13/2021 | New Issuance | 1,000,000,000 | Common | 0.0005 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 07/20/2021 | New Issuance | 2,000,000,000 | Common | 0.0005 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |
| 07/21/2021 | New Issuance | 1,000,000,000 | Common | 0.0005 | Yes | GPL Ventures LLC – Alexander Dillon | REG A | Unrestricted | Free Trading |

Shares Outstanding on Date of This Report:
**Ending Balance:**
Date 07/31/2021                Common:
**26,764,218,412**
Preferred: 1

## B. Debt Securities, Including Promissory and Convertible Notes

Use the chart and additional space below to list and describe all outstanding promissory notes, convertible notes, convertible debentures, or any other debt instruments that may be converted into a class of the issuer's equity securities.

Check this box if there are no outstanding promissory, convertible notes or debt arrangements: ☐

| Date of Note Issuance | Outstanding Balance ($) | Principal Amount at Issuance ($) | Interest Accrued ($) | Maturity Date | Conversion Terms (e.g. pricing mechanism for determining conversion of instrument to shares) | Name of Noteholder (entities must have individual with voting / investment control disclosed). | Reason for Issuance (e.g. Loan, Services, etc.) |
|---|---|---|---|---|---|---|---|
| 5/8/19 | $135,000 | $135,000 | $20,046.58 | 5/8/20 | Fifty percent (50%) of the lowest closing price of the Company's common stock for the ten (10) trading days prior to the conversion date | East Capital Investments LLC - Chris Danzi | Loan |
| 5/23/19 | $72,500 | $72,500 | $10,467.81 | 5/23/20 | Fifty percent (50%) of the lowest closing price of the Company's common stock for the ten (10) trading days prior to the conversion date | East Capital Investments LLC - Chris Danzi | Loan |
| 6/19/19 | $32,000 | $32,000 | $4,383.56 | 6/24/20 | Fifty percent (50%) of the lowest closing price of the Company's common stock for the ten (10) trading days prior to the conversion date | East Capital Investments LLC - Chris Danzi | **Loan** |
| 6/6/19 | $100,000 | $100,000 | $14,054.79 | 6/6/20 | Fifty percent (50%) of the lowest closing price of the Company's common stock for the ten (10) trading days prior to the conversion date | East Capital Investments LLC - Chris Danzi | Loan |
| 6/24/19 | $71,000 | $71,000 | $9,628.77 | 6/24/19 | Fifty percent (50%) of the lowest closing price of the Company's common stock for the ten (10) trading days prior to the conversion date | East Capital Investments LLC - Chris Danzi | Loan |
| 6/27/19 | $100,000 | $100,000 | $13,479.45 | 27/6/19 | Fifty percent (50%) of the lowest closing price of the Company's common stock for the ten (10) trading days prior to the conversion date | East Capital Investments LLC - Chris Danzi | Loan |
| 7/24/19 | $100,000 | $85,000 | $7,506.85 | 7/24/20 | Fifty percent (50%) of the lowest closing price of the Company's common stock for the twenty five(25) trading days prior to the conversion date | East Capital Investments LLC - Chris Danzi | **Loan** |

| 8/26/19 | $90,000 | $90,000 | $6,756.16 | 8/26/20 | Fifty percent (50%) of the lowest closing price of the Company's common stock for the twenty five(25) trading days prior to the conversion date | East Capital Investments LLC - Chris Danzi | Loan |
|---|---|---|---|---|---|---|---|

Use the space below to provide any additional details, including footnotes to the table above:

No reserves are setup at the Transfer Agent to accommodate conversions of these notes and they cannot be converted with a court order.

**4)    Financial Statements**

A.  The following financial statements were prepared in accordance with:

☒ U.S. GAAP
☐ IFRS

B.  The financial statements for this reporting period were prepared by (name of individual)[4]:

| | |
|---|---|
| Name: | **Zafar Iqbal** |
| Title: | **Accounting Consultant** |
| Relationship to Issuer: | **Retained Accountant** |

Provide the financial statements described below for the most recent fiscal year or quarter.  For the initial disclosure statement (qualifying for Pink Current Information for the first time) please provide reports for the two previous fiscal years and any subsequent interim periods.

C.    Balance Sheet;
D.    Statement of Income;
E.    Statement of Cash Flows;
F.    Statement of Retained Earnings (Statement of Changes in Stockholders' Equity)
G.    Financial notes; and
H.    Audit letter, if audited

You may either (i) attach/append the financial statements to this disclosure statement or (ii) file the financial statements through OTCIQ as a separate report using the appropriate report name for the applicable period end. ("Annual Report," "Quarterly Report" or "Interim Report").

If you choose to publish the financial statements in a separate report as described above, you must state in the accompanying disclosure statement that such financial statements are incorporated by reference.  You may reference the document(s) containing the required financial statements by indicating the document name, period end date, and the date that it was posted to OTCIQ in the field below. Financial Statements must be compiled in one document.

