**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

EAST CAPITAL INVESTMENTS CORP.,

Plaintiff,

-against-

GENTECH HOLDINGS, INC.,

Defendant.

Case No. 1:21-cv-10300-LLS


**Hon. Louis L. Stanton, U.S.D.J.**

**Hon. Ona T. Wang, U.S.M.J.**


**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF**
**CROSS-MOTION TO DISMISS THE ACTION PURSUANT TO**
**FED. R. CIV. P. 12(b)(6) and 12(b)(3) AND IN OPPOSITION TO PLAINTIFF'S**
**MOTION FOR SUMMARY JUDGEMENT IN LIEU OF COMPLAINT**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ……………………………………………………....… 1

PROCEDURAL HISTORY ……………………………………………………..…….. 2

STATEMENT OF FACTS ……………………………………………….…....…… 3

   A.  Background of the Parties and Relevant Non-Parties …………..…………….....…….. 3

   B.  The Notes …………………………………...…………………….…………... 5

ARGUMENT ……………………………………………………….………………….. 6

       I.      ESSEX'S FAILURE TO REGISTER AS A DEALER
              PURSUANT TO 15 USC § 78o(a)(1) RENDERS THE
              NOTES VOID PURSUANT TO 15 USC § 78cc(b), AND
              THEREFORE, THE COURT SHOULD GRANT GENTECH'S
              CROSS-MOTION TO DISMISS THE ACTION PURSUANT
              TO FED. R. CIV. P.12(b)(6)................................................................................. 6

           A.  Standard of Review ……………………………………………….…… 6

           B.  The Exchange Act's Dealer Registration Requirement
              and Essex's Failure to Comply With Same………………………….……… 8

           C.  The Notes are Securities ………………………………………….……… 9

           D.  Purchasing Convertible Notes Constitutes Engaging
              in the Business of Buying and Selling Securities ……………….………..11

      II.     ALTERNATIVELY TO I, GENTECH RAISES
              TRIABLE ISSUES OF FACT AS TO ESSEX'S FAILURE
              TO REGISTER AS A DEALER PURSUANT TO 15 USC
              § 78o(a)(1) AND THE VALIDITY OF THE NOTES PURSUANT
              TO 15 USC § 78cc(b) AND THEREFORE, AT MINIMUM, ECIC'S
              MOTION FOR SUMMARY JUDGEMENT IN LIEU
              OF COMPLAINT PURSUANT TO N.Y. C.P.L.R. 3213
              SHOULD BE DENIED…………………………………..………..……….. 13

     III.    WITH RESPECT TO NOTE 1 AND ALTERNATIVELY
              TO I AND II, THE INTEREST ON NOTE 1 IS IN EXCESS
              OF 25%, AND THUS CRIMINALLY USURIOUS AND
              UNENFORCEABLE UNDER FLORIDA LAW, WHICH
              SHOULD APPLY HERE, AND THEREFORE, THE
              COURT SHOULD GRANT GENTECH'S CROSS-MOTION
              TO DISMISS THE ACTION PURSUANT TO

i

FED. R. CIV. P. 12(b)(6)..… …........................................................................ 14

A. There is no reasonable basis to apply the laws of Nevada ………………… 14

B. The laws of Florida should apply to Note 1 ………………………….…. 16

C. Applying the laws of Florida, Note 1 is criminally usurious and
unenforceable …………………………………………………………………… 17

D. Persuasive authority that the option to convert the note
to shares at a 50% discount to the market rate should be
included as part of the overall interest rate determination
when making a usury determination in New York ……………………….... 20

E. Federal Courts sitting in diversity can apply the laws of Florida …..……… 21

IV.   ALTERNATIVELY TO I, II, AND III, GENTECH RAISES
TRIABLE ISSUES OF FACT AS TO WHETHER THE INTEREST
ON NOTE 1 IS IN EXCESS OF 25%, AND THUS CRIMINALLY
USURIOUS AND UNENFORCEABLE UNDER FLORIDA LAW,
AND THEREFORE, AT MINIMUM, ECIC'S MOTION FOR
SUMMARY JUDGEMENT IN LIEU OF COMPLAINT PURSUANT
TO N.Y. C.P.L.R. 3213 SHOULD BE DENIED…............................................. 22

V.   ALTERNATIVELY TO I AND II, ALL OF ECIC'S CLAIMS
RELATING TO OR ARISING OUT OF NOTES 2 THROUGH
8 MUST BE DISMISSED PURSUANT TO FED. R. CIV. P. 12(b)(3),
AS THE NOTES CONCLUSIVELY ESTABLISH THAT
ANY ACTION RELATING TO OR ARISING OUT OF
NOTES 2 THROUGH 8 MUST BE BROUGHT IN THE
STATE COURTS OF FLORIDA ……..…..…………………..................... 22

CONCLUSION ………..…..…..……..…..……..…..……..…..……..…..……..…..……………… 24

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Adar Bays, LLC v. GeneSYS ID, Inc.,*
    2021 N.Y. LEXIS 2206 (2021) ……………………………………………….... 20, 21

*Adickes v. S.H. Kress & Co.,*
    398 U.S. 144 (1970) ……………………………………………………….... 13

*AEI Life LLC v. Lincoln Benefit Life Co.,*
    892 F.3d 126 (2d Cir. 2018) ………………………………………………... 14, 16

*Altvater Gessler-J.A.Baczewski Intern. (USA) Inc. v. Sovieski,*
    572 F.3d 86 (2d Cir. 2009) ………………………………………………..… 23

*Branch Banking & Trust Co. v. South Fork Resources LLC,*
    2011 N.Y. Misc. LEXIS 4975 (Sup. Co. Nassau Cty. Aug. 31, 2011) ……………....… 13

*Brass v. American Film Techs.,*
    987 F.2d 142 (2d Cir. 1993) ………………………………………………...……… 7

*Brink's Ltd. v. S. African Airways,*
    93 F.3d 1022 (2d Cir. 1996) ………………………………………………..… 17

*Calcutti v. SBU, Inc.,*
    273 F. Supp. 2d 488 (S.D.N.Y. Jul. 23, 2003) …………………………….…..… 7

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ……………………………………………………...…..… 13

*Celsion Corp. v. Stearns Mgmt. Corp.,*
    157 F. Supp.2d 942 (N.D. Ill. Aug. 10, 2001) ……………………………..……… 8

*Chance v. Armstrong,*
    143 F.3d 698 (2d Cir. 1998) ……………………………………………..……… 7

*Cunningham v. LeGrand,*
    2013 U.S. Dist. LEXIS 81032 (S.D. W. Va. June 10, 2013) …………….…..…… 21

*Dixon v. Sharp,*
    276 So. 2d 817 (Fla. 1973) ……………….……….….……….….………………… 18

*EMA Fin., LLC v. NFusz, Inc.,*
    444 F. Supp. 3d 530 (S.D.N.Y. Mar. 16, 2020) …………………………....…… 14

*EPA ex rel. McKeown v. Port Auth. of N.Y. & N.J.,*
    162 F. Supp. 2d 173 (S.D.N.Y. 2001) …………………………………….…..…... 22

*Forest Park Pictures v. Universal Television Network, Inc.*,
    683 F.3d 424 (2d Cir. 2012) ……………………………………..…….…....….. 16

*Jaghory v. New York State Dept' of Ed.*,
    131 F.3d 326 (2d Cir. 1997) …………………………….……..…..……….... 6

*Jaramillo v. Weyerhaeuser Co.*,
    536 F.3d 140 (2d Cir. 2008) ……………………………………………….... 13

*Jersey Palm-Gross, Inc. v. Paper*,
    658 So. 2d 531 (Fla. 1995) …………………………………………....… 21