———

Financial statement information is considered current until the due date for the subsequent report (as set forth in the qualifications section above).  To remain qualified for Current Information, a company must post its Annual Report within 90 days from its fiscal year-end date and Quarterly Reports within 45 days of each fiscal quarter-end date.

---

[4] The financial statements requested pursuant to this item must be prepared in accordance with US GAAP or IFRS by persons with sufficient financial skills.

**5)    Issuer's Business, Products and Services**

The purpose of this section is to provide a clear description of the issuer's current operations.  In answering this item, please include the following:

A.  Summarize the issuer's business operations (If the issuer does not have current operations, state "no operations")

GenTech Holdings, Inc. operates businesses in the Functional Foods and Nutritional Supplements space. Its operating subsidiaries are Sinfit Nutrition, Inc. as well as American Metabolix, Inc. Sinfit Nutrition also owns a 75% controlling stake in Natures Spoon, LLC.
The brands we own and operate are:
SINFIT (www.sinfit.com)
Nature Soothie (www.naturesoothie.com)
NxtBar (www.nxtbar.com)
Yourganics (www.yourganicsnutrition.com)
MPB Snacks (www.mpbsnacks.com)
American Metabolix (www.americanmetabolix.com)
Core Natural Sciences (www.corenaturalsciences.com)
Storm Lifestyles (www.stormlifestyles.com)
Secret Javas (www.secretjavas.com)
Fizzique (www.drinkfizzique.com)

B.  Please list any subsidiaries, parents, or affiliated companies.

SINFIT Nutrition, Inc. 100% owned and controlled subsidiary
American Metabolix, Inc. 100% owned and controlled subsidiary
Nature Spoon, LLC. 75% owned and controlled subsidiary

C.  Describe the issuers' principal products or services.

Nutritional Supplements and Functional Foods

**6)    Issuer's Facilities**

The goal of this section is to provide a potential investor with a clear understanding of all assets, properties or facilities owned, used or leased by the issuer and the extent in which the facilities are utilized.

In responding to this item, please clearly describe the assets, properties or facilities of the issuer, give the location of the principal plants and other property of the issuer and describe the condition of the properties.  If the issuer does not have complete ownership or control of the property (for example, if others also own the property or if there is a mortgage on the property), describe the limitations on the ownership.

If the issuer leases any assets, properties or facilities, clearly describe them as above and the terms of their leases.

The company leases the following buildings
1)  6,500 sq foot warehouse at 11427 WI70 Frontage Road North, CO 80033
2)  2,000 sq foot warehouse at 4970 Iris Street, Wheat Ridge, CO, 80033
3)  11,000 sq foot Office / HQ building at 11445 WI70 Frontage Road North, CO 80033

**7)    Company Insiders (Officers, Directors, and Control Persons)**

The goal of this section is to provide an investor with a clear understanding of the identity of all the persons or entities that are involved in managing, controlling or advising the operations, business development and disclosure of the issuer, as well as the identity of any significant or beneficial shareholders.

Using the tabular format below, please provide information, as of the period end date of this report, regarding any person or entity owning 5% of more of any class of the issuer's securities, as well as any officer, and any director of the company, or any person that performs a similar function, regardless of the number of shares they own. **If any insiders listed are corporate shareholders or entities, provide the name and address of the person(s) beneficially owning or controlling such corporate shareholders, or the name and contact information (City, State) of an individual representing the corporation or entity in the note section.**

| Name of Officer/Director or Control Person | Affiliation with Company (e.g. Officer Title /Director/Owner of more than 5%) | Residential Address (City / State Only) | Number of shares owned | Share type/class | Ownership Percentage of Class Outstanding | Note |
|---|---|---|---|---|---|---|
| David Lovatt | CEO | Jacksonville, FLORIDA | 0 | 0 | 0 | See: Supplement Group. |
| Leonard K. Armenta Jr. | President | Wheat Ridge, COLORADO | 0 | 0 | 0 | See: Supplement Group. |
| ——— | ——— | ——— | ——— | ——— | ——— | ——— |
| Supplement Group (Europe) Ltd. Controlled 50% by David Lovatt and 50% by Leonard Armenta | Investor | Wheat Ridge, COLORADO | 1 | Preference A | 100% | ——— |
| ——— | ——— | ——— | ——— | ——— | ——— | ——— |

## 8)     Legal/Disciplinary History

A.  Please identify whether any of the persons or entities listed above have, in the past 10 years, been the subject of:

1.  A conviction in a criminal proceeding or named as a defendant in a pending criminal proceeding (excluding traffic violations and other minor offenses);

None

2.  The entry of an order, judgment, or decree, not subsequently reversed, suspended or vacated, by a court of competent jurisdiction that permanently or temporarily enjoined, barred, suspended or otherwise limited such person's involvement in any type of business, securities, commodities, or banking activities;

None

3.  A finding or judgment by a court of competent jurisdiction (in a civil action), the Securities and Exchange Commission, the Commodity Futures Trading Commission, or a state securities regulator of a violation of federal or state securities or commodities law, which finding or judgment has not been reversed, suspended, or vacated; or

None

4.  The entry of an order by a self-regulatory organization that permanently or temporarily barred, suspended, or otherwise limited such person's involvement in any type of business or securities activities.