*Kay v. Amendola*,
    129 So. 2d 170 (Fla. 2d Dist. Ct. App. 1961) …………………………....…..… 19

*L.B. Foster Co. v. Am. Piles, Inc.*,
    138 F.3d 81 (2d Cir. 1998) ………………………………………….…….... 14

*Madden v. Midland Funding, LLC*,
    237 F. Supp. 3d 130 (S.D.N.Y. Feb. 27, 2017) ………………………………..... 15

*Markwood Invs., Ltd. v. Neves (In re Neves)*,
    2014 Bankr. LEXIS 5022 (Bankr. S.D. Fla. Dec. 11, 2014) ……………………...…… 20

*Mass. Fin. Servs., Inc. v. Sec. Investor Prot. Corp.*,
    411 F. Supp. 411 (D. Mass. Mar. 26, 1976) …………………………………..…… 8

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ……………………………………………………..…...… 14

*McCarthy v. Dun & Bradstreet Corp.*,
    482 F.3d 184 (2d Cir. 2007) …………………………………………………..….. 6

*Northwood SG, LLC v. Builder Fin. Corp.*,
    76 So. 3d 3 (Fla. Dist. Ct. App. 2011) …………………………………………..... 17

*Pinchuck v. Canzoneri*,
    920 So. 2d 713 (Fla. Dist. Ct. App. 2006) ……………………………………….... 19, 21

*Power Up Lending Grp., Ltd. v. Cardinal Energy Grp., Inc.*,
    2019 U.S. Dist. LEXIS 57527 (E.D.N.Y. Apr. 3, 2019) …………………………...….. 15

*Quirino v. New Jewish Home*,
    2021 U.S. Dist. LEXIS 55005 (S.D.N.Y. Feb. 19, 2021) ……………………….…… 7

*Regional Props., v. Financial & Real Estate Consulting, Co.*,
    678 F.2d 552 (5th Cir. 1982) ………………………………………………….…... 8

*Reves v. Ernst & Young,*
    494 U.S. 56 (1990) …………………………………………………...… 9, 10

*Rollins v. Odom,*
    519 So. 2d 652 (Fla. Dist. Ct. App. 1988) …………………………………... 18

*Schulz v. Barrows,*
    94 N.Y.2d 624 (2000) ………………………………………………… 7

*SEC v. Almagarby,*
    479 F. Supp. 3d 1266 (S.D. Fla. Aug. 16, 2021) ……………………………. 10, 12

*SEC v. Big Apple Consulting USA, Inc.,*
    783 F.3d 786 (11th Cir. 2015) ………………………………………...… 11

*SEC v. Fierro,*
    2020 U.S. Dist. LEXIS 238936 (D.N.J. Dec. 18, 2020) ……..……………….. 11, 12

*SEC v. Keener,*
    2020 U.S. Dist. LEXIS 146256 (S.D. Fla. Aug. 13, 2020) …….……..…....…... 11

*SEC v. Ridenour,*
    913 F.2d 515 (8th Cir. 1990) ……………………………………………… 8

*Sec. Life of Denver Ins. Co. v. Shah,*
    906 F. Supp. 2d 1334 (S.D. Ga. Sep. 18, 2012) …………………………….... 21

*Sepanski v. Janiking, Inc.,*
    822 F. Supp. 2d 309 (W.D.N.Y. Sep. 30. 2011) ……………………………. 22

*St. Petersburg Bank & Tr. v. Hamm,*
    414 So. 2d 1071 (Fla. 1982) ………………………………………...… 18

*Starr v. Sony BGM Music Entm't,*
    592 F.3d 314 (2d Cir. 2010) ……………………..……………………… 7

*United States v. Balis,*
    244 Fed. App'x 397 (2d Cir. 2007) ……………………………………... 9, 10

*United States v. Rogers,*
    9 F.3d 1025 (2d Cir. 1993) ……………………………..…………..… 9

*United States v. Thomas,*
    54 F.3d 73 (2d Cir. 1995) ………………………………………………... 9

*Velletri v. Dixon,*
    44 So. 3d 187 (Fla. Dist. Ct. App. 2010) …………………………………… 18-20

## Statutes

*Federal Rules of Civil Procedure ("Fed. R. Civ. P.")*

Fed. R. Civ. P. 12(b)(3) ………………………………………………...… 1, 22, 23

Fed. R. Civ. P. 12(b)(6) ………………………………………………...… 1, 6, 22

Fed. R. Civ. P. 56 …………………………………………………………. 13

Fed. R. Civ. P. 56(a) ……………………………………………………... 13, 22

Fed. R. Civ. P. 56(c)(1) …………………………………………………… 13, 22

*United States Code ("U.S.C.")*

15 U.S.C. § 77b(a)(1) …………………………………………………..…… 9

15 U.S.C. § 78c(a)(5) …………………………………………………… 8

15 U.S.C. § 78c(a)(10) ……………………………………………….…... 10

15 U.S.C. § 78o(a)(1) …………………………………………………...… 9, 12

15 U.S.C. § 78cc(b) ……………………………………………………..… *passim*

*New York Civil Practice Law & Rules ("N.Y. C.P.L.R.")*

N.Y. C.P.L.R. 3211 ……………………………………………………… 8

N.Y. C.P.L.R. 3211(a)(2) ………………………………………………... 8

N.Y. C.P.L.R. 3211(a)(8) ……………………………………………....... 8

N.Y. C.P.L.R. 3212 …………………………………………………….... 13

N.Y. C.P.L.R. 3213 ………………………………………………….... *passim*

*Florida Statutes Annotated ("Fla. Stat. Ann.")*

Fla. Stat. Ann. § 687.03(3) ……………………………………….……..… 18

Fla. Stat. Ann. § 687.071(2) ……………………………………………...… 17, 19

Fla. Stat. Ann. § 687.071(7) ……………………………………….……..… 20, 21

## PRELIMINARY STATEMENT

Defendant GenTech Holdings, Inc. ("GenTech" or "Defendant") respectfully submits this Memorandum of Law in support of GenTech's cross-motion to dismiss the action pursuant to Fed. R. Civ. P. 12(b)(6) and 12(b)(3)(the "Cross-Motion") and in opposition to the motion for summary judgment in lieu of complaint brought pursuant to N.Y. C.P.L.R. 3213 (the "Motion") by Plaintiff East Capital Investments Corp. ("ECIC" or "Plaintiff"). There are eight (8) Convertible Promissory Notes (the "Notes") at issue in this action that were originated by non-party Essex Global Investment Corp. ("Essex"). Essex failed to register as a dealer and charged criminally usurious lending rates, rendering the Notes void and unenforceable as a matter of law. Upon information and belief, at all times relevant to this litigation, Essex only had two officers and employees: its Chief Executive Officer Ben Conde ("Conde") and its Vice President of Sales, Christopher Danzi ("Danzi"). *See* accompanying Declaration of GenTech's Chief Executive Officer David Lovatt ("Lovatt") (cited and referred to herein as "Lovatt Decl.") at ¶ 8, 16. As well, upon information and belief, after Conde's indictment on September 20, 2019 (Lovatt Decl. at ¶ 16), Danzi hastily formed ECIC and facilitated the transition of Essex's clients and business to ECIC. (Lovatt Decl. at ¶ 17). The fact that ECIC took assignment of the Notes does not breathe new life into the Notes and ECIC's claims under the Motion are meritless.

Between May and August of 2019, GenTech issued the Notes to Essex, whereby Essex was the lender (holder) and GenTech the borrower. *See* Notes 1 through 8, attached as Exhibits 1 through 8 to the accompanying Declaration of Edward Paltzik (cited and referred to herein as "Paltzik Decl."); *see also* Lovatt Decl. at ¶ 4. On or about February 21, 2020, ECIC took assignment of the Notes by entering into eight (8) Note Purchase Agreements and Assignment Agreements (collectively the "Agreements") with Essex. *See* Note Purchase Agreements and

companion Assignment Agreements, attached to the <u>Paltzik Decl</u>. as <u>Exhibits 9</u> through <u>16</u>;

<u>Lovatt Decl</u>. at ¶ 5.