None

B.  Describe briefly any material pending legal proceedings, other than ordinary routine litigation incidental to the business, to which the issuer or any of its subsidiaries is a party or of which any of their property is the subject. Include the name of the court or agency in which the proceedings are pending, the date instituted, the principal parties thereto, a description of the factual basis alleged to underlie the proceeding and the relief sought. Include similar information as to any such proceedings known to be contemplated by governmental authorities.

None.

## 9) Third Party Providers

Please provide the name, address, telephone number and email address of each of the following outside providers:

Securities Counsel

| | |
|---|---|
| Name: | Vic Devlaeminck |
| Firm: | ____ |
| Address 1: | 100013 N.E. Hazel Dell Avenue, Suite 317. |
| Address 2: | Vancouver, WA. 98665 |
| Phone: | 503-806-3533 |
| Email: | Vic@vicdevlaeminck.com |

Accountant or Auditor

| | |
|---|---|
| Name: | Zafar Iqbal |
| Firm: | ____ |
| Address 1: | C/O: 11427 WI70 Frontage Road N. |
| Address 2: | Wheat Ridge. CO. 80033 |
| Phone: | 1 800 807 4178 |
| Email: | invest@gentech.group |

Investor Relations

| | |
|---|---|
| Name: | None. |
| Firm: | ____ |
| Address 1: | ____ |

Address 2:          _____
Phone:              _____
Email:              _____

<u>Other Service Providers</u>
Provide the name of any other service provider(s) that **that assisted, advised, prepared or provided information with respect to this disclosure statement**. This includes counsel, broker-dealer(s), advisor(s) or consultant(s) or provided assistance or services to the issuer during the reporting period.

Name:               <u>None</u>
Firm:               _____
Nature of Services: _____
Address 1:          _____
Address 2:          _____
Phone:              _____
Email:              _____

## 10)    Issuer Certification

*Principal Executive Officer:*

The issuer shall include certifications by the chief executive officer and chief financial officer of the issuer (or any other persons with different titles but having the same responsibilities) in each Quarterly Report or Annual Report.

The certifications shall follow the format below:

I, <u>David Lovatt</u> certify that:

    1. I have reviewed this <u>quarterly statement</u> of <u>GenTech Holdings, Inc.</u>;

    2. Based on my knowledge, this disclosure statement does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this disclosure statement; and

    3. Based on my knowledge, the financial statements, and other financial information included or incorporated by reference in this disclosure statement, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in this disclosure statement.

09/10/21 [Date]

/s/ David Lovatt [CEO's Signature]

(Digital Signatures should appear as "/s/ [OFFICER NAME]")


*Principal Financial Officer:*

I, David Lovatt certify that:

   1. I have reviewed this quarterly statement of GenTech Holdings, Inc.;

   2. Based on my knowledge, this disclosure statement does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this disclosure statement; and

   3. Based on my knowledge, the financial statements, and other financial information included or incorporated by reference in this disclosure statement, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in this disclosure statement.

09/10/2021 [Date]

/s/ David Lovatt [CFO's Signature]

(Digital Signatures should appear as "/s/ [OFFICER NAME]")

## GENTECH HOLDINGS, INC.
### (Formerly Pocket Games, Inc.)
### CONSOLIDATED BALANCE SHEET
### AS ON JULY 31, 2021
### (Unaudited)

| | As on July 31, 2021 |
|---|---|
| | Amount in $ |
| **Assets** | |
| **Current Assets** | |
| Cash and cash equivalents | $ 4,175,557 |
| Accounts receivable | 164,713 |
| Loan origination costs due | 1,645 |
| From third party | 80,341 |
| Inventory | 1,005,126 |
| Prepaid expenses | 131,100 |
| **Total Current Assets** | **5,558,484** |
| | |
| **Other Assets** | |
| Fixed assets, net of accumulated depreciation of $ 6,202.31 | 33,529 |
| Goodwill | 2,461,342 |
| Security deposits | 2,350 |
| **Total Other Assets** | **2,497,220** |
| | |
| **Total Assets** | **8,055,704** |
| | |
| **LIABILITIES AND STOCKHODLERS' EQUITY** | |
| | |
| **Current Liabilities** | |
| Accounts payable | 446,158 |
| Accrued expenses, related parties | 2,987 |
| Accrued expenses | 291,729 |
| Accrued compensation | 63,090 |
| Loans payable, related parties | 272,175 |
| Loans payable | 302,810 |
| Convertible debenture | 702,500 |
| **Total Current Liabilities** | **2,081,448** |
| | |
| **Total Liabilities** | **2,081,448** |