By this action, ECIC seeks to enforce the terms of the Notes against GenTech via the

Motion. The Cross-Motion should be granted and the action dismissed in whole or in part, or in

the alternative, at minimum, the Motion denied, for three reasons: (1) Essex was engaged in

unregistered dealer activity, and thus all of the Notes and the Agreements are void pursuant to 15

USCS § 78cc(b); (2) As to Note 1, which contains a Nevada choice of law provision, Florida law

should apply, since there is no reasonable basis to apply Nevada law, and under the laws of

Florida, Note 1 is criminally usurious[1]; (3) Notes 2 through 8 unequivocally require that any

action be brought in the state courts of Florida.

### PROCEDURAL HISTORY

On October 27, 2021, ECIC commenced this action by filing the following documents in

Supreme Court of the State of New York, County of New York: Summons, Notice of Motion for

summary judgment in lieu of complaint pursuant to N.Y. C.P.L.R. 3213, Memorandum of Law

in Support of Motion, Affidavit of Danzi ("Danzi Aff."), Affidavit of Conde, Affirmation of

Plaintiff's attorney Christopher Milazzo with attached exhibits, and Request for Judicial

Intervention. The Summons and Notice of Motion were never served on GenTech.

On November 4, 2021, ECIC filed an Amended Summons and Amended Notice of

Motion. Then, on November 5, 2021, ECIC caused the Amended Summons, Amended Notice of

Motion, and all of the other aforementioned Motion documents to be served on GenTech. *See*

Motion documents (minus the exhibits attached to the Milazzo Affirmation, which are attached

---

[1] GenTech reserves the right to argue that Notes 2 through 8 are criminally usurious under
Florida law in subsequent motions or proceedings in this action or in an action in the state courts
of Florida.

to the <u>Paltzik Decl</u>. as <u>Exhibits 1</u> through <u>16</u>) and Affidavit of Service, collectively attached to the <u>Paltzik Decl</u>. as <u>Exhibit 17</u>.

 On December 3, 2021, GenTech filed a Notice of Removal in this Court on the primary basis of diversity jurisdiction, but also citing to the Court's subject matter jurisdiction given the substantial questions of federal securities laws involved. *See* Notice of Removal (minus attached exhibits, which are also attached to the <u>Paltzik Decl</u>.), attached to the <u>Paltzik Decl</u>. as <u>Exhibit 18</u>.

## STATEMENT OF FACTS

### A.  Background of the Parties and Relevant Non-Parties

 ECIC is a New Jersey corporation, Essex is a Nevada corporation (*See* <u>Exhibits 9</u> through <u>16</u>, Note Purchase Agreements), and GenTech is a Colorado corporation but was a Florida corporation at the time the Notes were issued (<u>Lovatt Decl</u>. at ¶¶ 6, 7). Danzi is ECIC's Chief Executive Officer and signatory on the Agreements. (<u>Exhibits 9</u> through <u>16</u>, Note Purchase Agreements). Upon information and belief, from June 2015 to December 2019, Danzi was employed as Vice President at Essex. (<u>Lovatt Decl</u>. at ¶ 8).

 Before the Notes were issued, Essex and GenTech had a pre-existing lending relationship. (<u>*Id.*</u> at ¶ 9). During the course of the relationship, Essex loaned various amounts to GenTech through the execution of at least twenty-eight (28) convertible promissory notes, including the Notes at issue in this action. (*Id.* at ¶ 10). Notes 1 through 8 at issue here are the last ones executed between Essex and GenTech. *Id.* In 2018, Essex converted the outstanding principal and accrued interest of an earlier issued note into shares of GenTech. (*Id.* at ¶ 11). Under the terms of that note, like those at issue here, Essex had the right to convert into shares at a specified discount to the lowest market price over a series of days leading up to the conversion. (*Id.* at ¶ 12). In addition to Essex exercising the option to convert shares at a discount, Essex elected to convert shortly after GenTech completed a reverse stock split. (*Id.* at ¶ 13). In a

reverse stock split, the company in effect consolidates the shares outstanding, and the result is fewer outstanding shares and a higher share price. (*Id.* at ¶ 14). For Essex, this provided an opportunity to further exploit its relationship with GenTech since Essex was able to "look back" and convert $2,000 of outstanding principal into 34,482,758 shares of GenTech at a discounted pre-reverse stock split share price of $0.000058 and sell into the market at prevailing rates, of, on average, $0.10, to the tune of approximately $3,500,000.00 in profit for Essex, all to the detriment of GenTech. (*Id.*). This transaction left GenTech in need of more capital, as part of a vicious cycle perpetuated by Essex. (*Id.* at ¶ 15).

Essex was formed by non-party Conde on July 17, 2013 (*Id.* at ¶ 16).[2] On September 20, 2019, Conde was indicted and charged with conspiracy to commit money laundering and substantive securities fraud, conspiracy to commit wire fraud, conspiracy to commit money laundering and substantive securities fraud.[3] (Lovatt Decl. at ¶ 16). That same day, Conde and Essex were named as Defendants in an action brought by the United States Securities and Exchange Commission (the "SEC").[4] (*Id.*). The SEC accused Conde of violating the antifraud provisions of Sections 17(a)(1) and (3) of the Securities Act of 1933 and the market manipulation and antifraud provisions of Sections 9(a)(1) and 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Exchange Act Rules 10b-5(a) and (c) for allegedly

---

[2] The Nevada SilverFlume Business Portal lists Essex's Formation Date as 7/17/2013. https://esos.nv.gov/EntitySearch/OnlineEntitySearch (accessed on December 8, 2021).
[3] *United States v. Benjamin Conde*, No. 2:19-cr-00432-JS (United States District Court, Eastern District of New York); https://www.justice.gov/civil/page/file/1253991/download (accessed on December 10, 2021).
[4] *SEC v. Benjamin Conde, Essex Global Investment Corp. and Facultas Capital Management, Inc*., No. 2:19-cv-5404-KS-AKT (United States District Court, Eastern District of New York); ; https://www.sec.gov/litigation/complaints/2019/comp24609.pdf (accessed on December 10, 2021).

acquired large blocks of Renewable Energy and Power, Inc. ("RBNW") shares through convertible notes purchased from RBNW by Essex.[5] (*Id.*).

Upon information and belief, Danzi, by and through his parents (who were also signatories on the Notes Purchase Agreements—*see* Exhibits 9 through 16), had invested significant assets in Essex. (Lovatt Decl. at ¶ 17). Therefore, it is nothing short of suspicious that in the aftermath of Conde's indictment, on or about November 1, 2019 Danzi hastily formed ECIC[6] and took assignment of the Notes, giving Danzi the purported authority as ECIC's Chief Executive Officer to collect on the Notes while Conde was entangled in the aforementioned criminal and civil investigations. (*Id.*); *see also* Danzi Aff. at ¶ 1.[7]

**B. The Notes**

The Notes (Exhibits 1 through 8), in which GenTech is referred to as the "Company" and Essex as the "Holder", are dated as follows and contain the following basic terms:

Note 1: dated May 8, 2019, in the principal amount of $135,000;
Note 2: dated May 23, 2019, in the principal amount of $72,500;
Note 3: dated June 6, 2019, in the principal amount of $100,000;
Note 4: dated June 19, 2019, in the principal amount of $32,000;
Note 5: dated June 24, 2019, in the principal amount of $71,000;
Note 6: dated June 27, 2019, in the principal amount of $100,000;
Note 7: dated July 24, 2019, in the principal amount of $100,000;
Note 8: dated August 23, 2019, in the principal amount of $90,000.