MEMBERS' EQUITY

**Preferred stock, $0.0001 par value; 2,500,000 shares authorized**

| | |
|---|---:|
| Preferred stock designated ,Series A, par value $0.0001 | |
| "1" share issued and outstanding as of July 31, 2021 | 0 |
| Preferred stock designated ,Series B, par value $0.0001 | |
| "0" share issued and outstanding as of July 31, 2021 | - |
| Preferred stock designated ,Series C, par value $0.0001 | |
| "0" share issued and outstanding as of July 31, 2021 | - |
| **Common stock, $0.0001 par value;  50,000,000,000 shares authorized;** | |
| 26,764,218,412 Shares issued and outstanding at July 31, 2021 | 2,753,616 |
| Additional paid in capital | 15,717,182 |
| Non-Controlling interests | (32,199) |
| Accumulated deficit | (12,464,344) |
| **Total stockholders' equity** | 5,974,255 |
| **Total Liabilites and stockholders' equity** | 8,055,704 |

The accompanying notes are an integral part of these financial statements.

**GENTECH HOLDINGS, INC.**
**(Formerly Pocket Games, Inc.)**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**FOR THE THREE MONTHS ENDED JULY 31, 2021**
**(Unaudited)**

|  |  | For the three months ended |
|---|---|---|
|  |  | **July 31, 2021** |
|  |  | **Amount in $** |
| Revenue | $ | 238,373 |
| Cost of revenue |  | (217,883) |
| **Gross profit** |  | 20,490 |
|  |  |  |
| Operating expenes: |  |  |
| Advertising & Marketing |  | (114,155) |
| General and administrative |  | (99,936) |
| Officer compensation |  | (30,000) |
| Legal & professional fees |  | (796,881) |
| Interest expense |  | (15,000) |
| Total operating expenses |  | (1,055,972) |
|  |  |  |
| Other income |  |  |
| Gain on settlement of debt |  | 597,299 |
| Other income |  | - |
| Total other income |  | 597,299 |
|  |  |  |
| Net loss before income taxes |  | (438,183) |
|  |  |  |
| Income tax expense |  | - |
|  |  |  |
| **Net loss** | $ | (438,183) |
|  |  |  |
| **Attributable to:** |  |  |
| Group |  | (438,571) |
| Non-Controlling Interests |  | 388 |
|  |  | (438,183) |

The accompanying notes are an integral part of these financial statements.

**GENTECH HOLDINGS, INC.**
(Formerly Pocket Games, Inc.)
CONSOLIDATED STATEMENT OF CASH FLOWS
FOR THE THREE MONTHS ENDED JULY 31, 2021
(Unaudited)

| | For the three months ended |
|---|---|
| | July 31, 2021 |
| | Amount in $ |
| **Cash Flows From Operating Activities** | |
| Net loss | $ (438,183) |
| Adjustments to reconcile net loss to net cash used by operating activities: | |
| Changes in operating assets and liabilities: | |
| Prepaid expenses | (42,568) |
| Accounts Receivable | (89,412) |
| Inventory | (426,190) |
| Accounts payable | 267,658 |
| Accrued expenses | (158,067) |
| Accrued officer compensation | 30,000 |
| Total adjustments to reconcile net income to net cash provided by operating activities: | (418,580) |
| | |
| **Net cash used in operating activities** | (856,763) |
| | |
| **Cash flows from investing activities** | |
| Purchase of Nutrition Spoon, LLC | (267,500) |
| Goodwill | (2,020,357) |
| | |
| **Net cash used in investing activities** | (2,287,857) |
| | |
| **Cash flows from financing activities** | |
| Conversion notes payable | (339,194) |
| Derivative liabilities | (414,856) |
| Issuance of common stock | 1,276,691 |
| Additional paid in capital | 5,958,249 |
| Loans payable | 40,920 |
| | |
| **Net cash provided by financing activities** | 6,521,810 |
| | |
| **Net increase in cash and cash equivalents** | 3,377,191 |
| **Cash and cash equivalents at the beginning of the year** | 798,367 |
| **Cash and cash equivalents at the end of the year** | $ 4,175,558 |

The accompanying notes are an integral part of these financial statements.

GENTECH HOLDINGS, INC.

(Formerly Pocket Games, Inc.)

CONSOLIDATED STATEMENT OF CHANGES IN STOCKHOLDERS' EQUITY

(Unaudited)