---

[5] *Id.*

[6] In searching the New Jersey Business Records, there does not appear to be an East Capital Investments Corp., however, there is a listed entity known as East Capital Investments LLC, that was incorporated in November 2019. www.njportal.com/DOR/businessrecords/entitydocs/businessstatcopies.aspx (accessed on December 9, 2021).

[7] GenTech is not the only penny stock issuer that has fallen prey to Essex and ECIC's predatory lending practices. *See Cyber Apps World, Inc. v. East Capital Investment Corp.,* No. A-21-838520-B (Eighth Judicial Circuit Court, Clark County, Nevada) (issuing a default judgment against East Capital Investment Corp. for failing to respond to Plaintiff's complaint); https://cyberappsworld.com/Filed%20Default%20Judgment%2011.1.21.pdf (accessed on December 10, 2021); *see also* https://www.accesswire.com/657386/cyber-apps-cyap-files-lawsuit-against-east-capital-investments-corp-for-significant-damages-in-connection-with-convertible-promissory-note (accessed on December 10, 2021).

All of the Notes contain choice of law and venue provisions. Note 1 provides, in pertinent part, that it "shall be governed by and construed in accordance with the laws of Nevada . . . . [The parties] consent to the exclusive jurisdiction and venue in the courts of the State of New York or in the Federal courts sitting in the county or city of New York." (Exhibit 1 at § 14). Notes 2 through 8 provide, in pertinent part, that they "shall be governed by and construed in accordance with the laws of the State of Florida . . . . *Any action* brought by either party against the other concerning the transactions contemplated by this Agreement *shall be brought only in the state courts of Florida*." (Exhibits 2 through 8, § 11) (emphasis added).

Under the terms of the Agreements, ECIC purchased the Notes from Essex with an aggregate principal amount of $700,500 from Essex in GenTech. (Exhibits 1 through 8; Lovatt Decl. at ¶ 18). The Notes include terms of conversion into shares of GenTech's common stock, $.0001 par value (the "Common Stock") pursuant to market adjustable formulas at between a 42% to 50% discount to the lowest trading price of the Common Stock during the previous 10 to 25 days. (Lovatt Decl. at ¶ 18). However, the Notes were never converted. (*Id.*).

## ARGUMENT

**I.     ESSEX'S FAILURE TO REGISTER AS A DEALER PURSUANT TO 15 USC § 78o(a)(1) RENDERS THE NOTES VOID PURSUANT TO 15 USC § 78cc(b), AND THEREFORE, THE COURT SHOULD GRANT GENTECH'S CROSS-MOTION TO DISMISS THE ACTION PURSUANT TO FED. R. CIV. P. 12(b)(6)**

### A.  Standard of Review

Fed. R. Civ. P. 12(b) provides that "a party may assert the following defenses by motion: (6) failure to state a claim upon which relief can be granted . . . ." In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 191 (2d Cir. 2007); *accord Jaghory v. New York State*

*Dept' of Ed.*, 131 F.3d 326, 329 (2d Cir. 1997). "The issue is not whether the plaintiff will ultimately prevail, but whether the plaintiff's claim, as pleaded, is sufficient to afford him or her the opportunity to proceed on the evidence." *Quirino v. New Jewish Home*, 2021 U.S. Dist. LEXIS 55005, *26 (S.D.N.Y. Feb. 19, 2021) (citing *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998)). However, in order to survive a motion to dismiss, a claim must be facially plausible—in other words, the claim must contain "factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Starr v. Sony BGM Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (internal citations omitted). A court must generally limit its consideration to: "(1) the factual allegations in the complaint, which are accepted as true; (2) documents attached to the complaint as an exhibit or incorporated in it by reference; (3) matters of which judicial notice may be taken; and (4) documents upon whose terms and effect the complaint relies heavily, *i.e.*, documents that are 'integral' to the complaint." *Calcutti v. SBU, Inc.*, 273 F. Supp. 2d 488, 498 (S.D.N.Y. Jul. 23, 2003) (citing *Brass v. American Film Techs.*, 987 F.2d 142, 150 (2d Cir. 1993)).

In this action, there is no complaint since the subject matter of the action relates to instruments for the payment of money only (the Notes) and thus ECIC commenced the action via motion for summary judgment pursuant to N.Y. C.P.L.R. 3213, which provides, in pertinent part:

> When an action is based upon an instrument for the payment of money only or upon any judgment, the plaintiff may serve with the summons a notice of motion for summary judgment and the supporting papers in lieu of a complaint.

However, N.Y. C.P.L.R. 3213 also provides that "[i]f the motion is denied, the moving and answering papers shall be deemed the complaint and answer, respectively, unless the court orders otherwise." Additionally, the New York Court of Appeals has held that in the context of a motion for summary judgment in lieu of complaint, "the court's authority to order 'otherwise' include[s] discretion to dismiss." *Schulz v. Barrows*, 94 N.Y.2d 624, 625-26 (2000) (affirming

lower court's dismissal of N.Y. C.P.L.R. 3213 action upon cross-motion by defendant for lack of personal jurisdiction pursuant to N.Y. C.P.L.R. 3211(a)(2) and (8)). Therefore, a motion to dismiss under Rule 12(b), which is analogous to N.Y. C.P.L.R. 3211, is a permitted method of responding to an action brought pursuant to N.Y. C.P.L.R. 3213.

Here, even if the allegations in ECIC's Motion papers are accepted as true, (i) the content of the Notes and the Agreements, which ECIC itself submits as exhibits in support of the Motion, in combination with (ii) various matters presented by GenTech and of which judicial notice may be taken, both of which are properly considered by this Court, demonstrate that dismissal is proper.

### B.  The Exchange Act's Dealer Registration Requirement and Essex's Failure to Comply With Same

The Exchange Act defines a "dealer" as "any person engaged in the business of buying and selling securities for such person's own account through a broker or otherwise," but specifically excludes from the definition "a person that buys or sells securities for such person's own account, either individually or in a fiduciary capacity, but not as a part of a regular business." 15 U.S.C. § 78c(a)(5). This definition "connote[s] a certain regularity of participation in securities transactions at key points in the chain of distribution." *Mass. Fin. Servs., Inc. v. Sec. Investor Prot. Corp.*, 411 F. Supp. 411, 415 (D. Mass. Mar. 26, 1976); *see also SEC v. Ridenour*, 913 F.2d 515, 517 (8th Cir. 1990) (finding that the defendant was a dealer because his high "level of [trading] activity . . . made him more than an active investor").

The Commission's dealer registration requirement is "of the utmost importance in effecting the purposes of the Act" because it enables the Commission "to exercise discipline over those who may engage in the securities business and it establishes necessary standards with respect to training, experience, and records." *Celsion Corp. v. Stearns Mgmt. Corp.*, 157 F.

Supp.2d 942, 947 (N.D. Ill. Aug. 10, 2001) (citing *Regional Props, v. Financial & Real Estate Consulting, Co*., 678 F.2d 552, 562 (5th Cir. 1982)).

      If one is deemed a "dealer" it then becomes unlawful "to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any [non-exempt] security…. unless such broker or dealer is registered in accordance with [the Exchange Act]." 15 U.S.C. § 78o(a)(1). Failure to register as a dealer is a direct violation of 15 U.S.C. § 78o(a)(1) and, further, 15 U.S.C. § 78cc(b) expressly voids such contracts, providing, in pertinent part:

> Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, ***shall be void*** (1) as regards the rights of any person who in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision, rule, or regulation . . . . (Emphasis added).

In the case at bar, upon information and belief, Essex was not registered as a dealer at the time the Notes were issued, or anytime thereafter. (*See* <u>Lovatt Decl.</u> at ¶ 19). Accordingly, for the reasons set forth below, the Notes are void as a matter of law.