| | Series A Preferred Stock | | Common Stock | | Additional Paid-In Capital | Accumulated Deficit | Non Controlling Interests in Subsidiaries | Total Stockholders' Equity (Deficit) |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| Balance, October 31, 2019 | 1,000 | $ - | 428,605,234 | $ 4,286 | $ 5,606,669 | $ (8,679,985) | $ - | $ (3,069,030) |
| Issuance of Common stock | - | - | 1,135,000,000 | $ 113,500 | 221,500 | - | - | 335,000 |
| Net loss for the quarter ended January 31, 2020 | - | - | - | - | - | (169,250) | - | (169,250) |
| Balance, January 31, 2020 | 1,000 | $ - | 1,763,605,234 | $ 117,786 | $ 5,828,169 | $ (8,849,235) | $ - | $ (2,903,280) |
| Issuance of Common stock | - | - | 140,000,000 | 14,000 | 98,000 | - | - | 112,000 |
| Issuance of Common stock for conversion of notes payable | - | - | 101,953,400 | 10,196 | 30,156 | - | - | 40,352 |
| Net loss for the quarter ended April 30, 2020 | - | - | - | - | - | (111,316) | - | (111,316) |
| Balance, April 20, 2020 | 1,000 | $ - | 2,005,958,634 | $ 141,982 | $ 5,956,325 | $ (8,960,551) | $ - | $ (2,862,244) |
| Issuance of Common Stock | - | - | 865,000,000 | 86,500 | 605,500 | - | - | 692,000 |
| Net loss for the quarter ended July 31, 2020 | - | - | - | - | - | (439,772) | - | (439,772) |
| Balance, July 31, 2020 | 1,000 | $ - | 2,870,958,634 | $ 228,482 | 6,561,825 | (9,400,322.79) | $ - | (2,610,016) |
| Issuance of Common stock for services | - | - | 700,000,000 | 70,000 | - | - | - | 70,000 |
| Issuance of Common stock for note conversions | - | - | 427,142,857 | 42,714 | 13,526 | - | - | 56,240 |
| Issuance of Common stock | - | - | 307,500,000 | 38,750 | 250,050 | - | - | 288,500 |
| Net loss for the quarter ended October 31, 2020 | - | - | - | - | - | (303,118) | - | (303,118) |
| Balance, October 31, 2020 | 1,000 | $ - | 3,705,205,491 | $ 352,446 | $ 6,825,401 | $ (9,703,441) | $ - | $ (2,525,594) |
| Issuance of Common stock | - | - | 4,144,790,000 | 414,479 | 100,132 | - | - | 514,611 |
| Common Shares retired | - | - | (1,100,000,000) | - | - | - | - | - |
| Net loss for the quarter ended January 31, 2021 | - | - | - | - | - | (190,115) | - | (190,115) |
| Preferred shares retired | - | (999) | - | - | - | - | - | - |
| Balance, January 31, 2021 | 1 | $ - | 6,897,308,489 | $ 766,925 | $ 6,925,533 | $ (9,893,556) | $ - | $ (2,201,098) |
| Issuance of Common stock | - | - | 7,100,000,000 | 710,000 | 2,833,400 | - | - | 3,543,400 |
| Net loss for the quarter ended April 30, 2021 | - | - | - | - | - | (2,129,696) | - | (2,129,696) |
| Balance, April 30, 2021 | 1 | $ - | 13,997,308,489 | $ 1,476,925 | $ 9,758,933 | $ (12,023,252) | $ - | $ (787,394) |
| Issuance of Common stock | - | - | 12,766,909,923 | 1,276,691 | 5,958,249 | - | - | 7,234,940 |
| Net loss for the quarter ended July 31, 2021 | - | - | - | - | - | (438,183) | - | (438,183) |
| Non Controlling Interests | - | - | - | - | - | - | (32,199) | (32,199) |
| Balance, July 31, 2021 | 1 | $ - | 26,764,218,412 | $ 2,753,616 | $ 15,717,182 | $ (12,464,343) | $ (32,199) | $ 5,977,164 |

The accompanying notes are an integral part of these financial statements.

GENTECH HOLDINGS, INC.
(formerly Pocket Games, Inc.)
Notes to Condensed Financial Statements
July 31, 2021
(Unaudited)

**Note 1 – Organization and Description of Business**

Pocket Games, Inc. (the "Company") was incorporated on October 4, 2013 ("Inception") under the laws of the State of Florida. The Company is engaged in the development, marketing and sale of interactive games for mobile devices, tablets and computers. The Company has limited customers and products and revenues to date.

We develop games and provide end-end services for software and application development. We also have a dedicated division for server support and cloud management. Our clients rely on us to support their core IT architecture and provide 24/7 support for their business-critical infrastructure

The Company has adopted a fiscal year end of October 31.

Effective November 21, 2018, the Company changed its name to GenTech Holdings, Inc. Along with the name change, the Company also effectuated a 1 share for 7,000 shares reverse stock split which reduced the number of outstanding shares of common stock from 7,565,028,107 to 1,080,718 at the effective date. All references to common stock have been adjusted to reflect the reverse stock split.

On October 19, 2020 the Company filed a 500:1 reverse stock split; however, this was withdrawn on January 15 2021.

On April 15, 2021 the Company files to increase its Authorized Stock to 40,000,000,000.

In July 2021, the Company acquired 75% of the equity of "Nature Spoon LLC" from "Sara Zolfaghari", the sole member of the company, through equity purchase agreement dated July 20, 2021.

Use of Estimates

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, and the disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

Cash and Cash Equivalents

Cash and cash equivalents consist of cash and short-term highly liquid investments purchased with original maturities of twelve months or less. Cash and cash equivalents at July 31, 2021 was $ 4,175,557.