### C.  The Notes are Securities

      In general, "'notes' are specifically enumerated in . . . 15 U.S.C. §77b(a)(1), which defines security as: "any *note*, stock, treasury stock, security future, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit sharing agreement . . . ." *United States v. Balis*, 244 Fed. App'x 397, 398 (2d Cir. 2007) (emphasis added) (quoting 15 U.S.C. §77b(a)(1) and citing *Reves v. Ernst & Young,* 494 U.S. 56, 64-65 (1990), *United States v. Thomas*, 54 F.3d 73, 78 (2d Cir. 1995), and *United States v. Rogers*, 9 F.3d 1025, 1033 (2d Cir.

1993). In addition, 15 U.S.C. §78c(a)(10) defines "security" to include, in pertinent part, "any

note " so long as that note has a maturity at the time of issuance "exceeding nine months."

Although rebuttable, the Supreme Court has recognized that "[a] note is presumed to be a

security." *See Reves*, 494 U.S. at 61, 67 (1990). "Congress' purpose in enacting the securities

laws was to regulate *investments*, in whatever form they are made and by whatever name they

are called." *Id*. at 61. (Emphasis in original). In *Reves,* the Supreme Court concluded that the

notes at issue were securities. As with the Notes at issue in the case at bar, the notes in *Reves*

were issued "in an effort to raise capital for its general business operations, and purchasers

bought them in order to earn a profit in the form of interest." *Id.* at 67-68.

More specifically to the facts of the case at bar, courts have held *convertible notes* (which

the Notes are) to be securities. In *Balis*, the Second Circuit concluded:

> There is no doubt that the Note was a security . . . . the government adduced unrebutted
> testimonial and documentary evidence at trial demonstrating that the Note had the
> economic characteristics of a security, including its $ 300,000 principal amount, its two-
> year maturity, its interest rate, and its convertibility into 3,000,000 shares of Millennium
> stock. 244 Fed. App'x 397, 398 (2d Cir. 2007); *see also SEC v. Almagarby*, 479 F. Supp.
> 3d 1266, 1268 (S.D. Fla. Aug. 16, 2021) ("[Defendants] obtained shares by purchasing
> 'aged debt' from the Issuers' debtholders and entering into certain agreements granting
> [Defendant Almagarby's LLC] the right to convert the debt into common stock of the
> Issuers at a significant discount—most often 50 percent—to then-prevailing market
> prices.").

Here, the Notes now held by ECIC matured twelve (12) months from the issuance date,

and upon maturity, required the repayment of principal plus ten percent (10%) interest per

annum[8]. (*See* <u>Exhibits 1</u> through <u>8</u>). While these characteristics alone are sufficient to establish

the Notes as securities, the Notes have the added feature of being convertible, making them more

analogous to the notes in *Balis* and *Almagarby*. For instance, under the terms of Note 1:

> The Holder of this Note is entitled, at its option, at any time after
> 150 days, to convert all or any amount of the principal face amount

---

[8] The actual interest rate on the Notes far exceeds 10% per annum, which is discussed at length
later in this Memorandum.

> of this Note then outstanding into shares of the Company's
> common stock (the "Common Stock") at a price ("Conversion
> Price") for each share of Common Stock equal to 50% of the
> **lowest traded price** of the Common Stock….for the ***Twenty*** prior
> trading days. (Exhibit 1, § 4(a) (emphasis in original)).

There can be no doubt that the Notes fall squarely within the definition of the term "security"

and are the type of investments Congress sought to regulate.

### D. Purchasing Convertible Notes Constitutes Engaging in the Business of Buying and Selling Securities

"[T]he primary indicia in determining that a person has "engaged in the business within

the meaning of the term 'dealer' is that the level of participation in purchasing and selling

securities involves more than a few isolated transactions." *SEC v. Fierro*, 2020 U.S. Dist. LEXIS

238936, *9 (D.N.J. Dec. 18, 2020) (quoting *SEC v. Keener*, 2020 U.S. Dist. LEXIS 146256, *12

(S.D. Fla. Aug. 13, 2020)). Further, the "centerpiece" to this definition is the word "business,"

meaning, in pertinent part, "[a] commercial enterprise carried on *for profit* . . . ." *SEC v. Big*

*Apple Consulting USA, Inc*., 783 F.3d 786, 809-10 (11th Cir. 2015) (citing Black's Law

Dictionary 239 (10th ed. 2009) (emphasis in original). Thus, courts in essence look at the

purpose of the transactions and the overall frequency.

In *Big Apple Consulting*, the Eleventh Circuit upheld a decision granting summary

judgement in favor of the SEC in part due to finding that defendants were dealers. The Court

stated that "[w]hile evidence of merely some profits from buying and selling securities may

alone be inconclusive proof, the defendants' entire business model was predicated on the

purchase and sale of securities." 783 F.3d at 809-10. As well, in *Fierro*, the SEC alleged that the

defendants were engaging in the same type of activity as Essex and ECIC—that is, buying

convertible notes from penny stock issuers. There, the Court found that it was "more than

plausible" that defendants met the statutory definition of "dealer" given the SEC alleged that

"[for] two years, defendants purchased and converted over fifty notes from more than twenty

penny stock issuers and then sold the newly issued shares of stock into the public market, generating about $2.3 million in profits." *Fierro*, 2020 U.S. Dist. LEXIS 238936 at *9; *see also Almagarby*, 479 F. Supp. 3d at 1268 (debt purchases with right to convert the debt into common stock of the Issuers at significant discount); *Keener,* 2020 U.S. Dist. LEXIS 146256 at *12-13 (defendant bought and converted over 100 convertible notes securities from more than 100 different microcap issuers during a three-year period).

In the case at bar, during the course of the lending relationship, Essex loaned funds to GenTech under twenty-eight (28) separate financing agreements. (Lovatt Decl. at ¶ 10). The terms of the notes were all generally the same, in that Essex would lend the money but retain the option to convert into shares of GenTech at a stated discount to the *lowest* market rate during the preceding 10 to 25 business days. In 2018, GenTech completed a reverse stock split whereby it reduced its outstanding shares, causing an increase in its share price. (*Id.* at ¶ 20). It was under this situation that Essex decided to capitalize on the punitive terms and convert the outstanding principal and accrued interest to equity. (*Id.* at ¶¶ 13-15, 20). That meant that Essex effectively bought GenTech shares at $0.000058 and then sold the shares into the market at an average of $0.10 per share, turning an easy profit of approximately $3,500,000.00, at GenTech's expense. (*Id.* at ¶ 20). GenTech fell into a negative cycle where the cost of capital was so high that it perpetuated the need to continually borrow money. (*Id.*). Essex, knowing this, stood ready to fund GenTech again at high interest rates and aggressive conversion discounts. (*Id.*) The regularity of the loan agreements, coupled with the profits, are akin to the other cases cited herein where courts have found dealer registration a requirement.

In summary, Essex was required to register a dealer for engaging in the recurring business practice of purchasing convertible notes. By failing to register as a dealer, Essex violated 15 U.S.C. § 78o(a)(1) rendering the Notes void pursuant to 15 U.S.C. § 78cc(b).

Moreover, since the Notes are void, there are no rights for this Court to enforce, making the assignment of the Notes from Essex to ECIC inconsequential. Accordingly, GenTech's cross-motion to dismiss should be granted.