Property and Equipment

Property and equipment are stated at cost less accumulated depreciation. Depreciation is calculated using the straight-line method over the estimated useful lives of the assets. During the year ended October 31, 2018, the Company purchased equipment for the mining of cryptocurrency. This equipment is being depreciated over a seven-year period.

Revenue Recognition

The Company generates revenue from the manufacture and sale of Functional Food Products. The Company recognizes revenue using four basic criteria that must be met before revenue can be recognized: (1) persuasive evidence of an arrangement exists; (2) delivery has occurred; (3) the selling price is fixed and determinable; and (4) collectability is reasonably assured, which is typically after receipt of payment and delivery, net of any credit card charge-backs and refunds. Determination of criteria (3) and (4) are based on management's judgment regarding the fixed nature of the selling prices of the products delivered and the collectability of those amounts. Provisions for discounts and rebates to customers, estimated returns and allowances, and other adjustments are provided for in the same period the related sales are recorded.

GENTECH HOLDINGS, INC.
(formerly Pocket Games, Inc.)
Notes to Condensed Financial Statements
July 31, 2021
(Unaudited)

The Company defers any revenue for which the product has not been delivered or is subject to refund until such time that the Company and the customer jointly determine that the product has been delivered or no refund will be required. Revenues on advertising are deferred and recognized ratably over the advertising period. During the Quarter ended July 31, 2021, the Company recorded $238,373 in revenues from sales.

Income Taxes

The Company recognizes deferred tax assets and liabilities based on differences between the financial reporting and tax basis of assets and liabilities using the enacted tax rates and laws that are expected to be in effect when the differences are expected to be recovered. The Company provides a valuation allowance for deferred tax assets for which it does not consider realization of such assets to be more likely than not.

**Note 2 - Going Concern**

As shown in the accompanying financial statements, the Company has incurred continuous losses from operations, has an accumulated deficit of $ 12,464,344 and has cash on hand of $ 4,175,557 as of July 31, 2021, and has generated minimal revenues to date. These factors raise substantial doubt about the Company's ability to continue as a going concern. Management is currently seeking additional sources of capital to fund short term operations through debt or equity investments, including loans from Officers and Directors. The Company, however, is dependent upon its ability to secure equity and/or debt financing and there are no assurances that the Company will be successful, therefore, without sufficient financing it would be unlikely for the Company to continue as a going concern.

The financial statements do not include any adjustments that might result from the outcome of any uncertainty as to the Company's ability to continue as a going concern. The financial statements also do not include any adjustments relating to the recoverability and classification of recorded asset amounts, or amounts and classifications of liabilities that might be necessary should the Company be unable to continue as a going concern.

**Note 3 – Related Party Transactions**

Promissory Notes

The Company has not issued promissory notes to any of related parties.

Revenues

The Company is in the business of the manufacture and sale of Functional Food Products. There were no revenues from related parties during the three months ended July 31, 2021.

Employment Contracts

The Company entered into an agreement with Supplement Group (Europe) Ltd. to supply all staff and warehousing on Jan 1st 2021. Supplement Group is owned by David Lovatt (50%) and Leonard K. Armenta Jr. (50%).

**Note 4 – Loans Payable, Related Parties**

Loans payable, related parties, consists of miscellaneous loans, non-interest bearing, due on demand amounting to $ 272,175 as on July 31, 2021.

**Note 5 – Loans Payable**

These loans are non-interest bearing and due on demand.  As of July 31, 2021, the balance due on these loans was $ 302,810.

GENTECH HOLDINGS, INC.
(formerly Pocket Games, Inc.)
Notes to Condensed Financial Statements
July 31, 2021
(Unaudited)

**Note 6 – Convertible Debenture**

Convertible debentures consist of the following at July 31, 2021.