**II.     ALTERNATIVELY TO I, GENTECH RAISES TRIABLE ISSUES OF FACT AS TO ESSEX'S FAILURE TO REGISTER AS A DEALER PURSUANT TO 15 USC § 78o(a)(1) AND THE VALIDITY OF THE NOTES PURSUANT TO 15 USC § 78cc(b) AND THEREFORE, AT MINIMUM, ECIC'S MOTION FOR SUMMARY JUDGEMENT IN LIEU OF COMPLAINT PURSUANT TO N.Y. C.P.L.R. 3213 SHOULD BE DENIED**

Under New York's procedural law, once it is determined that an action was properly brought under N.Y. C.P.L.R. 3213, the standard for summary judgment is the same as under N.Y. C.P.L.R. 3212, which is that the plaintiff "may show entitlement to summary judgment by demonstrating that there are no triable issues of fact*." Branch Banking & Trust Co. v. South Fork Resources LLC*, 2011 N.Y. Misc. LEXIS 4975, *14 (Sup. Co. Nassau Cty. Aug. 31, 2011). "To defeat such a showing, a defendant must present admissible evidence that raises triable issues of fact that would preclude liability." *Id*.

Similarly, under Fed. R. Civ. P. 56, a motion for summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Adickes v. S.H. Kress & Co*., 398 U.S. 144 (1970). Once the movant meets this burden, the non-moving party "must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.,* 536 F.3d 140, 145 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 322-23). Specifically, the non-moving party must cite to "particular parts of materials in the record" or show "that the materials cited [by the movant] do not establish the absence . . . of a

genuine dispute" as to any material fact. Fed. R. Civ. P. 56(c)(1). In reviewing the evidentiary

record, the court "must view the evidence in the light most favorable to the party against whom

summary judgment is sought and must draw all reasonable inferences in his [or her] favor." *L.B.*

*Foster Co. v. Am. Piles, Inc*., 138 F.3d 81, 87 (2d Cir. 1998) (citing *Matsushita Elec. Indus. Co.*

*v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986)).

      Here, in the alternative to this Court granting GenTech's Cross-Motion, GenTech has at

minimum raised genuine and triable issues of fact that would preclude liability—specifically,

that the Notes are securities within the meaning of the Exchange Act, that the Notes are void due

to the fact that Essex was required to register as a dealer but did not do so, and thus, that ECIC,

as assignee, cannot enforce the terms of the Notes against GenTech. Accordingly, in the

alternative to this Court granting GenTech's Cross-Motion, ECIC's Motion should be denied, its

Motion treated as a Complaint, and GenTech's Cross-Motion and opposition treated as an

Answer. *See* N.Y. C.P.L.R. 3213.

## III.  WITH RESPECT TO NOTE 1 AND ALTERNATIVELY TO I AND II, THE INTEREST ON NOTE 1 IS IN EXCESS OF 25%, AND THUS CRIMINALLY USURIOUS AND UNENFORCEABLE UNDER FLORIDA LAW, WHICH SHOULD APPLY HERE, AND THEREFORE, THE COURT SHOULD GRANT GENTECH'S CROSS-MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)

### A.  There is no reasonable basis to apply the laws of Nevada

      "A federal court sitting in diversity jurisdiction applies the choice of law rules of the

forum state." *AEI Life LLC v. Lincoln Benefit Life Co*., 892 F.3d 126, 132 (2d Cir. 2018). While

New York choice-of-law rules generally require courts to uphold a parties' choice-of-law

provision, courts may refuse "where (1) the parties' choice has no reasonable basis or (2)

application of the chosen law would violate a fundamental public policy of another jurisdiction

with materially greater interests in the dispute." *EMA Fin., LLC v. NFusz, Inc*., 444 F. Supp. 3d

530, 540 (S.D.N.Y. Mar. 16, 2020).

To determine if the choice of law selection bears a reasonable relationship to the agreement, courts will consider "the location of the following factors: the parties' negotiation of the agreement; performance under the agreement, including where the loan payments were received; the parties' places of incorporation; the parties' principal place of business; and the property that is the subject of the transaction." *Power Up Lending Grp., Ltd. v. Cardinal Energy Grp., Inc.*, 2019 U.S. Dist. LEXIS 57527, at *8-9 (E.D.N.Y. Apr. 3, 2019) (quoting *Madden v. Midland Funding, LLC*, 237 F. Supp. 3d 130, 148 (S.D.N.Y. Feb. 27, 2017)). In *Power Up*, the court applied these factors and found there was no reasonable basis to uphold the parties' contractual choice of law provision of Virginia as the only connection to Virginia was the lender's state of incorporation. 2019 U.S. Dist. LEXIS 57527 at *11. The court reasoned that there were "four states with at least some relationship with the Agreement" so it could not be said that most of the factors supported a relationship with the chosen Virginia forum. *Id* at *9-10*. In determining which laws should govern, the court found support for applying New York laws given that "the Agreement was negotiated in New York, payments were received by a bank in New York, and Plaintiff's principal place of business is in New York." *Id.* at *10. Conversely, in *EMA,* the court upheld the parties' choice of law provision since it was the borrower, rather than the lender, that shared its state of incorporation with the chosen forum of Nevada. *See EMA,* 444 F. Supp. 3d at 541 ("[T]he Court regards with some skepticism the arguments made by a Nevada corporation that the laws of its state of incorporation should not apply."). Thus, courts seem to place greater emphasis on the borrower's nexus to the state over that of the lender.

Here, there is no reasonable basis to apply Nevada law to Note 1 as the Parties have no connection to that State. The only possible connection with Nevada is that it is the State of incorporation for non-party Essex, the assignor of the Notes. (Lovatt Decl. at ¶ 7) Moreover, upon information and belief, Essex operated exclusively out of New Jersey. (*Id.*). ECIC is a New

Jersey corporation. (*Id.; see also* <u>Exhibit</u> 9 through <u>16</u>). During the period in which the Notes were issued—May to August 2019—GenTech was a Florida corporation with its principal place of business in Florida and Lovatt communicated with Essex and ECIC exclusively from Florida while Essex and ECIC communicated from New Jersey. (*<u>Lovatt Decl</u>.* at ¶ 6). While in Florida, GenTech negotiated the Notes, executed the Notes, and accepted receipt of the funds from Essex into GenTech's Bank of America account that Lovatt opened in or around March 2019 at the Saint Johns, Florida bank branch location. (*Id*. at ¶ 21).

Note 1 has at least some nexus to each of three states – Nevada, Florida and New Jersey. "The relevant inquiry [however] is not whether the selected state is the state with the greatest number of connections" but rather, whether the "relationship to the selected state is reasonable." *EMA,* 444 F. Supp. 3d at 541. Here, the only nexus to Nevada is as the state of incorporation of Essex, the original lender and assignor of the Notes, and an entity that is not even a party to this action. Moreover, the Chief Executive Officer of Essex, Conde, was indicted in September 2019 for several counts of federal securities law violations.[9] The Parties have no relationship with Nevada, and as such there is no reasonable basis for the laws of Nevada to apply to the Notes.

### B.  The laws of Florida should apply to Note 1

The matter now turns to which State laws apply to ECIC's demand for payment under Note 1. In the absence of an applicable choice-of-law provision, New York "looks to the 'center of gravity' of a contract to determine choice of law." *AEI Life LLC*, 892 F.3d at 135 (quoting *Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 433 (2d Cir. 2012)). "Under this approach, courts may consider a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and

---

[9] *United States v. Benjamin Conde*, No. 2:19-cr-00432-JS (United States District Court, Eastern District of New York); https://www.justice.gov/civil/page/file/1253991/download (accessed on December 10, 2021).

the domicile or place of business of the contracting parties." *Id.* (quoting *Brink's Ltd. v. S. African Airways*, 93 F.3d 1022, 1030-31 (2d Cir. 1996)).