| | July 31, 2021 |
|---|---|
| Originated February 8, 2016, unsecured $7,000 convertible promissory note, which carries a 10% interest rate and matures on February 8, 2017 ("Carl Grant"). The principal and interest is convertible into shares of common stock at the discretion of the note holder at a price equal to forty-two percent (42%) of the lowest closing price of the Company's common stock for the ten (10) trading days prior to the conversion date, or par value, whichever is greater. | 7,000 |
| Originated May 8, 2019, unsecured $135,000 convertible promissory note, which carries a 10% interest rate and matures on May 8, 2020 ("East Coast Capital # 1"). The principal and interest is convertible into shares of common stock at the discretion of the note holder at a price equal to fifty percent (50%) of the lowest trading price of the Company's common stock for the twenty five (20) trading days prior to the conversion date, or par value, whichever is greater. | 130,000 |
| Originated May 23, 2019, unsecured $72,500 convertible promissory note, which carries a 10% interest rate and matures on November 23, 2020 ("East Coast Capital Corp #2"). The principal and interest is convertible into shares of common stock at the discretion of the note holder at a price equal to fifty percent (50%) of the lowest trading price of the Company's common stock for the twenty five (25) trading days prior to the conversion date, or par value, whichever is greater. | 72,500 |
| Originated June 6, 2019, unsecured $100,000 convertible promissory note, which carries a 10% interest rate and matures on June 6, 2020 ("East Coast Capital Corp #3"). The principal and interest is convertible into shares of common stock at the discretion of the note holder at a price equal to fifty percent (50%) of the lowest trading price of the Company's common stock for the twenty five (25) trading days prior to the conversion date, or par value, whichever is greater. | 100,000 |
| Originated June 19, 2019, unsecured $32,000 convertible promissory note, which carries a 10% interest rate and matures on June 19, 2020 ("East Coast Capital Corp #4"). The principal and interest is convertible into shares of common stock at the discretion of the note holder at a price equal to fifty percent (50%) of the lowest trading price of the Company's common stock for the twenty five (25) trading days prior to the conversion date, or par value, whichever is greater. | 32,000 |
| Originated June 24, 2019, unsecured $71,000 convertible promissory note, which carries a 10% interest rate and matures on June 24, 2020 ("East Coast Capital Corp #5"). The principal and interest is convertible into shares of common stock at the discretion of the note holder at a price equal to fifty percent (50%) of the lowest trading price of the Company's common stock for the twenty five (25) trading days prior to the conversion date, or par value, whichever is greater. | 71,000 |

Case 1:21-cv-10300-LLS   Document 1-2   Filed 12/03/21   Page 171 of 173

**GENTECH HOLDINGS, INC.**
(formerly Pocket Games, Inc.)
Notes to Condensed Financial Statements
July 31, 2021
(Unaudited)

| | |
|---|---|
| Originated June 27, 2019, unsecured $100,000 convertible promissory note, which carries a 10% interest rate and matures on June 27, 2020 ("East Coast Capital Corp #6"). The principal and interest is convertible into shares of common stock at the discretion of the note holder at a price equal to fifty percent (50%) of the lowest trading price of the Company's common stock for the twenty five (25) trading days prior to the conversion date, or par value, whichever is greater. | 100,000 |
| Originated July 24, 2019, unsecured $100,000 convertible promissory note, which carries a 10% interest rate and matures on July 24, 2020 ("East Coast Capital Corp #7"). The principal and interest is convertible into shares of common stock at the discretion of the note holder at a price equal to fifty percent (50%) of the lowest trading price of the Company's common stock for the twenty five (25) trading days prior to the conversion date, or par value, whichever is greater. $100,000 of this note was received and accounted for during the year ended October 31, 2019. | 100,000 |
| Originated August 26, 2019, unsecured $90,000 convertible promissory note, which carries a 10% interest rate and matures on August 26, 2020 ("East Coast Capital Corp #8"). The principal and interest is convertible into shares of common stock at the discretion of the note holder at a price equal to fifty percent (50%) of the lowest trading price of the Company's common stock for the twenty five (25) trading days prior to the conversion date, or par value, whichever is greater. $90,000 of this note was received and accounted for during the year ended October 31, 2019. | 90,000 |
| Convertible debenture | 702,500 |
| Less: current maturities of convertible debenture | (702,500) |
| Long term convertible debenture | $          - |

The company has repaid certain notes originally issued to Fidelis Capital LLC. The notes were dated December 4, 2017 and March 2, 2019. The December note had an interest rate of 9% had an original amount of $20,000. The March 2019 notes had an interest rate of 10% and an original amount of $25,000. The December note had been paid in full and is no longer eligible for conversion. The March note has a remaining balance of $15,000.

**Note 7 – Changes in Stockholders' Equity (Deficit)**

Authorized Shares, Common Stock

Effective May 1, 2018, the Company amended its Articles of Incorporation to change the number of authorized shares from 50,000,000,000 to 25,000,000,000 and the change the par value of common stock from $0.0001 to $0.00001. Effective November 21, 2018, the Company effectuated a 1 share for 7,000 shares reverse stock split which reduced the number of outstanding shares of common stock from 7,565,028,107 to 1,080,718 at the effective date. All references to common stock have been adjusted to reflect the change in par value and the reverse stock split. Effective May 31, 2019, the Company amended its Articles of Incorporation to change the number of authorized shares from 25,000,000,000 to 10,000,000,000. On April 15, 2021 the Company files to increase its Authorized Stock to  40,000,000,000. As of July 31, 2021, there were 26,764,218,412 shares issued and outstanding.

Authorized Shares, Preferred Stock

The Company is authorized to issue 2,500,000 shares of its preferred stock, $0.0001 par value. As of July 31, 2021, there was 1 share of Series A Preferred Stock issued and outstanding. Each share of Series A Preferred Stock shall have voting rights equal to four times the sum of (a) all shares of Common Stock issued and outstanding at the time of voting; plus (b) the total number of votes of all other classes of preferred stock which are issued and outstanding at the time of voting; divided by (c) the number of shares of Series A Preferred Stock issued and outstanding at the time of voting. As of July 31, 2021, there were -0- shares of Series B Preferred Stock and -0- shares of Series C Preferred Stock issued and outstanding.