Analysis of the significant contacts in this action demonstrates that the "center of gravity" of Note 1 is Florida. New Jersey was simply the physical location of the lenders—Essex and ECIC—and the State in which ECIC hastily incorporated in the aftermath of Conde's indictment. Florida is where the borrower, GenTech, was incorporated at the time the Notes were issued, where GenTech maintained its principal place of business while it negotiated with Essex, where GenTech executed the Notes, and where GenTech received the funds under Note 1. (Lovatt Decl. at ¶¶ 6, 22). The other Notes were also executed around this same time, although Notes 2 through 8 are also subject to Florida laws through clear contractual provisions.

**C.  Applying the laws of Florida, Note 1 is criminally usurious and unenforceable**

Pursuant to Fla. Stat. Ann. § 687.071(2), "any person making an extension of credit to any person, who shall willfully and knowingly charge, take or receive interest thereon at a rate exceeding 25 percent per annum....commits a misdemeanor of the second degree," and pursuant to subsection 7 of the same section, "[n]o extension of credit made in violation of any of the provisions of this section shall be an enforceable debt in the courts of this state [Florida]." To find Note 1 unenforceable, the Court must determine that the interest rate is criminally usurious under Florida law and that the Courts of New York have the authority to declare Note 1 unenforceable. We address each in turn.

In Florida, "the elements of usury are: (1) a loan express or implied; (2) an understanding between the parties that the money lent shall be returned; (3) a payment of or an agreement to pay a greater rate of interest than is allowed by law; and (4) a corrupt intent to take more than the legal rate for the use of the money loaned." *Northwood SG, LLC v. Builder Fin. Corp.,* 76 So. 3d 3, 5 (Fla. Dist. Ct. App. 2011). "When usury is raised as a defense, the borrower must

affirmatively plead and establish the four elements of a usurious transaction by clear and satisfactory evidence." *Rollins v. Odom*, 519 So. 2d 652, 657 (Fla. Dist. Ct. App. 1988) (citing *Dixon v. Sharp*, 276 So. 2d 817, 820 (Fla. 1973).

There is no dispute that elements (1) and (2) have been established. On May 8, 2019, Essex purchased Note 1 from GenTech. (Exhibit 1). In exchange, GenTech was to pay the Face Value of $135,000.00 plus interest at 10% per annum one year later, on May 8, 2020. *Id.* However, these terms, outlined at the beginning of Note 1, grossly misstate the effective interest rate that Essex sought to extract from GenTech. To start, GenTech did not receive the full Purchase Price of the note. Instead, the Purchase Price of the Note was only $115,000 rather than the Face Value of $135,000 (Exhibit 1, p. 1), and Essex deducted $10,000.00 as an "administrative and legal costs fee," (Exhibit 1 § 15), meaning Gentech received net proceeds of only $105,000.00. And at maturity, Essex sought 10% interest on the Face Value amount of $135,000.00 (totaling $13,500.00) plus repayment of the Face Value amount of $135,000.00, for an aggregate amount of $135,000 + $13,500= $148,500. These embedded fees are even more egregious when one considers the 24% default interest rate that Plaintiff now seeks to impose in addition to the option to convert into shares of GenTech at a 50% discount to the lowest market price for the twenty prior trading days. (Exhibit 1).

The third element requires an analysis of the rate of interest detailed in the agreement. To calculate the interest rate, Florida courts look to Fla. Stat. Ann. § 687.03(3) and the *Hamm* calculations. *Velletri v. Dixon*, 44 So. 3d 187, 190-91 (Fla. Dist. Ct. App. 2010) (citing *St. Petersburg Bank & Tr. v. Hamm*, 414 So. 2d 1071, 1073 (Fla. 1982)). This method looks at any advances paid by the borrower, GenTech, and divides them by the loan principal amount. If the loan is longer than one-year, the interest is divided by the term of the loan. The resulting interest rate is then added to the stated interest rate in the loan agreement to arrive at an all-in interest

rate, which is benchmarked against the criminally usurious rate of 25%. Fla. Stat. Ann. §
687.071(2).

In *Velletri,* the upfront fees paid by the borrower totaled $78,013.70, the principal amount
was $250,000, the stated interest rate was 15% and the term was two years. Here, on Note 1 the
principal amount is $135,000, the stated interest rate is 10%, and the term is 1-year. The upfront
fees are at a minimum $10,000. *See* <u>Exhibit 1</u>, Note 1 ¶ 15 ("Upon Closing, Company [GenTech]
shall pay Holder [Essex] an administrative and legal costs fee of $10,00.00.") However, "[i]t is
well settled in Florida that the courts will look to the substance of the transaction rather than to
the form to determine usury." *Pinchuck v. Canzoneri*, 920 So. 2d 713, 715 (Fla. Dist. Ct. App.
2006); *see also Id.* (quoting *Kay v. Amendola*, 129 So. 2d 170 (Fla. 2d Dist. Ct. App.1961) ("Our
usury statutes show a clear legislative intent to prevent accomplishment of a usurious scheme by
indirection, and the concealment of the needle of usury in a haystack of subterfuge will not avail
to prevent its pricking the body of the law into action."). Thus, courts look at the transaction
holistically to determine the total fees. "[T]he aggregate principal face amount" or "Face Value"
of Note 1 is $135,000.00. Yet, Essex only paid a "Purchase Price" of $115,000.00 meaning that
the amount GenTech actually received was, $115,000.00, or $20,000 less than the stated
principal amount of the note, $135,000. (*See* <u>Exhibit 1, p. 1</u>). By demanding GenTech repay an
additional $20,000 at maturity under the auspicious of a higher principal amount, Essex
effectively embedded another $20,000 in fees. When combined with the aforementioned $10,000
in upfront fees, Essex charged GenTech an aggregate of $30,000 in fees. (*See* <u>Exhibit 1, p. 1;
Exhibit 1 § 15</u>). The calculation from *Velletri* is reproduced below along with a separate table
using the terms from Note 1.

| Velletri |
|---|
| 1. a. Advance of $78,031.70 |
|    b. $78,013.70 / $250,000 = 31.2% of total stated amount. |
| 2. a. Two year term. |
|    b. 31.2% spread over two years is 15.1% annual percentage rate. |

| |
|---|
| 3. a. The resulting APR from 2(b) above is 15.1% per year. |
| b. The stated annual rate on the note is 15% per year. |
| c. The effective rate of interest is 15% + 15.1% = 30.1% > 25% |

| Essex - GenTech Note 1 |
|---|
| 1. a. Advance of $30,000 |
| b. $30,000/ $135,000 = 22.2% of total stated amount. |
| 2. a. One year term. |
| b. 22.2% is a 22.2% annual percentage rate. |
| 3. a. The resulting APR from 2(b) above is 22.2% per year. |
| b. The stated annual rate on the note is 10% per year. |
| c. The effective rate of interest is 10% + 22.2% = 32.2% > 25% |

Using the methodology proscribed by the courts of Florida, the interest rate of 32.2% is in excess of 25%, which allows a court to conclude that Essex entered into this lending relationship with a corrupt intent. *See Markwood Invs., Ltd. v. Neves (In re Neves),* 2014 Bankr. LEXIS 5022, at *20 (Bankr. S.D. Fla. Dec. 11, 2014) ("Corrupt intent is presumed when the interest rate is over 25%."). Based on the elements, Note 1 is criminally usurious, and "[t]he civil penalty for criminal usury is … forfeiture of the right to collect the debt at all. *See* § 687.071(7)." *Velletri*, 44 So. 3d 187 at 189.