GENTECH HOLDINGS, INC.
(formerly Pocket Games, Inc.)
Notes to Condensed Financial Statements
July 31, 2021
(Unaudited)

Common Stock Issuances for the Year ended October 31, 2018
During the year ended October 31, 2018, the Company issued 207,373 shares of common stock for the conversion of convertible notes payable in the amount of $120,652. As the conversions were within the terms of the agreement, no additional gain or loss on the conversion has been recognized.

Common Stock Issuances for the Year Ended October 31, 2019
During the nine months ended July 31, 2019, the Company issued 77,524,271 shares of common stock for the conversion of convertible notes payable in the amount of $235,440. As the conversions were within the terms of the agreement, no additional gain or loss on the conversion has been recognized.

On November 28, 2018, the Company issued 350,000,000 shares of common stock for accrued compensation. The fair value of the common stock issued was $35,000 based on the estimated market price of the Company's common stock on the date of grant.

During the quarter ended January 31, 2020 the Company issued 1,335,000,000 shares of its common stock. This included 1,000,000,000 shares to its CEO as compensation. In February 2020, the Company issued 140,000,000 shares pursuant to its Regulation A offering, and 101,953,400 shares for a conversion of notes payable. The conversion settled the note balance in full.

During the quarter ended July 31, 2020 the Company issued 865,000,000 shares of its common stock pursuant to its Regulation A offering.

During the quarter ended October 31, 2020 the Company issued 2,914,642,857 shares of its common stock. 1,400000,000 issued for the acquisition of Hakuna Supply, 700,000,000 as compensation to Leonard Armenta, 387,500,000 pursuant to its Regulation A offering, and 427,142,857 for note conversions.

During the quarter ended April 30, 2021 the Company issued 7,100,000,000 shares of its common stock pursuant to its Regulation A offering.

During the quarter ended July 31, 2021 the Company issued 12,766,909,923 shares of its common stock pursuant to its Regulation A offering.

Note 7 – Commitments and Contingencies
Effective August 1, 2017, the Company entered into a consulting agreement with Green Light Developments LLC ("Green Light"), in which Green Light will provide business planning, M&A strategy, financial planning and other business development related services. The agreement is for $8,000 per month.

Note 8 – Subsidiaries
As disclosed in our Form 8-K filed with the Securities and Exchange Commission, we issued a total of 400,000 shares of our Series B Convertible Preferred Stock in connection with our acquisition of 80% of the Class A common stock and 100% of the Class B common stock of Social Technology Holdings, Inc. ("STH"), and reserved an additional 80,000 shares of our Class B voting Convertible Preferred Stock for issuance in a contemplated merger transaction to acquire the 20% minority interest in the STH Class A common stock. STH is the owner and operator of "Viximo", a software platform that allows game providers to access multiple websites from a single source API."

As disclosed in our Form 8-K filed with the Securities and Exchange Commission, we issued a total of 270,000 shares of our Series C Convertible Preferred Stock and a $3,960,000 convertible note due March 31, 2019 in connection with our acquisition of 100% of the outstanding common stock of Kicksend Holdings, Inc., a Delaware corporation ("Kicksend"). Kicksend is engaged in the business of file storage and sharing in real-time on digital platforms, including desktop, mobile and webapps, to permit users to organize, download and sent storage files.

Under the terms of these acquisitions, the Company was to receive full financial disclosure in order to maintain its 'fully reporting' status with the SEC. Subsequent to the closing, neither acquisition target was able to provide full financial disclosure and Pocket Games' attorney opined that this was a material breach of the contracts and the acquisitions described above were unwound. This resulted in the unwinding, return, and cancellation of all items related to the acquisitions. The Company recorded a loss on deconsolidation in the amount of $1,068,339 for the year ended October 31, 2016. The amount has been settled during the Quarter ended April 30, 2021.

GENTECH HOLDINGS, INC.
(formerly Pocket Games, Inc.)
Notes to Condensed Financial Statements
July 31, 2021
(Unaudited)

In October 2020 the Company purchased Products Supply Group, Inc. DBA as Hakuna Supply from Sun Kissed Industries for $350,000 of Genech's Common Stock. Based out of Thousand Oaks, CA, Hakuna, operates out of a 3500 square foot warehouse, office and retails space selling CBD infused teas, coffees and other ancillary products. As of April 30, 2021 the transaction was cancelled and Sun Kissed returned the shares it received in the transaction.

In July 2021, the Company acquired 75% of the equity of "Nature Spoon LLC" from "Sara Zolfaghari", the sole member of the company, through equity purchase agreement dated July 20, 2021 for $ 267,500 cash.

**Note 9 – Subsequent Events**

In September 2021, the Company acquired 100% of the equity of "American Metabolix, Inc." from "Torque Lifestyle Brands, Inc." through equity purchase agreement dated September 1, 2021 for $ 1,300,000.