### D. Persuasive authority that the option to convert the note to shares at a 50% discount to the market rate should be included as part of the overall interest rate determination when making a usury determination in New York

While New York law does not apply here, this Court may find it persuasive that the New York Court of Appeals in a decision dated October 14, 2021, held that "a conversion option that permits a lender to convert outstanding balance to shares of stock at a fixed discount should be treated as interest for purposes of a usury determination." *Adar Bays, LLC v. GeneSYS ID, Inc.,* 2021 N.Y. LEXIS 2206, *18 (2021). In *Adar Bays,* the Plaintiff had the right to convert the outstanding loan balance to shares of stock at a "35% discount calculated from the lowest trading price in the 20-day period preceding the notice of conversion." *Id*. at *21. Here, Essex had an option to convert the outstanding loan balance and any accrued interest into shares of Gentech common stock at a conversion price "equal to 50% of the lowest traded price of the Common

Stock….for the twenty prior trading days." (Exhibit 1, ¶4(a)). While Adar Bays, the lender, did

convert the note and Essex did not convert Note 1, the New York Court of Appeals noted that

"the possibility that Adar Bays may have never exercised the conversion option…does not

require the conclusion that the value of the conversion option is too uncertain as to be counted as

interest." *Adar Bays, LLC,* 2021 N.Y. LEXIS 2206, *31. As a result, courts in New York would

go so far as to incorporate the expected return on a conversion feature as an added interest charge

imposed on the borrower.

### E.  Federal Courts sitting in diversity can apply the laws of Florida

A district court sitting in diversity and applying the laws of the state of Florida can permit

a criminal usury defense and render a note unenforceable. In *Cunningham v. LeGrand*, the

defendant raised a criminal usury defense based on Florida law in the Southern District of West

Virginia. 2013 U.S. Dist. LEXIS 81032, at *17 (S.D. W. Va. June 10, 2013)*.* The Court found

"good cause supports considering the usury defense …especially inasmuch as it raises a

profound issue of public policy emphasized by both the Legislature and the court of last resort in

this state [West Virginia where criminal usury is capped at 18%]." *Id.* Similarly, in *Sec. Life of*

*Denver Ins. Co. v. Shah*, the district court, applying Florida law, determined the note was

usurious and granted borrower's motion for summary judgement. 906 F. Supp. 2d 1334, 1346

(S.D. Ga. Sep. 18, 2012). Accordingly, this Court should not allow ECIC to collect under Note 1

as the terms of the note are criminally usurious and thus, unenforceable. *See Pinchuck*, 920 So.

2d at 715 ("The civil penalty for violating this statute is forfeiture of the entire principal amount

§ 687.071(7), Fla. Stat. (1993).") (citing *Jersey Palm-Gross, Inc. v. Paper,* 658 So. 2d 531 (Fla.

1995)).

The bottom line is that Essex deceptively selected Nevada as the governing law of Note

1, and then assigned the Notes to ECIC when Conde was indicted. There is simply no reasonable

basis to apply Nevada laws, and in light of the clear contacts with Florida, the laws of Florida

should apply. As a result, this court should grant GenTech's motion to dismiss.

IV.   **ALTERNATIVELY TO I, II, AND III, GENTECH RAISES
TRIABLE ISSUES OF FACT AS TO WHETHER THE INTEREST
ON NOTE 1 IS IN EXCESS OF 25%, AND THUS CRIMINALLY
USURIOUS AND UNENFORCEABLE UNDER FLORIDA LAW, AND
THEREFORE, AT MINIMUM, ECIC'S MOTION FOR SUMMARY
JUDGEMENT IN LIEU OF COMPLAINT PURSUANT TO N.Y. C.P.L.R.
3213 SHOULD BE DENIED**

In the alternative to this Court granting GenTech's Cross-Motion, GenTech has at

minimum raised genuine and triable issues of fact that would preclude liability—specifically,

that the interest on Note 1 is in excess of 25%, which would be criminally usurious under Florida

law and thus render Note 1 unenforceable. The question of whether the interest on Note 1 is in

excess of 25% raises genuine and triable issues of fact. *See* N.Y. C.P.L.R. 3213, 3213; Fed. R.

Civ. P. 56(a), 56(c)(1). Accordingly, in the alternative to this Court granting GenTech's Cross

Motion as to Note 1, ECIC's Motion should be denied as to Note 1, its Motion treated as a

Complaint as to Note 1, and GenTech's Cross-Motion and opposition treated as an Answer as to

Note 1. *See* N.Y. C.P.L.R. 3213.

V.   **ALTERNATIVELY TO I AND II, ALL OF ECIC'S CLAIMS RELATING TO
OR ARISING OUT OF NOTES 2 THROUGH 8 MUST BE DISMISSED
PURSUANT TO FED. R. CIV. P. 12(b)(3), AS THE NOTES CONCLUSIVELY
ESTABLISH THAT ANY ACTION RELATING TO OR ARISING OUT OF
NOTES 2 THROUGH 8 MUST BE BROUGHT IN THE STATE COURTS OF
FLORIDA**

Fed. R. Civ. P. 12(b) provides that "a party may assert the following defenses by motion:

(3) improper venue . . . ." In deciding a motion to dismiss pursuant to Rule 12(b)(3), the court, as

with a motion pursuant to Rule 12(b)(6), "will accept as true all factual allegations in the non-

moving party's pleadings and draw all reasonable inferences in favor of the party opposing the

motion." *Sepanski v. Janiking, Inc*., 822 F. Supp. 2d 309, 312 (W.D.N.Y. Sep. 30. 2011). The

plaintiff bears the burden of demonstrating that venue is proper. *EPA ex rel. McKeown v. Port*

*Auth. of N.Y. & N.J.*, 162 F. Supp. 2d 173, 183 (S.D.N.Y. 2001). In addition, a party moving to dismiss an action pursuant to Rule 12(b)(3) on the basis of a forum selection clause must demonstrate that: "(1) the clause was reasonably communicated to the party resisting enforcement; (2) the clause was mandatory and not merely permissive; and (3) the claims and parties involved in the suit are subject to the forum selection clause." *Altvater Gessler-J.A.Baczewski Intern. (USA) Inc. v. Sovieski*, 572 F.3d 86, 89 (2d Cir. 2009).

Here, the forum selection clause is unequivocal: Notes 2 through 8 provide, in pertinent part, that they "shall be governed by and construed in accordance with the laws of the State of Florida . . . . *Any action* brought by either party against the other concerning the transactions contemplated by this Agreement *shall be brought only in the state courts of Florida*." (Exhibits 2 through 8, § 11) (emphasis added). Moreover, all three factors set forth by the Second Circuit are satisfied. First, there is no evidence that Essex, as ECIC's predecessor-in-interest, was unaware that the Notes contained this forum selection clause, nor is there any evidence that ECIC was not aware of the plain meaning of this clause when it accepted assignment. In fact, GenTech and Essex were both aware of this clause prior to and when the Notes were issued. (Lovatt Decl. at ¶ 22). Moreover, GenTech communicated to Essex that GenTech was, at the time, a Florida Corporation, and Notes 2 through 8 all indicate that GenTech was a Florida corporation. (*Id*. at ¶23; *see also* Exhibits 2 through 8). As to the second factor, the wording of the forum selection clause plainly indicates that venue in Florida is mandatory. As to the third factor, all claims relating to Notes 2 through 8, as well as both parties (ECIC and GenTech) are subject to the forum selection clause by reason of ECIC entering into the eight Note Purchase Agreements and Assignment Agreements with Essex. (Exhibits 9 through 16).

Accordingly, GenTech's motion to dismiss all claims relating to Notes 2 through 8 should be granted if not already held void pursuant to 15 USC § 78cc(b).

## <u>CONCLUSION</u>

The Court should grant GenTech's Cross-Motion and deny ECIC's Motion.


Dated this 10th day of December, 2021

Respectfully submitted,

_____
Edward Paltzik, Esq.
JOSHPE MOONEY PALTZIK LLP
1407 Broadway, Suite 4002
New York, NY 10018
Tel: 516-526-0341
Fax: 212-313-9478
epaltzik@jmpllp.com

*Attorneys for Defendant*
*Gentech Holdings, Inc.*